

MAR 18 PM 4:00

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

DOROTHY WADE, On Behalf of Herself and
All Others Similarly Situated,

                       Plaintiff,

    vs.

WELLPOINT, INC., ANGELA F. BRALY,
WAYNE DEVEYDT and LARRY C.
GLASSCOCK,

                      Defendants.

**1: 08-cv-0357-SEB-WTL**

Case No.

CLASS ACTION

JURY TRIAL DEMANDED

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff, by and through her attorneys, alleges the following upon personal knowledge as to herself and her acts. All other allegations are based upon the investigation of her counsel which has included, *inter alia*:

    (a)    review and analysis of filings made by WellPoint, Inc. ("WellPoint" or the "Company") with the Securities and Exchange Commission ("SEC");

    (b)    review and analysis of securities analysts' reports concerning WellPoint;

    (c)    review and analysis of press releases issued by WellPoint;

    (d)    review and analysis of WellPoint's January 23, 2008 Q4 2007 Earnings Conference Call and WellPoint's March 10, 2008 Conference Call; and

    (e)    review and analysis of media reports regarding WellPoint.

**SCANNED**

Further facts relating to the securities violations alleged herein are exclusively within the control of defendants.

## NATURE OF THE CASE

1.       This is a securities class action on behalf of all persons who purchased or acquired the common stock of defendant WellPoint between January 23, 2008 and March 10, 2008, inclusive (the "Class Period"). The claims asserted in the action arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act.

2.       During the Class Period, defendants made false and misleading statements and failed to disclose material facts concerning WellPoint's medical costs and medical enrollment levels. In addition, based on these false and misleading statements of current fact, defendants misled the market by issuing false and misleading earnings guidance.  As the direct result of defendants' wrongful actions, the common stock of WellPoint traded at artificially inflated prices throughout the Class Period.

3.       Unbeknownst to investors, during the Class Period, the Company was experiencing significant increases in its medical costs and adverse reserve developments in 2008 which would require increases to WellPoint's medical cost reserve, thereby increasing its medical costs.  In addition, WellPoint's membership growth was weighted more towards the less profitable self-funded products and enrollment in fully insured products was down.  This mix of enrollment, weighted toward WellPoint's less profitable products, was negatively affecting WellPoint's profitability during the Class Period and would continue to negatively impact profits throughout 2008.  As a result of these known facts at the beginning of the Class Period, defendants provided earnings guidance to the market which defendants knew WellPoint would not be able to achieve.

- 2 -

4.     When defendants disclosed the truth to the market on March 10, 2008, the price of WellPoint's common stock dropped 28.3% to close at $47.26, on volume of more than 54 million shares traded, many times the average daily trading volume for WellPoint common stock.

5.     As a result of the foregoing, the purchasers of the Company's common stock during the Class Period suffered substantial damages because the market price thereof was artificially inflated by defendants' misrepresentations and omissions during the Class Period. Accordingly, plaintiff seeks damages and other appropriate relief to compensate Class members for the losses caused by defendants' violations of the securities laws.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §1331, and 28 U.S.C. §1367.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) and (c). WellPoint maintains its executive offices in this District at 120 Monument Circle, Indianapolis, IN 46204. In addition, many of the acts and transactions giving rise to the violations of law alleged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

8.     In connection with the wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## THE PARTIES

9.     Plaintiff Dorothy Wade purchased WellPoint common stock at artificially inflated prices during the Class Period, as set forth in her certification attached hereto, and has been damaged thereby.

- 3 -

10.     Defendant WellPoint describes itself as the largest health benefits company in terms of commercial membership in the United States. The Company is an independent licensee of the Blue Cross and Blue Shield Association and serves its members as the Blue Cross licensee in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin. WellPoint's members fall principally into two categories: (a) "self-funded" policies that are managed by WellPoint on behalf of the members ("Self-Funded members"; "Self-Funded products"); and (b) fully insured products ("Fully-Insured members"; "Fully-Insured products"). Under self-funded products, WellPoint charges a fee for services, and the employer or plan sponsor reimburses WellPoint for all or most of the healthcare costs. For fully insured products, WellPoint charges a premium and assumes all or a portion of the healthcare risk. Self-funded products are less profitable for WellPoint than fully insured products. During the Class Period, WellPoint was registered with the SEC and filed annual, quarterly and other reports with the SEC.

11.     The Individual Defendants identified below served, at times relevant to the claims set forth herein, as senior officers and/or directors of WellPoint as follows (the "Individual Defendants"):

(a)     Defendant Angela F. Braly ("Braly") is, and has been since June 1, 2007, WellPoint's Chief Executive Officer and President and a member of the Company's Board of Directors. Prior to June 1, 2007, Braly served as WellPoint's executive vice president, general counsel and chief public affairs officer. Braly was a principal spokesperson on the Q4 2007 Earnings Conference Call and the March 10, 2008 Conference Call and in WellPoint's press releases and signed the Company's Form 10-K filed with the SEC on February 21, 2008.

(b)     Defendant Wayne DeVeydt ("DeVeydt") is, and has been since before the beginning of the Class Period, WellPoint's Executive Vice President and Chief Financial Officer.

- 4 -

DeVeydt has also had responsibility for investor relations and became chief of staff to the Office of the CEO in 2006. DeVeydt was a principal spokesperson on the Q4 2007 Earnings Conference Call and the March 10, 2008 Conference Call and signed the Company's Form 10-K filed with the SEC on February 21, 2008.

(c)     Defendant Larry C. Glasscock ("Glasscock") is, and has been since November 2005, Chairman of the Company's Board of Directors. Glasscock signed the Company's Form 10-K filed with the SEC on February 21, 2008 and sold $6.6 million worth of WellPoint stock during the Class Period at artificially inflated prices.

12.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, revenue recognition and reserve policies, operational trends, finances, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, recognition and reserve policies and financial

- 5 -

condition, as alleged herein. The Individual Defendants made the false and misleading statements, as alleged herein, and were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

14. As officers and/or directors and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate, complete and truthful information with respect to the Company's financial condition and performance, growth, operations, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful, complete and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the misrepresentations and misleading statements contained therein. Braly and

- 6 -

DeVeydt each signed the Company's SEC Form 2007 10-K, filed with the SEC on February 21, 2008, and the required certifications included therein.

16.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WellPoint common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding WellPoint's financial condition, business, present and future prospects, growth, operations and the intrinsic value of its common stock; (b) enabled defendant Glasscock and certain other Company insiders to sell their personally-held shares of WellPoint common stock for gross proceeds in excess of $7.3 million; and (c) caused plaintiff and other members of the Class to purchase WellPoint common stock at artificially inflated prices during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased or acquired WellPoint common stock between January 23, 2008 and March 10, 2008, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company and its subsidiaries and affiliates, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. As of February 21, 2008, WellPoint had more than 541.9 million shares of common stock outstanding. Throughout the Class Period, WellPoint's common stock was

- 7 -

actively traded on the NYSE under the ticker symbol "WLP." Record owners and other members of the Class may be identified from records maintained by WellPoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal laws that are complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the financial condition, business, operations, income, expenses and growth of WellPoint; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

23.     At all relevant times, the market for WellPoint common stock was an efficient market for the following reasons, among others:

(a)     WellPoint common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, WellPoint filed periodic public reports with the SEC and the NYSE;

(c)     WellPoint regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)     WellPoint was followed by numerous securities analysts employed by major brokerage firms, banks and investment houses who participated in WellPoint's Q4 2007 Earnings Conference Call and March 10, 2008 Conference Call and who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

24.     As a result, the market for WellPoint common stock promptly digested current information regarding WellPoint from all publicly available sources and reflected such information in WellPoint's stock price.  Under these circumstances, all purchasers of WellPoint common stock during the Class Period suffered similar injury through their purchase of WellPoint's common stock at artificially inflated prices and a presumption of reliance applies.  Further, plaintiff is entitled to, and will rely on, the presumption of reliance doctrine based on the material omissions alleged herein.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

25.     The Class Period begins on January 23, 2008. On that date, the Company issued a press release announcing its Q4 and full year 2007 results.  Defendant DeVeydt is quoted in the press release stating that "[w]e remain confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3 percent."  In discussing membership, the press release stated that approximately 144,000 members from Connecticut's Medicaid managed care programs had been converted in Q4 2007 from fully insured to self-funded contractual arrangements.  Defendants stated that these 144,000 members were currently being serviced under a self-funded arrangement set to expire on February 29, 2008.  Under the heading "OUTLOOK," defendants stated, among other things, that WellPoint continues to expect net income of $6.41 per share, expects medical enrollment to reach approximately 35.6 million members, representing growth for the year of approximately 800,000 members, and expects the benefit expense ratio to be approximately 81.6 percent.

26.     Also on January 23, 2008, WellPoint held its Q4 2007 Earnings Conference Call during which defendants Braly and DeVeydt were the principal spokespersons for WellPoint. Numerous analysts joined the conference call, including analysts from Goldman Sachs, JP Morgan, Citigroup and Oppenheimer & Co. On the conference call, defendant Braly stated that WellPoint was "maintaining our $6.41 earnings per share" guidance for 2008 and that "reduced membership" experienced in 2007 had virtually no impact on WellPoint's earnings per share.  DeVeydt reiterated the statements made by Braly on the conference call.  While acknowledging that WellPoint had experienced a rise in medical costs in Q4 2007, DeVeydt was quick to assure the market that:

- "[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008";

- "our 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results";

- "we continue to expect our 2008 medical cost trend to also be less than 8%";

- "medical enrollment is now expected to approximate 35.6 million members with fully insured membership now expected to be 17.1 million and self-funded membership expected to be 18.5 million"; and

- "operating revenue is now expected to total approximately $62.6 billion."

27.     On the Q4 2007 Earnings Conference Call, defendants provided detailed information concerning WellPoint's 2007 results and the impact on WellPoint's 2008 results, both on a year-end basis and a quarterly basis. Defendants also answered very specific questions directed to them by the attending analysts and made a series of additional false and misleading statements in those answers.

28.     On the conference call, several of the Wall Street analysts asked questions of management. The analyst from Morgan Stanley raised the issue of the relationship between WellPoint's medical costs, product pricing and profit margins, asking what the impact on 2008 profitability would be where WellPoint had actually lowered its pricing of products entering 2008 and following the higher medical costs in 2007 that WellPoint had experienced which required it to increase its reserves for medical costs at year-end 2007. Defendant DeVeydt responded by saying that he was "not worried about '08, but your point is dead on for '07." DeVeydt added that "I still feel very confident in our pricing and our renewals."

29.     When questioned by the analyst from UBS about the adequacy of the reserves for medical costs, defendant DeVeydt responded by saying, in pertinent part, that "we've met with the actuaries . . . and . . . we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall short."

- 11 -

30.     The analyst from Citigroup asked at what point in 2007 WellPoint knew that fourth quarter 2006 medical costs had increased beyond the levels that WellPoint had reserved for. DeVeydt responded that "by basically mid February [2007], we had pretty good visibility that we were starting to develop less favorably."

31.     The analyst from Deutsche Bank asked whether WellPoint had factored the slowing economy and its impact on medical cost trends into its 2008 guidance. DeVeydt responded, saying that "we have backed into our guidance an assumption for a slowdown and specifically, we were very specific about it relative to the National Account business that we had expected. Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good."

32.     Braly ended the Q4 Earnings Conference Call stating that "we had a productive year in 2007 and we're off to a good start for 2008."

33.     On February 21, 2008, the Individual Defendants signed and filed with the SEC WellPoint's 2007 Form 10-K. In the MD&A, at pages 40-41, defendants highlighted the importance of "profitable enrollment growth" in achieving 15% growth in earnings per share, and stated their belief that WellPoint's geographic diversity reduced the impact of economic pressures on WellPoint's earnings and provided WellPoint with "increased opportunities for growth." Defendants also stated, at page 63, that they continually monitor and adjust claims liability and benefit expense based on subsequent paid claims activity and that because WellPoint's business is "primarily short tailed," page 66, incurred claims are quick to show up and, therefore, defendants can quickly assess and adjust the adequacy of the Company's reserves for medical costs. At no place in the 2007 Form 10-K did defendants correct any of their false and misleading statements they had made, as alleged in paragraphs 25, 26 and 28-32, or disclose that WellPoint had experienced in 2008, to date, a significant rise in medical costs, an unprofitable shift in new enrollment to Self-Funded members,

and had priced its 2008 products at less profitable levels, and that as a result of these adverse material facts, the guidance that defendants had given the market on January 23, 2008 was no longer viable.

34. The statements referenced above in paragraphs 25, 26 and 28-33 were materially false and misleading because defendants knew, but failed to disclose, or recklessly disregarded, at the time they made their statements that:

(a) WellPoint was experiencing a significant increase in medical costs commencing January 1, 2008 to the extent that defendants had no basis in fact which supported their earnings guidance or their benefit expense ratio guidance. In fact, defendants knew that earnings for Q1 2008 would likely be in the range of $1.16 to $1.26 per share, rather than the $1.44 per share defendants told the market on January 23, 2008. Defendants knew of the significant rise in medical costs on a real-time basis in 2008, in part, as Q4 2007 medical claims came in for processing and payment. For example, commencing January 1, 2008, defendants experienced a significant rise in oncology and other medical claims. Defendants also admitted on the March 10, 2008 Conference Call, that they knew, at the outset of 2008, that WellPoint's claims cycle time (the time between date of service and date of claim payment) had slowed considerably. Thus, defendants knew on January 23, 2008, that there were a significant number of claims from Q4 2007, and earlier, that had been incurred but had not yet been paid. Defendants did not factor these claims into their calculation of medical costs for 2008. Thus, defendants, despite their statements to the contrary on January 23, 2008, had not properly factored in the actual medical costs and trends in medical costs that WellPoint had been and was experiencing, including costs in WellPoint's senior medical advantage and commercial businesses. Indeed, as Braly and DeVeydt admitted in the March 10, 2008 Conference Call, there were existing adverse trends that they did not factor into their January 23, 2008 guidance;

(b)      WellPoint's reserves for medical costs were understated, in part, because, the claims incurred in 2007 were significantly higher than the reserves established at December 31, 2007, for those claims and WellPoint would be required at the beginning of 2008 to add $175 million to the reserve, $125 million of which would negatively impact WellPoint's profitability.   Defendants knew that WellPoint's medical cost reserves were understated at January 23, 2008, as admitted by defendants on the March 10, 2008 Conference Call, in part because defendants knew, as alleged in subparagraph (a) above, that there were incurred medical costs which had not been paid and defendants did not factor those costs into their reserve calculations;

(c)      WellPoint's enrollment growth was heavily weighted toward self-funded products and members which were substantially less profitable for WellPoint. At January 1, 2008, defendants knew that the Connecticut membership would be operating under self-funded programs through February 29, 2008, at which time WellPoint would endeavor to renegotiate a contract on reasonable terms. As defendants later admitted on the March 10, 2008 Conference Call, "half of the reduction in membership guidance relates to the Connecticut medicaid ASO contract."  Thus, defendants not only knew that these Connecticut members would revert to less profitable "self-funded" status but that there was no assurance they would not lose these 144,000 members after February 29, 2008, thereby negatively affecting WellPoint's membership levels.  Defendants also knew, on a real time basis, that the large majority of new enrollees coming on board in 2008, at the time they became enrolled, were in Self-Funded programs.  Defendants further knew that WellPoint had experienced a 5.9% rise in Self-Funded members throughout 2007 and that there was no basis in fact for this trend to change in 2008, particularly in light of existing economic factors;

(d)      WellPoint was not achieving significant new enrollment of Fully-Insured members in 2008 and defendants knew this adverse material fact on a real time basis.  Defendants also knew that growth in Medicare Advantage was greatly slowed and that WellPoint was suffering

- 14 -

declines in enrollment in Small Group and Individual membership.  Defendants further knew that

WellPoint had experienced a decline in Fully-Insured members throughout 2007 and that there was

no basis in fact for this trend to change in 2008, particularly in light of existing economic factors.  In

fact, the failure to achieve any significant growth in Fully-Insured members in 2008, to date,

confirmed the 2007 trend in membership type.  This failure exacerbated the financial impact of the

growth in less profitable Self-Funded members and had an exponential adverse impact on

WellPoint's earnings throughout 2008; and

(e)     WellPoint was being adversely impacted by economic factors which were not

neutralized by WellPoint's geographic diversity and to an extent greater than defendants had

factored into their 2008 guidance.  At the outset of the Class Period, for example, defendants knew

that the Medi-Cal premium would be reduced as of July 1, 2008, and that because Medi-Cal was

WellPoint's largest State Sponsored market, with approximately 1.2 million members, the adverse

impact on WellPoint's profitability would be significant.

## THE TRUTH IS REVEALED

35.     In a surprising and sudden reversal, on March 10, 2008, after the close of the market,

defendants issued a press release entitled "WellPoint Revises 2008 Earnings Per Share Guidance,

admitting that "[f]or the first quarter of 2008, we are now expecting net income of $1.16 to $1.26 per

share assuming net realized investment gain of $0.06 per share as compared to our previous

guidance of $1.44 per share" and that "it now expects full year 2008 net income to be in the range

$5.76 to $6.01, assuming net realized investment gains of approximately $0.06 per share."  Thus,

WellPoint dropped its growth guidance from 15.3% to a range of 4% to 8%, and then only if it

achieved investment gains of $0.06 per share.  Defendants called a hastily scheduled conference call

with analysts for 5:30 p.m. on March 10, 2008.  In the press release, defendants attributed the sharp

decline in WellPoint's financial and business position to a rise in medical costs, insufficient medical

cost reserves, lower enrollment of Fully-Insured members and higher enrollment of Self-Insured members, caused, in part, by economic conditions. On the March 10, 2008, conference call, Braly, in admitting that they "missed some trends," in effect, admitted that the adverse trends driving down the growth in WellPoint's earnings per share, medical costs, reserve levels and new enrollment were in existence at the beginning of the Class Period on January 23, 2008 and continuing thereafter through the date of the signing and filing of WellPoint's Form 10-K.

36.     The market reacted very strongly to defendants' admissions, coming only six weeks after the Q4 2007 Earnings Conference Call. The price of WellPoint common stock dropped $18.66, on volume in excess of 54 million shares, to close at $47.26 per share on March 11, 2008, a decline of 28.3%. A Goldman Sachs analyst stated, as quoted in an Associated Press article dated March 11, 2008, at 9:07 p.m., that "WellPoint's problems reflect company-specific underwriting error, but also reflect industry-wide pricing pressures that are now combined with upward pressure on underlying medical cost trends."

37.     The market for WellPoint common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, WellPoint's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired WellPoint's common stock relying upon the integrity of the market price of WellPoint's common stock and market information relating to WellPoint, and have been damaged thereby.

38.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of WellPoint's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about WellPoint's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of WellPoint and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

40.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding WellPoint, their control over, and/or receipt and/or modification of WellPoint's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning WellPoint, participated in the fraudulent scheme alleged herein.

- 17 -

41.    In addition, during the Class Period, defendant Glasscock and certain other Company

insiders sold their personally-held shares of WellPoint common stock for gross proceeds in excess of

$7.3 million, as set forth in the chart below:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| BURKE | SHEILA | 2/15/2008 | 2,000 | $74.86 | $149,720 |
| | | | 2,000 | | $149,720 |
| | | | | | |
| GLASSCOCK | LARRY | 2/6/2008 | 26,113 | $78.94 | $2,061,360 |
| | | 2/6/2008 | 5,000 | $78.50 | $392,500 |
| | | 2/26/2008 | 8,000 | $74.17 | $593,360 |
| | | 2/26/2008 | 5,500 | $74.20 | $408,100 |
| | | 2/26/2008 | 3,900 | $74.30 | $289,770 |
| | | 2/26/2008 | 3,000 | $74.25 | $222,750 |
| | | 2/26/2008 | 2,500 | $74.22 | $185,550 |
| | | 2/26/2008 | 1,600 | $74.16 | $118,656 |
| | | 2/26/2008 | 1,500 | $74.19 | $111,285 |
| | | 2/26/2008 | 800 | $74.21 | $59,368 |
| | | 2/26/2008 | 400 | $74.26 | $29,704 |
| | | 2/26/2008 | 300 | $74.23 | $22,269 |
| | | 2/26/2008 | 200 | $74.27 | $14,854 |
| | | 2/26/2008 | 100 | $74.24 | $7,424 |
| | | 2/26/2008 | 100 | $74.29 | $7,429 |
| | | 2/26/2008 | 100 | $74.31 | $7,431 |
| | | 2/27/2008 | 10,000 | $73.88 | $738,800 |
| | | 2/27/2008 | 4,800 | $73.90 | $354,720 |
| | | 2/27/2008 | 4,200 | $74.00 | $310,800 |
| | | 2/27/2008 | 3,200 | $73.94 | $236,608 |
| | | 2/27/2008 | 1,500 | $73.92 | $110,880 |
| | | 2/27/2008 | 1,100 | $73.98 | $81,378 |
| | | 2/27/2008 | 800 | $73.91 | $59,128 |
| | | 2/27/2008 | 800 | $73.97 | $59,176 |
| | | 2/27/2008 | 500 | $73.96 | $36,980 |
| | | 2/27/2008 | 300 | $74.04 | $22,212 |
| | | 2/27/2008 | 200 | $73.95 | $14,790 |
| | | 2/27/2008 | 200 | $73.99 | $14,798 |
| | | 2/27/2008 | 200 | $74.01 | $14,802 |
| | | 2/27/2008 | 200 | $74.03 | $14,806 |
| | | | 87,113 | | $6,601,688 |
| | | | | | |
| GOULET | KENNETH | 2/14/2008 | 4,700 | $74.06 | $348,082 |
| | | 2/14/2008 | 2,100 | $74.05 | $155,505 |
| | | 2/14/2008 | 700 | $74.07 | $51,849 |
| | | | 7,500 | | $555,436 |
| | | | | | |
| | | Total: | 96,613 | | $7,306,844 |

## Loss Causation/Economic Loss

42.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of WellPoint's common stock and operated as a fraud or deceit on Class Period purchasers of WellPoint's common stock by failing to disclose the increasing costs that the Company was facing and its poor enrollment, among other things. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of WellPoint's common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of WellPoint's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

43.     By failing to disclose the extent of the Company's increasing costs and its poor enrollment, among other things, defendants presented a misleading picture of WellPoint's business and prospects. Defendants' false and misleading statements had the intended effect and caused WellPoint's common stock to trade at artificially inflated levels throughout the Class Period.

44.     As a direct result of defendants' disclosures on March 10, 2008, the price of WellPoint common stock fell precipitously, falling 28.3%, to close at $47.26 per share. This decline removed the inflation from the price of WellPoint common stock, causing real economic loss to investors who had purchased WellPoint common stock during the Class Period.

45.     The 28.3% decline in the price of WellPoint common stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in WellPoint common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts

- 19 -

unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of WellPoint common stock and the subsequent significant decline in the value of WellPoint common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

46. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47. During the Class Period, WellPoint and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of WellPoint common stock; (c) enable defendant Glasscock and certain other Company insiders to sell their personally-held shares of WellPoint common stock for gross proceeds in excess of $7.3 million; and (d) cause plaintiff and other members of the Class to purchase WellPoint common stock at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

48. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for such stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

- 20 -

The Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

49.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, the defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01, *et seq.*) and Regulation S-K (17 C.F.R. Sections 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's common stock would be based on truthful, complete and accurate information.

50.     WellPoint and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, future prospects and financial condition, of WellPoint as alleged herein.  The defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of WellPoint's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about WellPoint and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of WellPoint common stock during the Class Period.

51.     Each of the Individual Defendants' primary liability and controlling person liability
arise from the following facts: (a) the Individual Defendants were high-level senior executives
and/or directors at the Company during the Class Period and members of the Company's
management team or had control thereof; (b) each of these defendants, by virtue of his
responsibilities and activities as a senior officer and/or director of the Company, was privy to and
participated in the creation, development and reporting of the Company's internal budgets, plans,
projections and/or reports; (c) each of these defendants enjoyed significant personal contact and
familiarity with the other defendants and was advised of and had access to other members of the
Company's management team, internal reports and other data and information about the Company's
finances and operations at all relevant times; and (d) each of these defendants was aware of the
Company's dissemination of information to the investing public which they knew, or recklessly
disregarded, was materially false and misleading.

52.     The defendants had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth in that they failed to
ascertain and to disclose such facts, even though such facts were available to them.     Such
defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for
the purpose and effect of concealing WellPoint's operating and financial condition and future
business prospects from the investing public and supporting the artificially inflated price of its
securities. As demonstrated by defendants' misstatements of the Company's financial statements,
business, operations and earnings throughout the Class Period, defendants, if they did not have actual
knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such
knowledge by deliberately refraining from taking those steps necessary to discover whether those
statements were false or misleading.

53.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of WellPoint common stock were artificially inflated during the Class Period. In ignorance of the fact that market prices of WellPoint's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired WellPoint's common stock during the Class Period at artificially high prices and were damaged thereby.

54.     At the time of said misrepresentations, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of WellPoint, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their WellPoint common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     The Individual Defendants acted as controlling persons of WellPoint within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and/or awareness of the Company's operations and/or intimate knowledge of the Company's finances, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, each of the Individual Defendants had direct and/or supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants culpably participated in the commission of the wrongs alleged herein.

60.     As alleged above, WellPoint and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as Lead Plaintiff and as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Granting such other and further relief as the Court may deem just and proper.

### DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: March 18, 2008                    COHEN & MALAD, LLP

                                         Scott D. Gilchrist

                                         Irwin B. Levin
                                         Richard E. Shevitz
                                         Scott D. Gilchrist
                                         One Indiana Square
                                         Suite 1400
                                         Indianapolis, Indiana  46204
                                         Telephone: 317/636-6481
                                         317/636-2593 (fax)
                                         ilevin@cohenandmalad.com
                                         rshevitz@cohenandmalad.com
                                         sgilchrist@cohenandmalad.com

- 25 -

Deborah R. Gross
LAW OFFICES BERNARD M. GROSS, P.C.
Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215-561-3600
215-561-3000

Samuel H. Rudman
David A. Rosenfeld
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

James Orman
LAW OFFICES OF JAMES ORMAN
1845 Walnut Street, 15th Floor
Philadelphia, PA  19103
Telephone:  215-523-7800
215-523-9290 (fax)

***Attorneys for Plaintiffs***

l:\Wellpoint\Pleadings\080317 COMPLAINT.doc

LAW OFFICES BERNARD M. GROSS, P.C.

## CERTIFICATION OF DOROTHY WADE

1.      I, Dorothy Wade, have reviewed the Complaint and have authorized the filing of same;

2.      I did not purchase the common stock of WellPoint, Inc. at the direction of plaintiff's counsel or in order to participate in any private action arising under this title of the federal securities laws;

3.      I am willing to serve as class representative and provide testimony at deposition and trial if necessary;

4.      During the period January 23, 2008 through March 10, 2008, my transactions in the common stock of WellPoint common stock consisted of the purchase of 10 shares on the open market at $76.04 per share, on 02/12/08.

5.      During the previous three years, I have not been a lead plaintiff in the any securities fraud class action.

6.      I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14ᵗʰ day of March , 2008, at Strafford     .(City/state)
                                                              PA

_Dorothy Wade_
(Signature/address)