# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOROTHY WADE, On Behalf of Herself and All Others Similarly Situated, | : : : | No. 1:08-cv-00357-SEB-DML |
| Plaintiff, | : : | <u>CLASS ACTION</u> |
| vs. | : : : | |
| WELLPOINT, INC., et al., | : : | |
| Defendants. | : : : | <u>JURY TRIAL DEMANDED</u> |

**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ...................................................................................1

    WellPoint's Operations Prior to and During the Class Period............................1

    Summary of Defendants' False and Misleading Class Period Statements and
        Market Impact ..........................................................................................5

JURISDICTION AND VENUE ...............................................................................11

THE PARTIES............................................................................................................11

CONFIDENTIAL WITNESSES ..............................................................................14

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE
    DURING THE CLASS PERIOD ........................................................................25

THE TRUTH IS REVEALED...................................................................................39

ADDITIONAL SCIENTER ALLEGATIONS .........................................................42

    Defendants' Knowledge of Facts Rendering Their Class Period Statements False .........43

    Insider Trading....................................................................................................47

LOSS CAUSATION/ECONOMIC LOSS ...............................................................49

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
    DOCTRINE ........................................................................................................51

APPLICABILITY OF SAFE HARBOR ..................................................................53

LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS .....................................53

COUNT I ...................................................................................................................55

COUNT II ..................................................................................................................58

PRAYER FOR RELIEF ............................................................................................59

DEMAND FOR A JURY TRIAL..............................................................................61

1.      This is a securities class action on behalf of all persons who purchased or acquired the common stock of defendant WellPoint, Inc. ("WellPoint" or the "Company") between January 23, 2008 and March 10, 2008, inclusive (the "Class Period").  The claims asserted arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and §20(a) of the Exchange Act.  WellPoint is a healthcare benefits company whose stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WLP."  Defendants are WellPoint, Angelea F. Braly ("Braly"), Wayne S. DeVeydt ("DeVeydt") and Larry C. Glasscock ("Glasscock").

## SUMMARY OF THE ACTION

**WellPoint's Operations Prior to and During the Class Period**

2.      WellPoint operates nationwide and offers a broad spectrum of network-based managed care plans to large and small employers, individuals and Medicaid and senior markets.  The Company is an independent licensee of the Blue Cross and Blue Shield Association and serves its members as a Blue Cross licensee in numerous states.  Through its subsidiaries, WellPoint is licensed to conduct insurance operations in all 50 states.  WellPoint's members fall principally into two categories: (a) "self-funded" members with policies that are managed by WellPoint on behalf of the members, whereby WellPoint does not retain financial risk associated with the member's health care costs ("Self-Funded members," "Self-Funded products" or "ASOs"); and (b) "fully insured" members who WellPoint indemnifies against costs of health benefits ("Fully-Insured members," or "Fully-Insured products").  The profit margin on Fully-Insured members greatly exceeds the profit margin on Self-Insured members.  According to defendants, as represented at a March 13, 2008, Bear, Stearns & Co. Inc. London Healthcare Conference, Fully-Insured members are approximately four to five times more profitable than Self-Funded members.

3.      WellPoint's profitability depends principally on its ability to price and sell its products at levels that exceed its health care costs.  One metric defendants, as well as analysts,

closely follow to track WellPoint's profitability is its benefit expense ratio. WellPoint's benefit expense ratio, also referred to as its medical loss ratio ("MLR") or medical cost ratio ("MCR"), is equal to the cost of medical services divided by the premium received from its services. The lower the benefit expense ratio, the more profitable the Company. In each reporting period, a significant portion of the benefit expense recognized by WellPoint consists of actuarial estimates of claims incurred but not yet reported or paid ("IBNR"). IBNR claims are medical claims that WellPoint anticipates will be incurred for medical services already rendered, but which are not quantifiable because those claims have not yet been processed by WellPoint. WellPoint's actuaries, based on historical claims data as well as actuarial assumptions of claims to be filed, calculate the dollar value of IBNR claims in order to forecast the Company's benefit expense ratio. The accuracy of the historical claims data is a critical component of the actuaries' calculations. As the projected claims materialize, adjustments are made and recorded in the period in which the need for such an adjustment arises. WellPoint maintains a level of financial reserves, based on its forecasted needs, to cover the variations in actual and estimated claims.

4.    As a result of its business model, WellPoint's operations depend largely on its ability to accurately predict and manage health care costs and pricing trends and set realistic reserve levels. To that effect, WellPoint maintains three actuarial departments: (i) Pricing Actuaries; (ii) Cost of Care Actuaries; and (iii) Reserve Actuaries. Pricing and Cost of Care Actuaries set forecasts based on a review of historical claims data and projected pricing and cost of care trends based on sales projections for future membership enrollment. Reserve Actuaries set reserves based on a review of historical claims data and projected IBNR claims through use of "lag studies."[1]

---

[1]    Lag studies are studies based on historical claims and other data used to show trends and patterns over a period of six months or longer. WellPoint's lag studies resulted in data showing its current claims plus claims that were estimated to be received over the following six months. The lag

5.      Historically, WellPoint expanded its business and membership base through strategic acquisitions.  With each acquisition, WellPoint inherited a separate data and claims processing system, most of which do not interface with WellPoint's own systems.  Prior to and during the Class Period, WellPoint had at least eight recently-acquired companies whose data and claims processing systems had not yet been integrated into WellPoint's information system.  Each of these companies had its own data warehouse, processes and procedures for data collection, storage, analysis and reporting, and each company analyzed trends, calculated projections and determined strategies using different financial and accounting processes.  As a result, the ways in which the newly acquired companies calculated product pricing and recorded payment transactions for medical claims varied greatly from company-to-company and from WellPoint's own systems and procedures.  In addition to its multiple data systems, WellPoint also employed a multitude of claims processing systems which, like the data systems, were not integrated and did not interface.  WellPoint had at least 13 to 14 different stand-alone claims processing systems in operation prior to and during the Class Period.  WellPoint's actuaries depended upon these systems, along with the multiple data warehouses, to calculate their estimates.  But, because the systems did not interface, performing actuarial analyses of company-wide data and calculating realistic reserves and forecasts proved extremely difficult.  Retrieving data from numerous systems frequently resulted in occurrences of data variances and duplication.  Absent system-wide integration of these numerous systems and processes, it was nearly impossible for WellPoint to consolidate the data from the various systems into accurate and reliable reports that were necessary as a basis for Company-wide forecasts by both actuaries and management.

_____

studies also showed what percentage of the estimated claims was supposed to be received within a given timeframe.

6.    To address this systemic deficiency, WellPoint sought to create and implement an integrated and centralized data depository, or Enterprise Data Warehouse ("EDW"), beginning mid-2007.  Shortly after its commencement, however, the EDW project encountered several substantial setbacks.  For example, during the same time that the EDW project was active, many of the recently-acquired companies continued to individually upgrade their financial processes and systems.  As a result, the new data being uploaded into the EDW systems did not match the format of the old data, in part, because the companies had implemented new algorithms used for the calculations.  By the start of the Class Period in January 2008, the EDW project was still in its infant stages.  Despite WellPoint's efforts to maintain and integrate these systems prior to and during the Class Period, the myriad systems continued to negatively impact WellPoint's ability to accurately predict medical costs and project reserves and its claims-related activities.

7.    The failure to integrate these numerous systems also negatively impacted WellPoint's ability to timely and accurately process current medical claims.  As a result, by January 2008, WellPoint was experiencing a significant increase in its medical claims backlog.  These problems continued throughout the Class Period and ultimately resulted, in part, in sanctions by the U.S. Centers for Medicare & Medicaid Services ("CMS") in January 2009.

8.    At the same time WellPoint was struggling with its systems migration, beginning late-2006/early-2007, WellPoint's medical claims cost trends deteriorated.  Aware of this problem in 3Q07, Chief Executive Officer ("CEO") Braly internally announced plans to reorganize WellPoint in an attempt to control the increasing cost of care, beginning in 2008.  However, because WellPoint did not have visibility into the Company's future medical costs due to its systems integration issues, it could not accurately forecast cost trends or set realistic reserves.

9.    Additionally, by the end of 2007, the country began experiencing an economic downturn.  As a result of the then-current economic conditions, WellPoint began experiencing a shift

in membership away from its more expensive and more profitable Fully-Insured products to its less expensive and less profitable Self-Funded products. The shift toward Self-Funded products had a negative effect on the Company's profits. WellPoint attempted to negate this adverse effect on its profits by initiating a series of rate increases in the periods leading up to 2008. This plan did not work. Instead, even more new and existing members elected to sign up for the Self-Funded plans, thereby exacerbating the adverse business mix shift.

**Summary of Defendants' False and Misleading
Class Period Statements and Market Impact**

10. On January 23, 2008, the start of the Class Period, WellPoint held its 4Q07 Earnings Conference Call announcing its earnings for 4Q07 and fiscal year 2007. On the call, defendants announced several disappointing results. First, WellPoint's benefit expense ratio had increased to 82.4% in 2007, compared to 81.2% in 2006. Defendants explained that this increase was attributable, in part, to inadequate reserves estimated at 3Q07 for 4Q07. According to defendants, at the end of 3Q07, the Company set its reserves too low for IBNR claims incurred in 3Q07 but reported in 4Q07. As a result, the Company was forced to book medical costs above forecasted levels in 4Q07 for services actually provided in 3Q07. This error was attributed to a claims systems migration which resulted in claims not being adjudicated and paid as quickly as they should have been. Further, defendants announced that, while total enrollment had increased, the mix of business had shifted in favor of less profitable products, from 51% Fully-Insured members and 49% Self-Funded members in 2006 to 49% Fully-Insured members and 51% Self-Funded members in 2007. Defendants downplayed this shift, attributing it in large part to a single, isolated transition of 144,000 members in their Connecticut Medicaid membership from Fully-Insured to Self-Funded membership.

11. Despite these disappointing results, defendants insisted that WellPoint would achieve 2008 guidance of: (a) $6.41 earnings per share ("EPS"), a 15.3% increase over 2007; (b) an increase

of 800,000 total new members; and (c) an 81.6% benefit expense ratio.  To support this guidance, defendants were quick to assure investors that "*[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008*."  Defendants also reassured the market as to the integrity of their 2008 forecasted medical reserves, stating that although the systems migration resulted in "a slowdown of certain claims processing" in 2007, defendants had "dedicated resources to address this issue and improved the timeliness of affected claims processing, . . . carefully evaluated our year-end reserves" and "*are confident that our reserving is consistent, conservative, and appropriate*."  Moreover, defendants declared that they had *completed* "*several system migrations*," and, as a result, "*got better transparency into the reserving*" and "*more transparency around some of the actual development*."  Although several analysts questioned defendants' aggressive guidance, particularly given WellPoint's disappointing 4Q07 results, defendants responded that they were "*very confident*" with their pricing forecasts, were "*ultraconservative on the reserve side*" and were "*not going to fall short*" of their guidance.

12.     Defendants had no reasonable basis for these forecasts when made.  At the same time defendants were reassuring the market that their system migration efforts were going "*flawless[ly]*," defendants knew, according to Confidential Witnesses ("CWs"), that the same system integration problems which had caused WellPoint to miss its 4Q07 forecasts continued to negatively affect the Company.  As of January 2008, WellPoint continued to operate on a myriad of different stand-alone systems, none of which inter-faced.  WellPoint's newly acquired companies continued to use separate financial and accounting processes and employed different methods for calculating product pricing and recording medical claims.  Although WellPoint sought to integrate its multiple systems with a centralized EDW, it had not yet been successful in doing so.  As a result, WellPoint's actuaries continued to retrieve data from various systems and data warehouses in different formats, which made analyzing company-wide data for reserves and pricing forecasts extremely difficult.

According to the CWs, WellPoint's actuaries could not derive reliable actuarial data from WellPoint's systems, were unable to develop appropriate lag studies and IBNR estimates and could not accurately forecast medical claims costs or reserves.

13.     As a result of these systems integration and actuarial issues, defendants lacked visibility into claims data and future medical costs and, therefore, were unable to accurately forecast the Company's benefit expense ratio and medical reserves.  Defendants' lack of visibility also hindered their ability to forecast price trends and accurately price WellPoint's products.  Moreover, defendants' efforts to remedy their system integration problems by migrating to a comprehensive claims system further hampered their ability to timely and accurately process claims and deteriorated the reliability of their forecasting data.  Indeed, defendants admitted, after the Class Period, that their system migration efforts negatively affected their ability to accurately forecast and process claims: "*During 2006 and then throughout 2007, we had some migration issues which caused a slow down in our claims processing, which has created some of our current pricing issues that we've incurred [in 1Q08]*."  Defendants also admitted that these efforts caused a lack of visibility: "*[The claims] are just not being recognized as quickly, which means that . . .we have less visibility to what our ultimate liability [will be]*."  This was exactly the opposite of what defendants told investors on January 23, 2008 – that "*our claims processing timeliness increased*" and "*we do have fewer claims processing systems . . . [and] better visibility*."

14.     Defendants also knew by January 2008 that WellPoint's inability to timely and accurately process medical claims was resulting in a significant backlog of claims.  For example, according to the CWs, weekly "stats" reports showed a noticeable increase in the claims backlog by January 2008, with a backlog in some departments in excess of two months.  In January 2008, WellPoint's Suspended Claims group identified a backlog of thousands of claims that had been denied in the late 2007 timeframe.  Moreover, by the start of the Class Period, WellPoint had

experienced an increase in returned claims that had been submitted to CMS for reimbursement due to computer and submission errors. As a result, WellPoint was forced to "write-off" over $1 million in late-2007/early-2008. The CWs confirmed that this issue was communicated directly to defendant DeVeydt.

16. Additionally, defendants knew, based, in part, on their recent experience in 4Q07, that their inability to accurately forecast medical claims resulted in their understating 2008 medical cost reserves. Defendants even admitted on March 10, 2008, that, at the time they gave guidance on January 23, 2008, the cost of existing IBNR claims had not been factored into their 2008 medical reserve calculations. Defendants internally discussed what effect these same forecasting problems experienced in 4Q07 would have on the Company going forward. In an attempt to remedy the problem, defendant Braly sought during the Class Period to extend the Company's forecast out from six months to at least 11 months in order to help clarify the forecasting process and avoid future misses. Braly's new forecast, however, was not completed until February 22, 2008, after defendants already knew that WellPoint would not meet its 2008 guidance.

16. To make matters worse, defendants also knew when they made these statements in January 2008 that WellPoint's claims cost trends were increasingly adverse. Defendant Braly acknowledged this problem internally in 3Q07 and announced a new reorganization strategy to help control the increasing cost of care, effective 2008. The Company's lack of visibility into claims data and price trends, however, hindered its ability to set realistic reserves and accurately price its products to combat this adverse trend.

17. Moreover, as a result of the nation-wide economic downturn, WellPoint's membership growth was decreasing and shifting toward less profitable Self-Funded products. Defendants knew at the start of the Class Period, based on WellPoint's open enrollment period for 2008 (*i.e.*, October to December 2007), that WellPoint was not securing the number of projected

enrollments. Thus, defendants knew by December 2007, but failed to disclose, that this adverse trend would continue to negatively impact the Company's profits in 2008.

18.     Defendants knew during the Class Period that WellPoint could not achieve its 2008 guidance and, in fact, admitted as much. During a WellPoint Managers meeting attended by defendants in mid-February 2008, defendant Braly told attendees that they would hear rumors about "issues" that WellPoint was going to announce to the public.

19.     Then, on March 10, 2008, just six weeks after reassuring investors that the systems integration problems experienced in 4Q07 had been remedied, defendants admitted that these same system integration problems were continuing to adversely impact the Company. Defendants disclosed that WellPoint continued to experience a slowdown in claims cycle time and lacked visibility into forecasting data and, as a result, their "*original trend assumptions for 2008 were understated*." Moreover, directly contradicting their Class Period assurances, defendants admitted for the first time that the "*weakening economic environment [was] impacting membership*." As a result, defendants lowered WellPoint's 2008 EPS guidance from $6.41 to a range of $5.76 to $6.01, a decrease in expected growth from 15.3% to a range of 4% to 8%. Defendants also increased their benefit expense ratio guidance from 81.6% to a range of 82.8% to 83.1%. Defendants further disclosed that "*enrollment in fully-insured products was below expectation*" and "*we are not doing as well as we had expected*," and lowered enrollment guidance by 300,000 new members. Notably, WellPoint's Chief Accounting Officer ("CAO") and Controller, Jamie S. Miller ("Miller"), announced her resignation the next day.

20.     Significantly, only weeks before disclosing these adverse facts to the public, defendant Glasscock, along with other WellPoint insiders, quickly unloaded large blocks of WellPoint stock. All told, WellPoint insiders reaped over $7.3 million from their perfectly-timed sales. Glasscock alone pocketed over $6.6 million. Notably, the majority of these sales occurred

- 9 -

*after* defendants internally disclosed at the mid-February 2008 Managers meeting that the Company would be publicly announcing negative results, but *before* investors were similarly made privy to any such material information. These fortuitously-timed stock sales further demonstrate defendants' knowledge that their fiscal year 2008 guidance was baseless, that WellPoint's systems integration problems continued to hamper the Company's operations and that the truth about the foregoing, once known to the market, would batter the Company's stock price.

21.     While WellPoint insiders made off handsomely by selling millions of dollars of WellPoint stock while the Company's share price was still artificially inflated, defendants' public announcement of their revised 2008 guidance and concomitant disclosure of the Company's continuing and severe systemic problems badly damaged investors. As a result of their March 10, 2008 disclosures, which stunned the market, WellPoint's stock price collapsed by $18.66, a decline of 28.3%, wiping out over $1 billion in market capitalization in just one day. Defendants are liable for the damage that their false and misleading statements and omissions during the Class Period caused to class members.

22.     In light of defendants' knowledge or reckless disregard of WellPoint's claims processing problems, ongoing systems integration problems, actuarial forecasting problems and the adverse trends WellPoint was experiencing in enrollment, medical costs and medical reserve levels (which are detailed below), defendants made statements, particularized below, that they knew or recklessly disregarded, were false and misleading at the time they made them. In addition, defendants misled the market by issuing false and misleading earnings guidance, which, based on their knowledge of then-current facts, defendants knew could not be achieved by WellPoint.

23.     As a result of the foregoing, the purchasers of the Company's common stock during the Class Period suffered substantial damages because the market price thereof was artificially inflated by defendants' misrepresentations and omissions during the Class Period. Accordingly,

Lead Plaintiff seeks damages and other appropriate relief to compensate class members for the losses caused by defendants' violations of the securities laws.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1367.

25.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b)-(c).  WellPoint maintains its executive offices in this District at 120 Monument Circle, Indianapolis, Indiana 46204.  In addition, many of the acts and transactions giving rise to the violations of law alleged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

26.     In connection with the wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

## THE PARTIES

27.     Lead Plaintiff Dorothy Wade purchased WellPoint common stock at artificially inflated prices during the Class Period, as set forth in her certification previously filed with the Court.

28.     Defendant WellPoint describes itself as the largest health benefits company in terms of commercial membership in the United States and serves its members as the Blue Cross licensee in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin.  During the Class Period, WellPoint was registered with the Securities and Exchange Commission ("SEC") and filed annual, quarterly and other reports with the SEC.

29.     The defendants identified below served, at times relevant to the claims set forth herein, as senior officers and/or directors of WellPoint as follows (the "Individual Defendants"):

(a)     Defendant Braly is, and has been since June 1, 2007, WellPoint's CEO and President and a member of the Company's Board of Directors.  Prior to June 1, 2007, Braly served as WellPoint's executive vice president, general counsel and chief public affairs officer.  Braly was a principal spokesperson on the 4Q07 Earnings Conference Call, the March 10, 2008 Conference Call and in WellPoint's press releases, and signed the Company's Form 10-K filed with the SEC on February 21, 2008.

(b)     Defendant DeVeydt is, and has been since before the beginning of the Class Period, WellPoint's Executive Vice President and Chief Financial Officer ("CFO").  DeVeydt has also had responsibility for investor relations and became chief of staff to the Office of the CEO in 2006.  DeVeydt was a principal spokesperson on the 4Q07 Earnings Conference Call and the March 10, 2008 Conference Call, and signed the Company's Form 10-K filed with the SEC on February 21, 2008.

(c)     Defendant Glasscock is, and has been since November 2005, Chairman of the Company's Board of Directors.  Until June 2007, Glasscock was WellPoint's CEO.  Glasscock signed the Company's Form 10-K filed with the SEC on February 21, 2008 and sold $6.6 million worth of WellPoint stock during the Class Period at artificially inflated prices.

30.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, revenue recognition and reserve policies, operational trends, finances, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings

and committees thereof and via reports and other information provided to them in connection therewith.

31.    Each of the Individual Defendants, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, recognition and reserve policies and financial condition, as alleged herein.  The Individual Defendants made the false and misleading statements, as alleged herein, and were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

32.    As officers and/or directors and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC, traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate, complete and truthful information with respect to the Company's financial condition and performance, growth, operations, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful, complete and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

33.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC

- 13 -

filings, press releases and other public statements pertaining to the Company during the Class Period. Each individual defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the misrepresentations and misleading statements contained therein. Braly, DeVeydt and Glasscock each signed the Company's SEC Form 2007 10-K, filed with the SEC on February 21, 2008, and Braly and DeVeydt signed the required certifications included therein.

34.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WellPoint common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding WellPoint's financial condition, business, present and future prospects, growth, operations and the intrinsic value of its common stock; (b) enabled defendant Glasscock and certain other Company insiders to sell their personally-held shares of WellPoint common stock for gross proceeds in excess of $7.3 million; and (c) caused Lead Plaintiff and other members of the class to purchase WellPoint common stock at artificially inflated prices during the Class Period.

**CONFIDENTIAL WITNESSES**

35.    Lead Plaintiff's allegations concerning the falsity of defendants' statements and their scienter, particularized herein, are based upon, in part, information obtained from numerous former WellPoint employees. Each of the CWs held a position with WellPoint that permitted him or her direct access to the information he or she provided.

36.    CW1 was a Senior Finance Manager at WellPoint for approximately seven years until 2007, whose responsibilities included budgeting, performing financial analyses and managing a team

of accountants. Based on this position, CW1 had significant knowledge of WellPoint's forecasting and budgeting process. According to CW1, the Finance and Accounting personnel prepared forecasts and budgets based on historical data and input from the actuaries, and submitted the forecasts to the accountants at the corporate facility. A significant portion of the forecasts involved reserves based on actuarial "lag studies." The lag studies were created by WellPoint actuaries by evaluating historical claims data over a six month or longer period and were used to calculate the estimated number of IBNR claims and the percentage of the IBNR claims that would be received within stated periods of time. Based on the witness' position, CW1 also had knowledge of the increasingly adverse claims cost trends beginning in late-2006/early-2007.

37.     CW2 was a Manager of Operations at Unicare, a WellPoint subsidiary, from approximately January 1998 until January 2008. Based on this position, the witness had knowledge of WellPoint's use of multiple claims processing systems during the Class Period. According to CW2, each time WellPoint acquired a company, the acquired entity continued to operate on the existing systems it had at the time of the acquisition, as opposed to migrating claims processing systems and other information systems onto the WellPoint platform of systems. As a result, according to CW2, there were myriad systems in use during the witness' tenure, which made the amalgamation of data across entities difficult. CW2 also had knowledge of WellPoint's ongoing efforts to merge its claims processing systems throughout the Company onto an integrated system.

38.     CW3 was an Actuarial Analyst for Cost of Care in California for WellPoint's Blue Cross of California plan from August 2005 through September 2007, whose primary responsibility was analyzing medical cost trends. The witness reported to the Director of Cost of Care for the West Coast, who reported to the Senior Vice President. Based on this position, CW3 had extensive knowledge of WellPoint's actuarial process. According to CW3, WellPoint's actuarial department was divided into three parts: Pricing; Cost of Care; and Reserving. The Pricing group worked with

the underwriting and sales departments on medical pricing trends, the Cost of Care group reported trends directly to corporate and analyzed renewal business and existing business and the Reserving group calculated various reserves needed to be taken by the Company.  The witness also had knowledge of and worked directly on WellPoint's quarterly Corporate Trend Report, a medical pricing forecast based on existing pricing which was submitted to WellPoint's corporate headquarters as a basis for Company forecasts.

39.    CW4 was a Claims Correspondent Agent at WellPoint from December 2006 until September 2008, whose responsibilities included entering medical claims information into the Company's computer system and preparing the claims for processing.  Based on this position, the witness had knowledge of the backlog of unprocessed claims during the Class Period.  According to CW4, the witness' department was more than two months behind in processing claims during the Class Period and, at the time of the witness' departure from WellPoint in September 2008, the witness' department was just finishing processing the medical claims received in July 2008.

40.    CW5 was employed at WellPoint in Indianapolis on WellPoint's Eli Lilly corporate account from 2002 until May 2008.  The witness' responsibilities included administering health care benefits for Eli Lilly personnel, handling inbound and outbound calls and dealing with other claims-related issues.  Based on this position, CW5 had knowledge of WellPoint's claims backlog during the Class Period.  According to CW5, beginning in early 2008, there was a marked increase in the volume of claims pending processing.  The backlog in claims inventory was reported on "stats" reports that were circulated at weekly Friday meetings attended by Customer Services personnel, Claims Processing team members and Claims Processing Managers.  CW5 understood that this backlog was tracked because in October 2007, WellPoint, due to the large volume of unprocessed claims  inventory in WellPoint's Commercial business, had agreed to pay providers a 15% penalty on claims that were processed more than 45 days after receipt.

- 16 -

41.    CW6 was employed at WellPoint from 2004 until July 2008. The witness' last position at WellPoint was Director of Strategy and Planning in WellPoint's Information Technology ("IT") Department.  Based on this position, CW6 had knowledge of WellPoint's utilization of different data systems throughout the Company and the actuaries inability to access the data they needed in order to calculate their projections during the Class Period.  According to CW6, WellPoint had 14 different stand-alone systems and four data warehouses that were not integrated during the Class Period, which were used by the actuaries to calculate their estimates.  Because the actuaries were unable to access all the data they needed in order to calculate their projections, WellPoint decided to consolidate the 14 systems into one Enterprise Resource Planning ("ERP") platform.  The witness' department began planning activities for the systems integration project in August/September 2006.  However, because WellPoint's IT infrastructure was old and could not support the new technology required for the implementation of the new ERP platform, WellPoint needed to spend significant amounts of money to first upgrade its IT infrastructure before the ERP integration could be implemented.  CW6 was aware of ERP project details through the witness' supervisor, who was responsible for heading the project.  According to CW6, integration of the Company's warehouse data systems was initiated around the same time, and both that project and the ERP project had not been completed by the time the witness left WellPoint in July 2008.

42.    CW7 was employed at WellPoint on a contract basis from July 2007 through November 2007 as Project Director for the development and implementation of an EDW.  Based on this position, the witness had significant knowledge of WellPoint's system integration issues.  According to CW7, when the witness came onboard, WellPoint had at least eight recently-acquired companies that were not integrated into WellPoint's information system, each with its own data warehouse, processes and procedures for data collection, storage, analysis and reporting.  The witness had knowledge that use of these multiple systems made it nearly impossible for the

Company to consolidate the data from various systems into accurate and reliable reports for use in forecasting. According to CW7, WellPoint had decided to implement the EDW project to remedy these problems. The witness also had knowledge of monthly project reviews held by the Executive Vice President of Integration and Chief Actuarial Officer and weekly meetings with the Company's Vice President, also attended by the Chief Information Officer.

43.     CW8 was employed at WellPoint as an Actuary for the Company's Blue Cross of California plan from July 2005 through January 2008. The witness' responsibilities included reviewing historical claims data, projecting IBNR claims and setting reserves based on a review of historical and projected claims inventory. Based on this position, CW8 had significant knowledge of WellPoint's processes for setting reserves and forecasts. The witness also had knowledge of WellPoint's business mix shift from Fully-Insured products to Self-Funded products during the Class Period.

44.     CW9 was a Director of Corporate Finance at WellPoint from approximately November 2006 through April 2008. The witness was responsible for budgeting, forecasting and preparing variance reports comparing forecasted to actual results for various functional departments within WellPoint, including the Actuarial, Strategy and Legal divisions. CW9 worked directly with defendant Braly. Based on this position, the witness had knowledge of: (1) Braly's attempt to control costs through a reorganization effective in 2008; (2) Braly's Executive Leadership Team ("ELT") and its quarterly meetings at the corporate office; (3) Braly's monitoring of the Company's financial condition, including comparisons of forecasts to actual financial results; (4) Braly's response to WellPoint's 4Q07 earnings miss by creating a new 11-month forecasting process to replace the "six plus six" budgeting process currently at use (whereby six months of actual financial results were tracked in comparison to six months of budgeted numbers); and (5) reports and updates received by Braly, including year-to-date "snapshots" of financial results of operations and details

about the performance of each business unit.  Additionally, based on this position, CW9 had extensive knowledge of the problems stemming from WellPoint's multiple non-integrated claims processing systems.  According to CW9, because these numerous systems did not interface, performing actuarial analyses of company-wide claims data and calculating valid reserves was extremely difficult.  Specifically, the witness noted that the actuaries could not derive reliable actuarial data from the system for use in establishing reserves and, therefore, such reserves did not include IBNR claims.  CW9 also had knowledge of the Company's efforts to implement a single claims processing system throughout the Company to remedy these forecasting problems, but as of April 2008, when the witness left WellPoint, the project to unify claims processing at WellPoint was at least three years behind schedule.

45.    CW10 was a Suspended Adjustment Unit Claims Processor III at WellPoint for 23 years until May 2008.  The witness' last title was Senior Claims Processor in the National Government Services Suspended group and his/her duties included adjudicating claims that had been designated "suspended."  This function included claims from New Jersey, New York, Indiana and Kentucky which were sent to Indiana for processing.  The witness was assigned to the Suspended Claims group in Indiana in September 2006.  Based on this position, CW10 had knowledge of the dramatic increase in WellPoint's suspended claims inventory during the Class Period.  According to CW10, WellPoint's Business System Operations group began identifying batches of claims that had been denied in the late 2007 timeframe, and thousands of claims were wrongly denied and sent to the Suspended Claims group in increasing numbers beginning in December 2007/January 2008.  CW10 had further knowledge that all suspended claims that were processed by the Suspended Claims group were recorded and tracked electronically in the Multi-Carrier System, in addition to being noted in a hard copy log.

46.     CW11 was an Executive Assistant  at WellPoint from February 2007 until October 2008 at WellPoint's Blue Cross Blue Shield subsidiary in North Haven, Connecticut.  The witness, throughout the entire period of employment, was the Executive Assistant to the Vice President of Strategy and Planning, who reported to Chief Operations Officer ("COO") Mark Boxer ("Boxer"). Boxer, in turn, reported to defendant Glasscock and, subsequently, to defendant Braly.   Because of his/her position, the witness had knowledge of the Company's ELT which consisted exclusively of WellPoint's senior-level Vice Presidents and executive officers, including defendant Braly's direct reports.  According to CW11, the ELT had quarterly conference calls, called "quad calls," which usually took place a few days before the Company's announcement of its quarterly earnings.

47.     CW12 was an Senior Actuarial Analyst at WellPoint from March 2004 through October 2006 in the Network Analysis & Strategy Group, which was overseen by a Staff Vice President, within WellPoint's Corporate Actuarial Department.  The group performed actuarial analyses and generated actuarial forecasts (which were referred to as reports), for the entire Company regarding various aspects of the Company's operations, including membership growth, medical costs, benefit structure and reimbursement standards.  Once the group created a forecast, or report, WellPoint's Reserves team would calculate the required reserves based on the forecast. Throughout the witness' employment with WellPoint, the witness was responsible for data collection, analysis and "manipulation," which resulted in the generation of quarterly, semi-annual and annual Actuarial Reports.  The witness also was responsible for analyzing the Company's computer systems and forecasting models and submitting proposals to senior-level management in the Actuarial Department regarding necessary improvements to the computer systems and forecasting models.  Based on this position, CW12 had extensive knowledge of WellPoint's actuarial process and the problems caused by WellPoint's myriad non-integrated systems.  According to CW12, following each acquisition, WellPoint would inherit a separate, non-integrated computer

system. Each system was on a different platform and, therefore, the systems could not interface with each other. According to CW12, actuaries were unable to retrieve data from the numerous systems in a timely and accurate manner and, therefore, could not create accurate Actuarial Reports. CW12 also had knowledge of WellPoint's attempt to remedy its actuarial process and reporting quality by implementing an EDW. However, the witness understood that the EDW project had not been completed by the time the witness left in 2006. CW12 also knew, from conversations with his/her supervisor, that the CEO of the Company reviewed and influenced the Actuarial Reports. This witness, although having left WellPoint's employ prior to the beginning of the Class Period, provided information concerning the actuarial process at WellPoint, which, according to other witnesses described herein in ¶¶36, 38, 41, 43, 44, and 48 continued to exist at WellPoint during the Class Period and which tainted the actual process used to set the medical reserves which are the subject of this action and the defendants' misstatements as alleged herein.

48.    CW13 was an Actuarial Director of Cost of Care at WellPoint from August 1991 until July 2008, whose actuarial responsibilities included gathering and evaluating data related to the cost of healthcare. Based on this position, CW13 had extensive knowledge of WellPoint's actuarial processes. CW13 explained that the actuaries would retrieve data from WellPoint's various data warehouses and put the data through various financial models and forecast various trends. The actuaries would repeat this process monthly, constantly monitoring and revising the data, and Actuarial Reports were then gathered from each group and consolidated at the local, regional and national levels. CW13 also had knowledge of defendants' review of the actuaries' forecasted data during the Class Period. According to CW13, in December 2007, when the Company's management reviewed the readjusted forecasted data based on the available current data through November 2007, the management "realized" that the claims were higher then they originally forecasted. Moreover, CW13 knew, through communications with the Company's Chief Actuary following defendants'

March 10, 2008 disclosures, that WellPoint's 1Q08 guidance revision was caused by the Company's inability to timely obtain information regarding medical claims and set accurate reserves.

49.      CW14 was a Program Director in the Senior Business unit at WellPoint from May 2006 until June 2008.  CW14 reported to a Regional Vice President of Facilitated Enrollment, who reported to the Vice President and General Manager of National Medicare Part D, who in turn reported to President of Senior Services.  In this position, the witness managed WellPoint's Point of Sales Facilitated Enrollment ("POS FE") program, which was part of WellPoint's overall Medicare Part D program, and managed a cross-functional program team of approximately 15 to 20 employees at any given time.  CW14 also maintained a master spreadsheet of WellPoint's pharmacy claims related to the POS FE program, which the witness manually updated every morning with the pharmacy claims processed during the previous day.  The spreadsheet contained the total number of eligible claims and rejected claims.  At the end of each month, CW14 submitted the master spreadsheet to WellPoint's Accounting Department, which then submitted the data to CMS for reimbursement.  CW14 was also involved in CMS audits of WellPoint during the Class Period.  Based on this position, CW14 had knowledge of the increasing backlog of unreimbursed POS FE claims that were returned to WellPoint from CMS during the Class Period.  At the end of 2007, an Accounting employee brought to CW14's attention that the total number of Prescription Drug Events ("PDEs") submitted to the CMS to date and the total reimbursement amount associated with the PDEs did not match, resulting in a write-off of $3 to $4 million in late-2007/early-2008.  According to CW14, this issue was communicated directly to defendant DeVeydt.  CW14 was also aware of WellPoint's ongoing struggle to integrate its multiple computer systems during the Class Period.

50.      CW15 was a Director of Compliance for Senior Business/Medicare Part D at WellPoint from October 2000 until June 2008.  The witness was responsible for ensuring that the Medicare Part D plans were managed according to federal and state regulations.  CW15 had five

employees working under his/her direct supervision. CW15 also conducted on-going audits and reviews of WellPoint's Medicare Part D business compliance with CMS regulations. In doing so, the witness frequently reviewed the "up-time" and "down-time" of WellPoint's claims processing systems to ensure that claims were processed in a timely fashion. The witness was also responsible for evaluating various computer system errors, in order to ensure that the underpaid accounts were reimbursed in a timely manner and appropriate withholdings were applied to the overpaid accounts. Additionally, CW15 had regular interactions with the Individual Defendants at Managers meetings. Based on this position, CW15 had knowledge of WellPoint's computer system and compliance issues during the Class Period. CW15 was aware that the CMS was very "distraught" about WellPoint's system issues because there were numerous complaints filed by WellPoint members with the CMS. According to CW15, WellPoint's computer system issues, which were ongoing during the Class Period, ultimately caused the CMS to sanction WellPoint in January 2009.

51. CW16 was an Enterprise Director of Sales Support and Technology at WellPoint from February 2001 until June 2008. CW16 reported to the President of Large Group, who reported directly to defendant Braly. The witness was responsible for implementing a computer system used to give sales representatives visibility into the total number of plans sold during a given period of time and to track the Company's sales results. CW16 also attended quarterly Managers meetings attended by defendants. According to CW16, at these meetings, every manager presented his/her plan, either an annual or six-month plan going forward. The manager's presentations also focused on what had been done and accomplished during the past year, what goals were not achieved and what did not go as planned. Based on this position, CW16 had knowledge of the business shift mix from Fully-Insured products to Self-Funded products during the Class Period. According to CW16, the increase in Self-Funded products was "obvious" by October 2007. CW16 was also aware of

WellPoint's numerous non-integrated computer systems and the Company's unsuccessful efforts to integrate the systems.

52.     CW17 was a Staff Vice President of Direct Sales and Retention in WellPoint's Senior Business Unit from December 2005 until May 2008.  During the witness' tenure, WellPoint's operations were divided into at least three divisions, including the State Medicaid business, the Senior business and the Specialty business.  CW17 was assigned to the Senior Service division, known internally at 4SB, which covered the West Coast and other regions, including New York. CW17 was responsible for Direct Sales and Retention in the West Coast, Central and East regions and oversaw a team of approximately 160 sales personnel.  The witness also attended conference calls held approximately every two to three months, and more frequently during the "open enrollment" period, which was from October to December each year.  The other attendees included various director-level and above personnel, as well as defendants DeVeydt's and Braly's direct reports.  During these calls, the attendees discussed cost-related issues and other matters.  Based on this position, CW17 was aware of WellPoint's decreasing enrollment growth during the Class Period.  According to CW17, the open enrollment period was between October and December for the next calendar year.  CW17 indicated that during the 2008 open enrollment period (*i.e*., October through December 2007), WellPoint's Senior business failed miserably in terms of securing the number of enrollments needed or projected.

53.     CW18 was a National Dental Director at WellPoint for approximately two years until May 2006.  The witness reported to the President and General Manager of WellPoint's Dental organization, who in turn reported to the CEO of the Company.  In this capacity, CW18 was responsible for overseeing the operations of WellPoint's Dental organization and supervising Quality Assurance related to the Dental group.  Based on the witness' position within the Company and having supplied data for Board presentations, CW18 was aware that detailed PowerPoint slides were

prepared by the head of each organization for delivery to the Board of Directors on each element of the business on a quarterly basis. This witness, although having left WellPoint's employ prior to the beginning of the Class Period, provided information concerning the forecasting and reporting process at WellPoint which, according to other witnesses described herein in ¶¶36, 44 and 46 continued to exist at WellPoint during the Class Period.

54.     CW19 was an Accounting Manager at a WellPoint subsidiary from January 2005 until June 2008. The witness reported to the Staff Vice President of Finance. The Vice President of Finance reported to a Finance Manager, who in turn reported to defendant DeVeydt. As an Accounting Manager, CW19 was in charge of the "alternate funding" for Self-Funded products. The witness attended quarterly Managers meetings, which were attended by all high-ranking executive officers, including the Individual Defendants. According to CW19, the usual subject of discussion at the Managers meetings was the Company's quarterly performance, financial results and the future of the Company. During a Managers meeting in mid-February 2008, defendant Braly told CW19 and other attendees that they would hear "rumors" about issues that WellPoint was going to announce to the public. According to CW19, Braly urged the attendees not to engage in such rumors but to patiently wait until the issues were properly disclosed to the public.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

55.     On January 23, 2008, WellPoint issued a press release announcing its Q4 and full year 2007 results. The press release also set forth 2008 EPS guidance of $6.41. In the press release, defendant DeVeydt stated:

> "*We remain confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3 percent*," said Wayne S. DeVeydt, chief financial officer of WellPoint, Inc. "We expect to continue generating strong cash flow in excess of our net income, and we plan to utilize our capital to expand product offerings, enhance services and improve returns for our shareholders. We expect to repurchase more than $4.0 billion of our stock during 2008, subject to market conditions."

56.     Under the heading "OUTLOOK," the press release stated, among other things, that WellPoint continues to expect net income of $6.41 per share, representing growth of 15.3% over 2007, medical enrollment to reach approximately 35.6 million members, representing growth for the year of approximately 800,000 members, and the benefit expense ratio to be approximately 81.6%.

57.     The press release also reported an increase in WellPoint's benefit expense ratio in 2007 to 82.4%, an increase of 120 basis points over 2006. Defendants attributed this increase to higher than expected claims costs, business mix changes and less favorable than expected reserve development, caused in part by a slowdown of claims processing resulting from systems migration. Notwithstanding the 2007 increase in benefit expense ratio, WellPoint assured the public that it remained confident in its 2008 benefit expense ration of 81.6%. Elaborating on the Company's benefit expense ratio, the press release stated:

> The full year 2007 benefit expense ratio was 82.4 percent, an increase of 120 basis points from 81.2 percent in 2006. Approximately 80 basis points of the increase was driven by the medical business of the Specialty, Senior and State Sponsored Business reporting segment. The remaining increase was attributed to the CCB segment and included the impact of business mix shifts, including a decline in Individual membership, and less favorable than expected reserve development in 2007.
>
> ***The Company remains confident with its full year 2008 benefit expense ratio estimate of 81.6 percent, given the strong full year 2007 operating results in its CCB segment, its outlook for stable medical cost trends in 2008 and the expected improvements in its State Sponsored operations***.

58.     The press release also discussed the Company's medical cost trends, stating:

> Medical cost trends were below 8.0 percent in 2007, with the primary driver being unit cost increases. ***The Company continues to expect that medical cost trends will remain below 8.0 percent in 2008, and continues to price its business so that expected premium yield exceeds total cost trend***, where total cost trend includes medical costs and selling, general and administrative ("SG&A") expense.

59.     Also on January 23, 2008, WellPoint held its 4Q07 Earnings Conference Call during which defendants Braly and DeVeydt were the principal spokespersons for WellPoint. During the Conference Call, defendants provided detailed information concerning WellPoint's 2007 results and

the impact those results may have on WellPoint's 2008 results, both on a year-end basis and a quarterly basis. Numerous analysts joined the conference call, including analysts from Goldman Sachs, JP Morgan, Citigroup and Oppenheimer & Co.

60. On the Conference Call, defendants announced that WellPoint had experienced a year-over-year increase in its benefit expense ratio, a metric followed closely by the Company and analysts. Defendants admitted that one of the contributing factors for this increase was inadequate reserves booked in 3Q07. At the end of 3Q07, the Company set its reserves too low, which caused the Company to book medical costs in 4Q07 above forecasted levels for services actually provided in 3Q07. This error was attributed to a claims system conversion which resulted in claims not being adjudicated and paid as quickly as they should have been.

61. In addition to the increase in benefit expense ratio, defendants also reported an adverse shift in the business mix from 49% less profitable Self-Funded and 51% more profitable Fully-Insured members in 2006 to 51% Self-Funded and 49% Fully-Insured in 2007. Defendant Braly, however, attributed this shift to a single, isolated event and was quick to assure investors that these negative developments would not affect WellPoint in 2008, stating that defendants were "***maintaining our $6.41 earnings per share***" guidance for 2008 and explaining that "***reduced membership*** experienced in 2007 had virtually no impact on WellPoint's expected EPS**:

> During the fourth quarter of 2007, the state of Connecticut implemented changes to its Medicaid managed care program, which resulted in approximately 144,000 members converting from fully insured to self-funded contractual arrangements. We are currently servicing these members under a self-funded arrangement that expires next month and we are in discussions with the state of Connecticut on extending this agreement.

> Given this and other shifts in business mix, our overall membership base was 51% self-funded and 49% fully insured at December 31st, 2007 compared with 51% fully insured and 49% self-funded at December 31st, 2006.

*          *          *

- 27 -

*Although we are only three weeks into the new year, we continue to have good visibility into our original guidance of one million net new members*. . . .

*While our 2008 membership guidance is lower, we are maintaining our $6.41 earnings per share guidance as the reduced membership in these areas had nominal contributions to EPS*.

62.    Defendant Braly also reassured investors that the negative developments in 2007 resulting from an ongoing systems migration had been resolved, stating: "Our expected growth in 2008 and beyond results in part from a number of milestones we've accomplished during 2007. . . . Some of the specific milestones we achieved in 2007 include the following. [sic] *Completing several system migrations, resulting in lower technology production costs and improved information management capabilities*."

63.    Defendant DeVeydt reiterated the positive statements made in the press release and by defendant Braly.  While acknowledging that WellPoint had experienced a rise in medical costs in 4Q07, DeVeydt reassured the market that "*[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008*."  As DeVeydt explained:

*2007 was unfavorably impacted by 2006 reserves that developed less favorably in 2007 than anticipated*.

*                *                *

*[W]e also experienced a relatively high level of [unfavorable] intra-year reserve adjustments in the CCB segment during the fourth quarter of 2007 . . . .  We are migrating to fewer claims systems and streamlining our operations and processes. As a result, we've seen a slowdown of certain claims processing and our September 30th, 2007 reserves did not completely adjust for this slowdown.  In the fourth quarter, we dedicated resources to address this issue and improved the timeliness of affected claims processing.  We have carefully evaluated our year-end reserves. We've adjusted our completion factors to better take business process changes into consideration and are confident that our reserving is consistent, conservative, and appropriate, maintaining our high single-digit margin for adverse development*.

*So our 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results in our CCB segment, our continued outlook for stable medical cost trends in 2008, and the expected improvements in our State Sponsored operations*.  We continue to price our business so that our expected premium yield exceeds total cost trend, where total cost

trend includes medical costs and selling, general and administrative expense.  As evidenced by our announced withdrawal from the Ohio CFC Medicaid program, we remain very disciplined in our underwriting approach and do not pursue business that we believe is priced below our profitability targets.  Our 2007 medical cost trend was less than 8% and we continue to expect our 2008 medical cost trend to also be less than 8%.

\*      \*      \*

***We continue to establish reserves in a consistent and conservative manner***.

64.    Defendant DeVeydt also reiterated WellPoint's 2008 guidance:

***[W]e continue to expect net income of \$6.41 per share, representing growth of 15.3% over 2007***.  Year-end medical enrollment is now expected to approximate 35.6 million members with fully insured membership now expected to be 17.1 million and self-funded membership expected to be 18.5 million.  Due primarily to the change in Ohio and Connecticut State Sponsored business, operating revenue is now expected to total approximately \$62.6 billion.

   ***As I noted earlier, we now expect the benefit expense ratio to be approximately 81.6*** and our SG&A expense ratio is now expected to be approximately 14.4.  We expect full-year 2008 operating cash flow of \$4.4 billion or 1.2 times net income.

Defendant DeVeydt added that this guidance was "right on at this point in time and we are very confident with it" and that 2008 results would be "dead on with our original guidance."

65.    On the 4Q07 Earnings Conference Call, defendants also answered very specific questions directed to them by the attending analysts and made a series of additional false and misleading statements in those answers.  For example, the analyst from Goldman Sachs raised the question of whether the rise in medical costs in 4Q07 and inadequate reserves resulting from WellPoint's systems migration had changed defendants' views on forecasting, and whether defendants were "comfortable that you have this cleaned up now and that you are in a conservative position going into 2008?"  Defendant Braly responded:  "We do feel very solid about 2008 and where we are. ***As we saw this experience in the slowdown that Wayne [DeVeydt] referred to, it was on a single system and we did have some migration into that system***.  We are very focused on excellent service and saw the results of that ***in the fourth quarter as our claims processing***

- 29 -

*timeliness increased* and *we got better transparency into the reserving. . . . [W]e're feeling really good about '08*." Defendant DeVeydt added:

> It's very common when you're doing a migration that you get a slowdown in some of your claims processing. Part of our focus was to account for that, which we thought we had done as of the third quarter. As part of our desire to continue to provide great customer service and improve our customer service rankings, which did improve in the fourth quarter, we really accelerated paying some of that backlog down. In doing that, *we got a little more transparency around some of the actual development.* And so from our perspective, I would say *I feel very confident that we've got our reserves at that high single digit level they've been at historically and that we're going to start the new year off very strong.*

66.    The analyst from Morgan Stanley also raised the issue of the relationship between WellPoint's medical costs, product pricing and profit margins, questioning the impact on 2008 profitability of the higher medical costs experienced by Wellpoint in 2007 that had required it to increase its reserves for medical costs at year-end. Defendant DeVeydt responded by saying that he was "*very confident in our pricing right now. I really am not worried about '08 [pricing]*" and "*very confident in our pricing and our renewals.*"

67.    When questioned by the analyst from UBS about the adequacy of the reserves for medical costs, defendant DeVeydt responded by saying, in pertinent part, that "*one of the things that we've met with the actuaries on and talked about is the fact that we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall short. . . . The other thing is, our cycle time has really shrunk between when we're receiving the claims and when we're paying it.*" In further response to the question, defendant Braly added: "Well, also, *we do have fewer claims processing systems* now than we had at the end of '06. And we're seeing the benefit of that in a number of ways. We can get our arms around the inventories, the claims processing metrics. *We get better visibility as we get more efficient and have fewer systems.*"

68.    On the issue of WellPoint's 2008 reserves, defendant DeVeydt further reassured the market that "[o]ne of the things we did was not only look at [the medical reserves] from an actuarial

perspective, but we did a similar analysis from a cash perspective. ***And I would say that they . . . are up quite a bit and I think it gives us some comfort that we're going into '08 adequately reserved***."

69. When asked by the Citigroup analyst if the systems migrations would negatively affect WellPoint going forward in 2008, defendant Braly reassured the analyst that it would not:

> ***We had some flawless execution around those migrations. So our plan is to continue to migrate in the way that we have with the process improvement so that we are doing so slowly and cautiously and making good decisions around each element of the process in a really integrated business plan with operations and claims and IT. So we feel really good about that***.

Defendant DeVeydt further assured the analyst that in light of the systems migration, "***We're going to remain ultraconservative on the reserve side***."

70. The analyst from Deutsche Bank asked whether WellPoint had factored the slowing economy and its impact on medical cost trends into its 2008 guidance. DeVeydt responded that the slowing economy was built into 2008 guidance, stating that "***we have backed into our guidance an assumption for a slowdown*** and specifically, we were very specific about it relative to the National Account business that we had expected. ***Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good***."

71. Braly ended the 4Q07 Earnings Conference Call very positively, stating that "we had a productive year in 2007 and we're off to a good start for 2008."

72. Analysts responded favorably to defendants' announcements, particularly to their strong confidence in guidance and their repeated reassurance that the system integration problems would not negatively affect WellPoint in 2008. For example, in a January 23, 2008 report, Stifel Nicolaus emphasized defendants' reassurances regarding earnings visibility, reporting that despite the "fairly unattractive [4Q07] quarter exhibiting less stability," "***the 2008 outlook remains strong with good earnings visibility***." Oppenheimer & Co. reported similarly on February 1, 2008, stating

- 31 -

that: "WellPoint reported one of the worst quarters that we've seen in a while in the fourth quarter, but the good news is that most of the company's issues will not recur in 2008 . . . . [T]he company did spend a lot of time explaining why we won't see its problems spill into 2008. . . . *The good news here is that most of WellPoint's fourth quarter and 2007 medical loss ratio issues won't recur in 2008*."

73.     On January 30, 2008, WellPoint participated in the Wachovia Healthcare Conference, where the Company continued to make false and misleading statements about the effects of its systems migration.  At the conference, WellPoint, through its representative Michael Kleinman ("Kleinman"), Vice President of Investor Relations, discussed the systems migration at length and even indicated it was having a *positive* effect on the Company's benefit expense ratio:

> [T]here has been a lot of talk about our medical loss ratio, or our benefit expense ratio.  **We expect the benefit expense ratio to fall from 82.4% in 2007 to 81.6% in 2008**.

*     *     *

> Part of it is also that we have taken some very active steps to drive savings through our system.

*     *     *

> *Part of the ways that we're driving cost out of the system is through consolidating systems*. . . . *Now we are standardizing our processes and are doing a very good job of coming down*.  We expect to have three base claims-processing systems 2010-2011; and ultimately continue to move lower from there.

> And let me stop just a minute and talk about how we're doing these systems migrations.  We do systems migrations on a very low-risk methodology.  It is not a big bang conversion where as one day you can throw a switch and everybody is changed.  What we do is we start to move from system A, the old system; to system B, the new system.  Both of these systems are currently operating today, processing millions of claims on an accurate and timely basis.

> We'll start putting the new business on system B and then as the business renews on system A, we'll renew the business on system B.  When our members – they get a new card, oh, I've go my new Blue Cross and Blue Shield card.  That's great and they put it in their pocket and go forward.  They have no idea that we have just migrated them.  Then after 13 months we simply turn off the old system.

Now our IT folks will tell you that I just way oversimplified that because there are other issues involved as well. ***But that's why you don't see the big hiccups that can come and is inherent in big conversions***.

74.    Regarding WellPoint's 2008 guidance for its benefit expense ratio, WellPoint, through its representative Kleinman, further stated at the Wachovia Healthcare Conference that: "***Year over year, the medical loss ratio did go up 120 basis points***. . . . ***[W]e feel good going forward that we've got those issues under control***." Kleinman also reiterated defendants' guidance, stating that "***we expect $6.41 per share in 2008. That's about 15.3% higher than in 2007***."

75.    On February 21, 2008, the Individual Defendants signed and filed with the SEC WellPoint's 2007 Form 10-K. In the Management's Discussion and Analysis of Final Condition and Results of Operation item, defendants highlighted the importance of "profitable enrollment growth" in achieving 15% growth in EPS, and stated their belief that WellPoint's geographic diversity reduced the impact of economic pressures on WellPoint's earnings and provided WellPoint with "increased opportunities for growth." Defendants also stated that they ***continually monitor and adjust claims liability and benefit expense based on subsequent paid claims activity*** and that because WellPoint's business is "primarily short tailed," ***incurred claims are quick to show up and, therefore, defendants can quickly assess and adjust the adequacy of the Company's reserves for medical costs***:

> The most judgmental accounting estimate in our consolidated financial statements is our liability for medical claims payable. . . . We record this liability and the corresponding benefit expense for incurred but not paid claims including the estimated costs of processing such claims. Incurred but not paid claims include (1) an estimate for claims that are incurred but not reported, as well as claims reported to us but not yet processed through our systems; . . . and (2) claims reported to us and processed through our systems but not yet paid . . . .

> Liabilities for both claims incurred but not reported and reported but not yet processed through our systems are determined in aggregate, employing actuarial methods that are commonly used by health insurance actuaries and meet Actuarial Standards of Practice. Actuarial Standards of Practice require that the claim liabilities be adequate under moderately adverse circumstances. ***We determine the amount of the liability for incurred but not paid claims by following a detailed actuarial***

- 33 -

*process that entails using both historical claim payment patterns as well as emerging medical cost trends to project our best estimate of claim liabilities.* . . .

For the most recent incurred months (generally the most recent two months), the percentage of claims paid for claims incurred in those months is generally low. This makes the completion factor methodology less reliable for such months. Therefore, incurred claims for recent months are not projected from historical completion and payment patterns; rather they are projected by estimating the claims expense for those months based on recent claims expense levels and health care trend levels, or "trend factors."

76.     WellPoint's 2007 Form 10-K also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Braly and DeVeydt:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report . . . .

Defendants Braly and DeVeydt also certified that: "The information contained in the [Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

77.     At no place in the 2007 Form 10-K did defendants correct any of their false and misleading statements, as alleged in ¶¶55-74, or disclose that WellPoint had experienced in 2008, to date, a significant rise in medical costs and an unprofitable shift in new enrollment to Self-Funded members, lacked the ability to adequately forecast pricing trends and medical cost reserves because of its systems integration issues, had significantly understated its medical cost reserves and priced its 2008 products at less profitable levels, and that as a result of these adverse material facts, the guidance that defendants gave the market on January 23, 2008 was no longer viable.

78.     Based on the foregoing allegations, defendants knew that their statements, alleged above in ¶¶55-76, were false and misleading when made because defendants knew or recklessly

- 34 -

disregarded that, prior to and during the Class Period, WellPoint was experiencing and continuing to experience: (i) system integration problems; (ii) claims processing problems; (iii) growing claims backlog; (iv) lack of visibility into claims data; (v) inability to adequately calculate IBNR claims; (vi) inability to establish adequate reserves; (vii) problems in adequately pricing products; (viii) a rising benefit expense ratio; and (ix) a continuing shift in membership away from the more profitably Fully-Insured products to the admittedly less profitable Self-Funded products. Despite this knowledge, defendants made the alleged false and misleading statements and failed to disclose these adverse material facts which, in addition, collectively, made defendants' 2008 guidance, as alleged in ¶¶55-58, 61, 63-66, 70, 73 and 74, false and misleading and lacking in any reasonable basis in fact. The factual basis for defendants' knowledge is alleged above in ¶¶5-9, 12-18, 36-54. Defendants' statements were materially false and misleading because defendants knew, but failed to disclose those facts and, in addition, the following adverse facts:

(a)     Contrary to defendants' Class Period statements, WellPoint's system integration problems that caused it to inadequately forecast its benefit expense ratio and medical cost reserves in 4Q07 continued to hamper WellPoint's visibility into claims data and its ability to set realistic reserves in 2008. According to CW9, WellPoint lacked visibility into its future medical costs due to the lack of systems integration and, therefore, could not accurately forecast medical costs, reserves or price trends.

(b)     Defendants' lack of visibility into claims data resulted in significantly understated medical claims reserves reported during the Class Period. According to CW1 and CW8, WellPoint's forecasts were based on historical data and input from actuaries. The actuaries set reserves based on a review of historical claims data and projected but not reported claims. To calculate the reserves, the actuaries performed "lag studies" to determine the number of IBNR claims and the percentage of IBNR that would be received within a given period of time. The actuaries also

reviewed historical claims data and forecasted trends regarding pricing and cost of care. CW6 reported that, as of January 2008, WellPoint was operating on at least 13 to 14 different stand-alone systems that were not integrated. According to CW6, although WellPoint was making efforts to integrate the systems, it had not been successful in doing so, and the lack of integration hindered its ability to accurately forecast costs and reserves. Additionally, according to CW2, CW7 and CW12, at least eight companies acquired prior to 2004 were not yet integrated into WellPoint's information system, and each of these companies had its own data warehouse, processes and procedures for data collection, storage, analysis and reporting. Moreover, each company used different financial and accounting processes. As a result, the companies' methods for calculating product pricing and recording payment transactions for medical claims varied greatly. The CWs indicated that these differences made it nearly impossible for WellPoint to consolidate the data from the various systems into accurate and reliable reports that could be used as a basis for the Company's forecasts. While defendants sought to remedy these problems by creating an EDW, as of January 2008, this project was far from complete.

(c)     Because its systems did not interface, performing actuarial analyses of company-wide claims data and calculating valid reserves was extremely difficult. According to CW9 and CW12, the myriad claims processing systems hindered WellPoint's ability to derive reliable actuarial data from the system for use in establishing forecasts. Without such data, the actuaries were unable to develop appropriate lag studies and IBNR estimates, and could not accurately forecast medical claim costs or reserves. In addition, the lack of visibility into claims data hindered the Company's ability to forecast price trends and accurately price its products. In fact, according to CW13, the inability to timely obtain current data regarding medical claims was a direct cause of WellPoint's guidance miss at the end of the Class Period. As a result of defendants' inaccurate forecasts, WellPoint's reserves for 2008 medical costs were significantly understated, in

part, because the claims incurred in 2007 were significantly higher than the reserves established at December 31, 2007 for those claims.

(d)     Additionally, defendants' efforts to integrate WellPoint's myriad non-integrated systems prior to and during the Class Period decreased the accuracy and timeliness of its medical claims processing, further deteriorating the reliability of its actuarial data.  Indeed, when asked on March 13, 2008, at a Bear, Stearns & Co. London Healthcare Conference, how their "system integration efforts . . . might have hampered [their] visibility on costs," defendants admitted that these efforts caused a slowdown in claims processing and a lack of visibility:

> ***[As a result of the system integration efforts,] we experienced a slowdown in the average claims payment cycle time.  On average, it took us longer to pay claims than it had in the past. . . .  They are just not being recognized as quickly, which means that, on the margin, we have less visibility to what our ultimate liability [will be].***

This was exactly the opposite of what defendants told investors on January 23, 2008 – that "our claims processing timeliness increased" and "we do have fewer claims processing systems . . . [and] better visibility."

(e)     WellPoint's inability to timely and accurately process claims resulted in a significant claims backlog during the Class Period, the receipt and payment of which were not in line with its actuarial assumptions.  For example, CW14 reported that prior to and during the Class Period, WellPoint was experiencing problems with its POS FE program, which was part of its overall Medicare Part D program managed by the CMS.  As part of this program, pharmacy participants submitted claims to WellPoint, who in turn submitted claims, referred to as PDEs, to CMS for reimbursement.  Pursuant to CMS requirements, WellPoint had to submit PDEs for all plans to CMS in a timely fashion in order to get reimbursed for the submitted claims.

(f)     By 2007, WellPoint began accumulating unreimbursed POS FE claims that were returned to WellPoint from CMS.  According to CW14, approximately 50,000 PDEs were

returned to WellPoint from the end of 2006 and throughout 2007 due to submission and entry errors by WellPoint. At the end of 2007, WellPoint reports showed that the total number of PDEs submitted to CMS and the total reimbursement amount associated with the PDEs was off by approximately $3 to $4 million. CW14 indicated that this discrepancy caused WellPoint to write-off a large portion of this amount (approximately one third) in late 2007/early 2008. CW15 corroborated these facts, stating that CMS was very distraught at WellPoint's system issues because they resulted in numerous complaints filed by WellPoint members with CMS. In fact, WellPoint's on-going computer system issues, and resulting compliance issues, ultimately caused CMS to sanction WellPoint in January 2009.

(g)    Moreover, thousands of claims which had been suspended, but not previously identified as such, were sent to the Suspended Claims group for processing in early 2008, thereby dramatically increasing WellPoint's claims inventory in that timeframe. According to CW10, beginning in December 2007/January 2008, the Company's Business System Operations group began identifying batches of claims that had been denied in the late 2007 timeframe. CW10 further reported that the number of these claims increased dramatically beginning December 2007.

(h)    CW4 and CW5 reported similar experiences. According to CW5, in the Commercial organization, "stats" reports that were circulated in a meeting each Friday showed a noticeable increase in the claims backlog by January 2008. Likewise, CW4's department, which processed claims for Blue Cross of California, Blue Cross/Blue Shield Partnership Plan and some Unicare members, had a backlog of claims in excess of two months. In fact, at the time of CW4's departure from WellPoint in September 2008, the department was just finishing processing the medical claims received in July 2008.

(i)    WellPoint was also experiencing a significant increase in medical costs prior to and during the Class Period, to the extent that defendants had no basis in fact which supported

their earnings or benefit expense ratio guidance. According to CW1, as early as late-2006/early-2007 WellPoint's medical claims cost trends became increasingly worse, in part due to problems with the Company's claims management process. Defendants internally acknowledged this problem in 3Q07 and announced a reorganization plan to help control the cost of care in 2008.

(j)    WellPoint was also being adversely impacted by economic factors which were not neutralized by its geographic diversity and to an extent greater than defendants had factored into their 2008 guidance. Contrary to defendants January 23, 2008 statements, the economic downturn was negatively affecting WellPoint's enrollment levels, particularly its Fully-Insured enrollment, contributing to a larger percentage of Self-Funded members. This shift in membership away from Fully-Insured products toward less profitable Self-Funded products was adversely affecting WellPoint's profits during the Class Period. CW8 confirmed that leading up to and during the Class Period, WellPoint was not getting Fully-Insured member enrollments as projected. CW16 corroborated this fact, stating that it was "obvious" as early as October 2007 that WellPoint's sales trends were moving more toward Self-Funded plans, which meant lower revenues for WellPoint.

## THE TRUTH IS REVEALED

79.    In a surprising and sudden reversal, on March 10, 2008, after the close of the market, defendants issued a press release entitled "WellPoint Revises 2008 Earnings Per Share Guidance," admitting that "for first quarter ending March 31, 2008, [we are] now expect[ing] to be in the range of $1.16 to $1.26 per share, assuming net realized investment gain of approximately $0.06 per share, compared with the prior forecast of $1.44 per share" and that "[WellPoint] now expects full year 2008 net income to be in the range $5.76 to $6.01 per share, assuming net realized investment gains of approximately $0.06 per share." Thus, WellPoint dropped its growth guidance from 15.3% ***to a range of 4% to 8%***, and then only if it achieved investment gains of $0.06 per share. WellPoint also ***increased its forecasted benefit expense ratio*** from 81.6% to a range of 82.8% to 83.1%.

Defendants called a hastily scheduled conference call with analysts for 5:30 p.m. that day. In the press release, defendants attributed the sharp decline in WellPoint's financial and business position to a rise in medical costs, insufficient medical cost reserves, lower enrollment of Fully-Insured members and higher enrollment of Self-Insured members, caused, in part, by economic conditions.

80.    On the March 10, 2008 Conference Call, defendant Braly disclosed for the first time that they "*missed some trends*." Defendant Braly further explained that "*our original trend assumptions for 2008 were understated*":

> *A majority of the earnings reduction is due to higher than expected medical costs, including less favorable than expected prior year reserve development. Also contributing is lower than expected fully-insured enrollment and, to a lesser extent, the changing economic and regulatory environment in which we operate*. . . .
>
> *On our fourth quarter '07 earnings call, you – we told you that we had carefully evaluated our year-end reserves and adjusted completion factors to reflect then-assumed claims trends*. While we continue to have favorable reserve development for the first two months of 2008, it was still less than our targeted level. . . . Consequently, *we now believe that our original trend assumptions for 2008 were understated. This higher trend impacts a number of business lines in 2008*. . . . As we discussed in January, *we began to notice a slowdown in claims cycle time*, which is the length of time between the date of service and the date of claim payment on a dollar-weighted basis. We dedicated resources to address this issue and improve the timeliness of effective claims processing. We also adjusted our completion factors to better take our business processes into consideration. While we did notice an impact on some aspects of claims payment as a result of these efforts, *our claim cycle times continued to increase in 2008*. In retrospect, *we had not adequately adjusted completion factors at year-end*.
>
> *       *       *
>
> *While our total medical enrollment levels to date are close to our expectations, the growth has been weighted more towards self-funded customers than we had planned*. . . . *[E]nrollment in fully-insured products was below expectations* . . . . As a result, we are lowering our full-year membership growth expectations to 500,000 new members, which reflects a reduction in guidance of approximately 300,000 membership. . . .
>
> *[W]e are not doing as well as we had expected*. . . .
>
> Small Group business is experiencing weaker sales and higher lapses. . . .

Individual membership has declined from year-end and continues to run behind our plan.

\*     \*     \*

**We believe that the nation's weakening economic environment is impacting membership**, such as in our Small Group business, where we were seeing negative [in-group] change and higher-than-expected benefit buy-downs.

81.     Defendant DeVeydt further stated that "**we missed the trend for 2008**," and admitted that "**[w]e got more insight into the [medical cost] data after January and February**," thereby admitting that defendants knew of these adverse developments throughout the Class Period. DeVeydt also admitted that "**[w]e need to fix our trend problem and price our product better**," and that this problem was "**more of a systemic problem**" specific to WellPoint, and not "an industry-wide trend problem."

82.     Defendants' March 10, 2008 announcements disclosed that WellPoint's systems integration problems causing its 4Q07 miss had continued to negatively affect the Company throughout 1Q08.  Specifically, defendants disclosed that due to a lack of visibility, they were unable to accurately forecast cost and price trends and set realistic reserves, and as a result, significantly understated 2008 reserves.  Defendants also disclosed that, as a result of the systems migration efforts, WellPoint was experiencing a slowdown in claims processing cycle time, and that this trend was increasing throughout 1Q08.  Further, defendants disclosed that the economic downturn was negatively affecting enrollment levels and that members were increasingly shifting to less profitable Self-Funded products.

83.     On March 11, 2008, the day following defendants' announcements, Miller notified the Company that she was resigning as CAO, Senior Vice President and Controller of WellPoint, effective April 4, 2008.

84.     Analysts clearly connected defendants' March 10, 2008 disclosures, and the resulting decline in stock price, to WellPoint's on-going system migration and visibility problems.  For

example, Oppenheimer & Co. reported on April 23, 2008: "***The issue [with the 1Q08 miss] was that due to a lack of visibility caused by the claims migration last year, the company underestimated cost trends in 2007, and mispriced much of its 2008 business***."  Similarly, Deutsche Bank reported on May 5, 2008:  "***The company also discussed in greater detail what it has diagnosed as root causes of its raised [benefit expense ratio] guidance for 2008.  Specifically, the company altered its historical approach to its systems conversion process which ended up decreasing visibility into the dollar value of the claims in backlog***."

85.     As a result of defendants' disclosures, coming only six weeks after the 4Q07 Earnings Conference Call, the price of WellPoint common stock dropped $18.66, on volume in excess of 54 million shares, to close at $47.26 per share on March 11, 2008, a decline of 28.3%.

## ADDITIONAL SCIENTER ALLEGATIONS

86.     As alleged herein, defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding WellPoint, their control over, and/or receipt and/or modification of WellPoint's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning WellPoint, participated in the fraudulent scheme alleged herein.

**Defendants' Knowledge of Facts Rendering**
**Their Class Period Statements False**

87.    Defendants knew, based on their admitted experience in 4Q07, that WellPoint lacked

the ability to accurately forecast medical costs, price products and set realistic reserves as a result of

its systems integration problems.  Defendants also knew during the Class Period, on a real-time basis

through updates and reports, that WellPoint's medical cost reserves for IBNR medical claims as of

December 31, 2007, which were reported during the Class Period, were significantly understated as

the claims materialized.  Indeed, defendants previously admitted on the January 23, 2008 Conference

Call that, generally, "***by basically mid February, we had pretty good visibility that we were starting***

***to develop less favorably [from the prior year]***."  Thus, by their own admission, defendants knew by

at least mid-February 2008 that medical claims incurred in 2007 were developing less favorably

during the Class Period.  Moreover, defendants later admitted, at a Bear, Sterns & Co. Inc. London

Healthcare Conference on March 13, 2008, that they knew as early as 2007 that they were not

accurately forecasting cost trends:

> *[A]s we headed towards the end of 2007 and early this year, we realized that,*
> *frankly, we just missed [cost trends].  We thought we had a complete view of what*
> *our cost of care expenses were, and we recognized that we did not.  So this led to*
> *prior-period [adverse] development, which is larger than we had anticipated, and*
> *the carryfoward of that recognition affected our 2008 projected results.*
>
> *So certainly, that recognition [in 2007] caused us to recognize that our cost*
> *trends were higher than we had suspected.*

88.    Defendants also knew by January 2008 that their efforts to integrate WellPoint's

myriad systems were hampering its medical claims processing, creating a significant backlog of

claims.  Indeed, defendants admitted on the March 10, 2008 Conference Call, that they knew at the

outset of 2008 that WellPoint's claims cycle time (the time between date of service and date of claim

payment) had slowed considerably ("***[a]s we discussed in January, we began to notice a slowdown***

***in claims cycle time***").  Thus, defendants knew in January 2008 that there were a significant number

of claims from 4Q07, and earlier, that had been incurred but had not yet been paid. Defendants also knew that as a result of its significant claims backlog, WellPoint was forced to write-off over $1 million in late-2007/early-2008. According to CW14, this issue was communicated directly to defendant DeVeydt.

89.     According to CW9, defendant Braly was kept informed of financial results compared to forecasts through updates provided to her by John Gallina ("Gallina"), WellPoint's Interim CAO, including year-to-date "snapshots" of financial results of operations and details about the performance of each business unit. WellPoint's actual results were derived from *Hyperion* reports, the data for which came from WellPoint's general ledger, which was maintained in WellPoint's *PeopleSoft* accounting system. WellPoint's forecasts were maintained on *Excel* spreadsheets.

90.     Additionally, according to CW9, defendant Braly monitored WellPoint's operations using, *inter alia*, her ELT, which would provide updates to her concerning their areas of responsibility. According to CW11, the ELT consisted exclusively of WellPoint's senior-level Vice Presidents and executive officers. Among the ELT members were Braly's direct reports: COO Boxer; Senior Vice President Enterprise Solutions and Acting Chief Information Officer Lori Beer, who replaced Boxer after his resignation in 2008; Executive Vice President and Chief Strategy and External Affairs Officer Bradley Fluegel; President and CEO of WellPoint Comprehensive Health Solutions Business Unit Dijuana Lewis; and Executive Vice President of Internal Audit and Chief Compliance Officer Randal Lewis. The ELT had quarterly conference calls, referred to as "quad-calls," which usually took place a few days prior to the Company's announcement of its quarterly earnings.

91.     Defendant Braly's reaction to WellPoint's 4Q07 forecast miss confirms her knowledge that the same problems would affect WellPoint going forward. According to CW9, in response to the 4Q07 forecast miss, Braly and Gallina developed an 11-month forecast to replace the

"six plus six" forecast that had been in use at WellPoint. Under the old format, in use prior to and during the Class Period through February 2008, WellPoint began its budgeting process in early June to include six months of actual results and six months of forecasted results. In order to clarify the forecasting process and avoid future forecasts misses, Braly wanted to extend the forecast out to at least 11 months. On February 22, 2008, Gallina presented a "two plus ten" budget to Braly, which included actual financial results of operations for January and February 2008, and a budget for the remainder of the year.

92.    Additionally, during a Managers meeting attended by defendants in mid-February, 2008, defendant Braly told attendees that they would hear rumors about some "issues" that WellPoint was going to announce to the public shortly. According to CW19, an attendee at the meeting, Braly urged the employees not to engage in such rumors, but to patiently wait until the issues were properly disclosed to the public.

93.    Defendants were also aware in 2007 that the Company's claims cost trends had become increasingly worse, and that these trends would continue into 2008. In fact, as a result of these negative trends, defendant Braly announced internally in 3Q07 her plans to reorganize WellPoint in an attempt to control the increasing cost of care, effective 2008. Defendants were aware of this adverse trend on a real-time basis as 4Q07 and 1Q08 medical claims came in for processing and payment.

94.    Moreover, defendants were aware of these adverse trends during the Class Period by way of a quarterly Corporate Trend Report. The Corporate Trend Report was a medical pricing forecast based on existing medical pricing that extended two years into the future and was submitted to WellPoint's corporate headquarters as a basis for Company forecasts. According to CW3, the Corporate Trend Report contained a one-page summary of the detailed analysis of the trends, including the figures and a commentary on analysis. The Corporate Trend Report, for any particular

quarter, would determine trends based upon claims data for that quarter, with a one-month "run out" to account for claims incurred in that quarter but not yet paid. For example, the 2Q07 Corporate Trend Report would use claims data information for claims incurred in May, June and July 2007 for the quarter ended in June 2007. The Corporate Trend Report was submitted by e-mail to an actuary at corporate in Indiana who would consolidate all the regional Corporate Trend Reports.

95.    Defendants were also aware of these facts through Actuarial Reports. According to CW13, WellPoint's actuaries retrieved data from the Company's various data warehouses and put the data through various financial models on a monthly basis. Actuarial Reports are gathered from each group and consolidated at the local, regional and national levels. In order for the Company to put together its 2008 annual financial plan, the actuaries began working on their analyses in August 2007. Once the actuaries completed this analysis, the annual financial plan was reviewed and approved by the local and regional Finance and General Managers for each division, after which the plan was submitted to the senior Vice President-level management of the Company. Once senior managers reviewed and approved the plan, it was submitted to the CFO and CEO for review and approval, then presented to the Board of Directors in late October/early November. According to CW18, presentations were also made to the Board of Directors on each element of the business on a quarterly basis, including detailed PowerPoint slides prepared by the head of each organization.

96.    Based on these reports, defendants knew as early as December 2007 that their 2008 projections had no reasonable basis. Because the forecasting for 2008 was performed based on available historical data for the first half of 2007, it required monthly adjustments. According to CW13, in December 2007, when the Company reviewed the readjusted forecasted data based on the available current data through November 2007, it "realized" that the claims coming in at the end of 2007 were higher than originally forecasted.

97.    Moreover, defendants knew that the economic downturn was negatively affecting WellPoint's enrollment levels, particularly its Fully-Insured enrollment, and that the resulting shift in membership toward less profitable Self-Funded products would adversely affect WellPoint's 2008 profits.  In fact, the failure to achieve any significant growth in Fully-Insured members in 2008, to date, confirmed the 2007 trend in membership type.  Moreover, according to CW17, the open enrollment period for 2008 was October 2007 through December 2007.  New and existing members were not allowed to enroll or make changes to plans beginning January 1, 2008, or thereafter, until the next open enrollment period.  Thus, defendants knew by January 1, 2008, that actual 2008 enrollment was shifting toward Self-Funded products and was less than their public guidance.

**Insider Trading**

98.    Defendant Glasscock's insider sales during the Class Period, as well as the sales of other WellPoint insiders, were suspicious in timing and amount and provide additional inference of scienter.  Combined, Company insiders sold 96,613 shares of their personally-held WellPoint common stock for gross proceeds in excess of $7.3 million shortly after the Company issued its aggressive 2008 guidance and reassured investors that WellPoint's problems in 2007 would not affect it going forward, as set forth in the chart below:

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold, incl. options |
|---|---|---|---|---|---|---|
| SHEILA BURKE (WellPoint Director) | 2/15/2008 | 2,000 | $74.86 | $149,720 | | |
| | | **2,000** | | **$149,720** | **9.34%** | 1.69% |
| LARRY GLASSCOCK (Defendant and Chairman of the Board) | 2/6/2008 | 26,113 | $78.94 | $2,061,360 | | |
| | 2/6/2008 | 5,000 | $78.50 | $392,500 | | |
| | 2/26/2008 | 8,000 | $74.17 | $593,360 | | |
| | 2/26/2008 | 5,500 | $74.20 | $408,100 | | |
| | 2/26/2008 | 3,900 | $74.30 | $289,770 | | |
| | 2/26/2008 | 3,000 | $74.25 | $222,750 | | |
| | 2/26/2008 | 2,500 | $74.22 | $185,550 | | |

- 47 -

| Insider | Date | Shares | Price | Proceeds | % Sold | % Sold, incl. options |
|---|---|---|---|---|---|---|
| | 2/26/2008 | 1,600 | $74.16 | $118,656 | | |
| | 2/26/2008 | 1,500 | $74.19 | $111,285 | | |
| | 2/26/2008 | 800 | $74.21 | $59,368 | | |
| | 2/26/2008 | 400 | $74.26 | $29,704 | | |
| | 2/26/2008 | 300 | $74.23 | $22,269 | | |
| | 2/26/2008 | 200 | $74.27 | $14,854 | | |
| | 2/26/2008 | 100 | $74.24 | $7,424 | | |
| | 2/26/2008 | 100 | $74.29 | $7,429 | | |
| | 2/26/2008 | 100 | $74.31 | $7,431 | | |
| | 2/27/2008 | 10,000 | $73.88 | $738,800 | | |
| | 2/27/2008 | 4,800 | $73.90 | $354,720 | | |
| | 2/27/2008 | 4,200 | $74.00 | $310,800 | | |
| | 2/27/2008 | 3,200 | $73.94 | $236,608 | | |
| | 2/27/2008 | 1,500 | $73.92 | $110,880 | | |
| | 2/27/2008 | 1,100 | $73.98 | $81,378 | | |
| | 2/27/2008 | 800 | $73.91 | $59,128 | | |
| | 2/27/2008 | 800 | $73.97 | $59,176 | | |
| | 2/27/2008 | 500 | $73.96 | $36,980 | | |
| | 2/27/2008 | 300 | $74.04 | $22,212 | | |
| | 2/27/2008 | 200 | $73.95 | $14,790 | | |
| | 2/27/2008 | 200 | $73.99 | $14,798 | | |
| | 2/27/2008 | 200 | $74.01 | $14,802 | | |
| | 2/27/2008 | 200 | $74.03 | $14,806 | | |
| | | **87,113** | | **$6,601,688** | **26.81%** | 6.59% |
| KENNETH GOULET (President and CEO of WellPoint's Commercial Business unit) | 2/14/2008 | 4,700 | $74.06 | $348,082 | | |
| | 2/14/2008 | 2,100 | $74.05 | $155,505 | | |
| | 2/14/2008 | 700 | $74.07 | $51,849 | | |
| | | **7,500** | | **$555,436** | **27.77%** | 13.85% |
| | **Total:** | **96,613** | | **$7,306,844** | | |

99.     These sales are highly suspicious in amount. Indeed, defendant Glasscock sold nearly 29% of his holdings in February 2008. Other insiders, Director Shiela Burke and President and CEO of WellPoint's Commercial Business unit Kenneth Goulet, sold significant amounts as well. While options are not stock holdings and should not be included in the insiders' retained holdings, even including options, the percentages and amounts sold are highly suspicious.

100.    The timing of these sales was also highly suspicious, as they were timed to take maximum advantage of the artificial price inflation caused by defendants' misrepresentations.  On January 23, 2008, defendants issued aggressive 2008 guidance and repeatedly reassured investors of their confidence in this guidance.  Defendants' strong reassurance to investors continued throughout the Class Period.  At the same time that defendants were making these bold statements and forecasts, Glasscock, along with other WellPoint insiders, sold significant amounts of their personally held WellPoint stock.  Glasscock unloaded 87,113 shares of his own WellPoint stock, nearly 29%, between February 2, 2008 and February 27, 2008, at prices between $73.88 and $78.94 per share – an astounding $26.62 more than the closing price of $47.26 after the March 10, 2008 disclosures – for proceeds of over $6.6 million.  Even more suspicious is that Glasscock sold 56,000 of these shares, for proceeds of over $4.1 million, *after* defendants disclosed internally at a Mangers meeting in mid-February that the Company was having problems, as set forth in ¶92, but *before making these announcements to the public*.

101.    Prior to the Class Period, on May 4, 2005, defendant Glasscock adopted a trading plan pursuant to Rule 10b5-1 of the Exchange Act through which he sold his personally owned WellPoint stock.  On February 11, 2008, Glasscock entered into a new trading plan, pursuant to which the majority of his Class Period sales were made.  As set forth in ¶¶87, 88 and 93-97 above, defendant Glasscock had knowledge of numerous materially adverse, non-public facts at the time he entered into his February 11, 2008 trading plan.  Thus, any trades made pursuant to this plan are not protected under Rule 10b5-1.

## LOSS CAUSATION/ECONOMIC LOSS

102.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of WellPoint's common stock and operated as a fraud or deceit on Class Period purchasers of WellPoint's common

stock by failing to disclose the increasing costs that the Company was facing and its poor enrollment, among other things. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of WellPoint's common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of WellPoint's common stock during the Class Period, Lead Plaintiff and the other class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

103. By failing to disclose the extent of the Company's increasing costs and its poor enrollment, among other things, defendants presented a misleading picture of WellPoint's business and prospects. Defendants' false and misleading statements had the intended effect and caused WellPoint's common stock to trade at artificially inflated levels throughout the Class Period.

104. As a direct result of defendants' disclosures on March 10, 2008, the price of WellPoint common stock fell precipitously, falling 28.3%, to close at $47.26 per share. This decline removed the inflation from the price of WellPoint common stock, causing real economic loss to investors who had purchased WellPoint common stock during the Class Period.

105. The 28.3% decline in the price of WellPoint common stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. Moreover, the timing and magnitude of the price decline in WellPoint common stock negates any inference that the loss suffered by Lead Plaintiff and the other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of WellPoint common stock and the subsequent significant decline in the value of WellPoint common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

106.    At all relevant times, the market for WellPoint common stock was an efficient market for the following reasons, among others:

(a)    WellPoint common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, WellPoint filed periodic public reports with the SEC and the NYSE;

(c)    WellPoint regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d)    WellPoint was followed by numerous securities analysts employed by major brokerage firms, banks and investment houses who participated in WellPoint's 4Q07 Earnings Conference Call and March 10, 2008 Conference Call and who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

107.    As a result, the market for WellPoint common stock promptly digested current information regarding WellPoint from all publicly available sources and reflected such information in WellPoint's stock price. Under these circumstances, all purchasers of WellPoint common stock during the Class Period suffered similar injury through their purchase of WellPoint's common stock at artificially inflated prices and a presumption of reliance applies. Further, Lead Plaintiff is entitled to, and will rely on, the presumption of reliance doctrine based on the material omissions alleged herein.

108.     The market for WellPoint common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, WellPoint's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the class purchased or otherwise acquired WellPoint's common stock relying upon the integrity of the market price of WellPoint's common stock and market information relating to WellPoint, and have been damaged thereby.

109.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of WellPoint's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

110.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about WellPoint's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of WellPoint and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## APPLICABILITY OF SAFE HARBOR

111.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of WellPoint who knew that those statements were false when made.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

112.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or acquired WellPoint common stock between January 23, 2008 and March 10, 2008, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company and its subsidiaries and affiliates, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

113.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  As of February 21, 2008, WellPoint had more than

541.9 million shares of common stock outstanding.  Throughout the Class Period, WellPoint's common stock was actively traded on the NYSE under the ticker symbol "WLP."  Record owners and other members of the Class may be identified from records maintained by WellPoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

114.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal laws that are complained of herein.

115.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

116.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the financial condition, business, operations, income, expenses and growth of WellPoint; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

117.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

### Violations of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder (Against All Defendants)

118.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    During the Class Period, WellPoint and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of WellPoint common stock; (c) enable defendant Glasscock and certain other Company insiders to sell their personally-held shares of WellPoint common stock for gross proceeds in excess of $7.3 million; and (d) cause Lead Plaintiff and other members of the Class to purchase WellPoint common stock at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

120.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for such stock in violation of §10(b) of the Exchange Act and Rule 10b-5. The Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

121.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative

statements and reports to the investing public, the defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01 *et seq.*) and Regulation S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's common stock would be based on truthful, complete and accurate information.

122.    WellPoint and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, future prospects and financial condition, of WellPoint as alleged herein.  The defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of WellPoint's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about WellPoint and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of WellPoint common stock during the Class Period.

123.    Each of the Individual Defendants' primary liability and controlling person liability arise from the following facts: (a) the Individual Defendants were high-level senior executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his/her

responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances and operations at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

124.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing WellPoint's operating and financial condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' misstatements of the Company's financial statements, business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

125.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of WellPoint common stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of WellPoint's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the

securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired WellPoint's common stock during the Class Period at artificially high prices and were damaged thereby.

126.    At the time of said misrepresentations, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff, other members of the Class and the marketplace known of the true financial condition and business prospects of WellPoint, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their WellPoint common stock during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

127.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

128.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

**Violation of §20(a) of the Exchange Act (Against the Individual Defendants)**

129.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

130.    The Individual Defendants acted as controlling persons of WellPoint within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and/or awareness of the Company's operations and/or intimate knowledge of the Company's finances, the Individual Defendants had the power to influence and control and did influence and

control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

131.    In particular, each of the Individual Defendants had direct and/or supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Individual Defendants culpably participated in the commission of the wrongs alleged herein.

132.    As alleged above, WellPoint and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as Lead Plaintiff and as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.


DATED: <u>May 11, 2009</u>                    COHEN & MALAD, LLP

                                         <u>/s/ Scott D. Gilchrist</u>
                                         Scott D. Gilchrist

                                         Irwin B. Levin
                                         Richard E. Shevitz
                                         Scott D. Gilchrist
                                         COHEN & MALAD, LLP
                                         One Indiana Square, Ste. 1400
                                         Indianapolis, IN  46204
                                         Telephone: 317/636-6481
                                         317-636-2593 (fax)
                                         ileven@cohenandmalad.com
                                         rshevitz@cohenandmalad.com
                                         sgilchrist@cohenandmalad.com

                                         ***Liaison Counsel***


                                         Laura M. Andracchio
                                         X. Jay Alvarez
                                         Sarah R. Holloway
                                         COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         Deborah R. Gross
                                         Robert P. Frutkin
                                         LAW OFFICES BERNARD M.
                                             GROSS, P.C.
                                         Wanamaker Bldg., Suite 450
                                         100 Penn Square East
                                         Philadelphia, PA  19107
                                         Telephone:  215/561-3600
                                         215/561-3000 (fax)

                                         ***Co-Lead Counsel for Plaintiffs***

- 61 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2009, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.  I hereby further certify that on May 11, 2009, a copy of the foregoing document was served by U.S. Mail, postage paid, on the following:

Mario Alba, Jr.
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS, LLP
58 South Service Road, Suite 200
Melville, NY 11747

X. Jay Alvarez
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301

/s/ Scott D. Gilchrist
Scott D. Gilchrist

Scott D. Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone:  (317) 636-6481
Facsimile:  (317) 636-2593
E-mail:  sgilchrist@cohenandmalad.com