**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

DOROTHY WADE, On Behalf Of
Herself and All Others Similarly
Situated,

          Plaintiffs,

v.

WELLPOINT, INC.; ANGELA F.
BRALY; WAYNE DEVEYDT; and
LARRY C. GLASSCOCK,

          Defendants.

Case No. 1:08-cv-0357-SEB-WTL

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   WELLPOINT'S JANUARY 23, 2008, EARNINGS PROJECTIONS WERE
      FORWARD-LOOKING STATEMENTS PROTECTED BY BOTH PRONGS
      OF THE REFORM ACT SAFE HARBOR, AND THE AMENDED
      COMPLAINT ALLEGES NO OTHER FALSE STATEMENTS ................................... 2

      A.    WellPoint's Earnings Projections Are Protected Forward-Looking
            Statements .................................................................................... 2

      B.    Plaintiff's Opposition Blatantly Misrepresents WellPoint's Statements In
            An Attempt To Show False Statements Of Current Or Historical Fact ................ 4

            1.    Plaintiff Misrepresents WellPoint's Alleged Statements Regarding
                  Its Claims Systems Migrations And Claims Processing ........................... 4

            2.    Plaintiff Misrepresents WellPoint's Statements About Membership
                  Trends ................................................................................ 7

            3.    Plaintiff Misrepresents WellPoint's Statements About Its Reserves ........ 8

III.  WELLPOINT'S JANUARY 23, 2008, EARNINGS PROJECTIONS ARE
      PROTECTED BY BOTH PRONGS OF THE REFORM ACT SAFE HARBOR ........... 9

      A.    Meaningful Warnings Accompanied WellPoint's Earnings Projections ............. 9

      B.    Plaintiff Pleads No Actual Knowledge Of Falsity ............................................ 12

            1.    None Of Plaintiff's Allegations Regarding Confidential Witnesses
                  Support An Inference Of Actual Knowledge ............................................ 13

            2.    Plaintiff Pleads No Facts Showing That Any Defendant Had
                  Actual Knowledge Of Any Statement's Falsity ..................................... 14

            3.    Contrary To Plaintiff's Assertions, Defendants Did Not Admit
                  Their Statements Were False ........................................................... 17

            4.    Mr. Glasscock's Stock Sales Pursuant To SEC Rule 10b5-1 Plans
                  Are Protected And Do Not Support An Inference Of Actual
                  Knowledge. .............................................................................. 19

IV.   PLAINTIFF STILL FAILS TO ATTRIBUTE ANY ALLEGED
      MISSTATEMENT TO MR. GLASSCOCK. ................................................. 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Asher v. Baxter Int'l Inc.*,
 377 F.3d 727 (7th Cir. 2004) ................................................................. 10

*Barr v. Matria Healthcare, Inc.*,
 324 F. Supp. 2d 1369 (N.D. Ga. 2004) ............................................. 4, 11

*Desai v. General Growth Properties, Inc.*,
 __ F. Supp. 2d __, 2009 WL 2971065 (N.D. Ill. Sept. 17, 2009).......... 12

*Elam v. Neidorff*,
 544 F.3d 921 (8th Cir. 2008) ................................................................ 20

*Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
 353 F.3d 1125 (9th Cir. 2004) .............................................................. 10

*Harris v. Ivax Corp.*,
 182 F.3d 799 (11th Cir. 1999) .............................................................. 11

*In re Read-Rite Corp. Sec. Litig.*,
 335 F.3d 843 (9th Cir. 2003) ................................................................ 17

*In re Republic Servs., Inc. Sec. Litig.*,
 134 F. Supp. 2d 1355 (S.D. Fla. 2001) .................................................. 3

*In re Stone & Webster, Inc., Sec. Litig.*,
 253 F. Supp. 2d 102 (D. Mass. 2003) .................................................... 3

*In re Sun Healthcare Group, Inc. Sec. Litig.*,
 181 F. Supp. 2d 1283 (D.N.M. 2002) ..................................................... 3

*Institutional Investors Group v. Avaya, Inc.*,
 564 F.3d 242 (3rd Cir. 2009) ................................................... 11, 12, 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ................................................................ 4

*Miller v. Champion Enters., Inc.*,
 346 F.3d 660 (6th Cir. 2003) ................................................................ 10

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
 365 F.3d 353 (5th Cir. 2004) .................................................................. 9

*Stavros v. Exelon Corp.*,
 266 F. Supp. 2d 833 (N.D. Ill. 2003) .................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) .............................................................................. 12

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ................................................................ 17

**Statutes**

15 U.S.C. § 78u-5(c)(1) ............................................................................ 9, 12

15 U.S.C. § 78u-5(c)(1)(B) ........................................................................... 12

15 U.S.C. § 78u-5(i)(1)(D) .............................................................................. 3

17 C.F.R. § 240.10b5-1(c) ............................................................................ 19

## I.    INTRODUCTION

The issue on this motion is whether WellPoint's 2008 earnings projections, which were initially issued on January 23, 2008, and then revised on March 10, 2008, are protected by the safe harbor of the Private Securities Litigation Reform Act ("Reform Act"). WellPoint's projections are protected by both prongs of the safe harbor: (1) they were accompanied by specific meaningful cautionary language, and (2) there is no showing that any Defendant had "actual knowledge" that the projections were false when announced on January 23.

The safe harbor defeats Plaintiff's action as a matter of law. In a desperate attempt to avoid its preclusive impact, Plaintiff resorts to mischaracterizing WellPoint's projections as statements of current fact, but no amount of pleading legerdemain can convert WellPoint's forward-looking projections into historical statements. Plaintiff similarly argues that Defendants made other misrepresentations of existing facts, but when Plaintiff's misleading edits and deceptive use of ellipses are compared to Defendants' actual statements, it is clear beyond dispute that no Defendant made any misrepresentation.

WellPoint's safe harbor warnings were detailed, specific, and expressly cautioned against the precise risks that ultimately occurred. Congress enacted the safe harbor to encourage public companies like WellPoint to disclose their future plans and projections. Giving effect to Plaintiff's quibbles with WellPoint's warnings would for all practical purposes eviscerate the safe harbor. But even if WellPoint's projections were not accompanied by meaningful cautionary language, Plaintiff would need to allege that Defendants had "actual knowledge" that the projections were false when announced. Plaintiff alleges no facts giving rise to the strong inference of actual knowledge required by the Reform Act, and her Amended Complaint should be dismissed.

II.    **WELLPOINT'S JANUARY 23, 2008, EARNINGS PROJECTIONS WERE FORWARD-LOOKING STATEMENTS PROTECTED BY BOTH PRONGS OF THE REFORM ACT SAFE HARBOR, AND THE AMENDED COMPLAINT ALLEGES NO OTHER FALSE STATEMENTS.**

Plaintiff's Amended Complaint alleges a putative class period that begins on January 23, 2008, when WellPoint disclosed (1) its results for the fourth quarter of 2007 and the full 2007 year, and (2) its then-current projections for 2008. The class period ends six short weeks later, on March 10, when WellPoint revised its 2008 projections. The revised projections were based on the actual results of the first two months of 2008 which, of course, could not have been known on January 23. ***WellPoint announced no other different or revised information on March 10***. Thus, there can be no serious question that the only public statements at issue on this motion are WellPoint's forward-looking 2008 earnings projections announced on January 23.

Faced with the conclusive effect the Reform Act has on forward-looking statements, Plaintiff makes a desperate attempt to recast WellPoint's forward-looking earnings projections as somehow false statements of current and historical fact. But WellPoint's projections of its future revenues and costs are paradigmatic forward-looking statements. Recognizing that she cannot successfully convert forward-looking statements into current facts, Plaintiff's Opposition makes a transparent attempt to cobble together a series of supposedly false extraneous statements by misrepresenting what Defendants actually said. Defendants' actual statements show that those statements are not false at all, and Plaintiff offers no facts showing otherwise.

A.    **WellPoint's Earnings Projections Are Protected Forward-Looking Statements.**

WellPoint's January 23, 2008, earnings release and conference call announced: (1) "[t]he Company continues to expect net income of $6.41 per share, representing growth of 15.3% over 2007;" (2) "[y]ear-end medical enrollment is now expected to be approximately 35.6 million members, representing growth for the year of approximately 800,000 members;" and (3) "[t]he benefit expense ratio is expected to be approximately 81.6 percent." (July 10, 2009, Dec. of

Lindsay L. Geida in Supp. of Defs.' Mot. to Dismiss Am. Compl. ("Geida Dec.") Ex. 1, Jan. 23, 2008, Press Release at 5.)

Plaintiff argues WellPoint's projections somehow lost their forward-looking nature because its earnings press release included statements that WellPoint "continues to expect that medical cost trends will remain below 8.0 percent in 2008, and continues to price its business so that expected premium yield exceeds total cost trend," which somehow converted the projections to statements of existing or historical fact. (*Id*. at 3; Opp. at 11.)

WellPoint's statements about the net income, enrollment, and benefit expense it expected in the future, including the cost and price trends on which those expectations were based, are classic forward-looking statements. In *In re Stone & Webster, Inc., Sec. Litig.,* 253 F. Supp. 2d 102, 116 (D. Mass. 2003), the court agreed that statements that defendant "***continue[d] to expect*** that the improved margins included in [its] substantial backlog of work will be realized, and [that its] ***continuing drive*** to reduce operating expenses will improve financial results" were forward looking. (emphasis added). A company's statement that it "***continue[s] to believe***" that its industry will become more efficient has also been found to be forward looking. *See In re Sun Healthcare Group, Inc. Sec. Litig.,* 181 F. Supp. 2d 1283, 1288 (D.N.M. 2002) (emphasis added). Similarly, a company's expression of its anticipation that revenue growth "***will continue into the future***" is a forward-looking statement. *See In re Republic Servs., Inc. Sec. Litig.*, 134 F. Supp. 2d 1355, 1363 (S.D. Fla. 2001).

These decisions are unsurprising because the Reform Act safe harbor specifically defines as forward looking the assumptions and bases underlying a company's projections. 15 U.S.C. § 78u-5(i)(1)(D) ("any statement of the assumptions underlying or relating to" a "statement of future economic performance, including any such statement contained in a  discussion and analysis of financial condition by the management" is forward looking). Thus, WellPoint's

projections do not lose their safe harbor protection simply because they were accompanied by the premium yield and medical cost trend expectations upon which they were based. *See Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1381 (N.D. Ga. 2004) ("statements of present or past observations regarding a company that are made in the context and furtherance of future projections may be protected by the safe harbor").

**B.      Plaintiff's Opposition Blatantly Misrepresents WellPoint's Statements In An Attempt To Show False Statements Of Current Or Historical Fact.**

Plaintiff also attempts to convert this case into one involving false statements of historical fact. But, a "litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false does not meet [the Reform Act's] standard." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). That general rule applies with special force here, where Plaintiff resorts to making misleading edits of WellPoint's actual statements, deceptively using ellipses and other obfuscation to try to create the appearance that WellPoint made false statements. Reading WellPoint's statements in context and in their entirety belies Plaintiff's argument that any statement was false.

**1.      Plaintiff Misrepresents WellPoint's Alleged Statements Regarding Its Claims Systems Migrations And Claims Processing.**

Plaintiff argues that "[w]hen specifically asked by analysts about the adequacy of WellPoint's reserves, defendants falsely assured the analysts that '***[w]e had . . . flawless execution*** around those migrations.' (¶69)[.]" (Opp. at 9.) But WellPoint made no such claim. Instead, Plaintiff's Opposition strings together WellPoint's supposed statement by cutting out words before, in the middle of, and after the language it quotes.[1]

---

[1] WellPoint's actual statement, with Plaintiff's omissions in bold, was:
> "***But towards the end of '07, we had pretty significant migration activity in our National Accounts Host business that went very well. We executed really well on that migration as well as in the PBM.*** We had *some* flawless execution around those migrations. ***So our plan is to continue to migrate in the way that we have with the process improvement so that we are doing so slowly and cautiously and making good decisions around each element of the process in a really integrated business plan with operations and claims and IT.***"

The full context of WellPoint's statements shows that Plaintiff's selective quotations misrepresent WellPoint's comments about the success of its systems migration efforts in at least three ways. First, the question WellPoint was asked by an analyst had nothing to do with WellPoint's reserves. Instead, the analyst asked if WellPoint changed its plans for continued claims systems migration in 2008 in light of difficulties it encountered with those migrations in 2007. (Geida Dec., Ex. 25, Jan. 23, 2008, Conf. Call Final Tr. at 18.) Second, WellPoint's response to the analyst's question referred only to two specific claims systems migrations in 2007, which involved certain National Accounts business and Pharmacy Benefits Management business. (*Id.*) Plaintiff makes ***no allegations*** at all about those migrations, let alone that they were problematic. Third, in the same call, WellPoint disclosed that its claims systems migrations efforts in 2007 resulted in a slowdown in claims processing and acknowledged that its third quarter 2007 reserves had not fully accounted for that slowdown. (*Id.* at 5, 8.) Indeed, the analyst's question itself referred to that disclosure. (*Id.* at 18 ("[I]n light of what happened in '07, can you tell us has there been a change in your plans for continued migrations in '08?").) The public record belies Plaintiff's argument that WellPoint claimed flawless execution around all of its migration efforts in an attempt to mislead analysts that its reserves were adequate.

Plaintiff also claims that WellPoint misrepresented present or historical fact when it stated that in 2007 it completed "several system migrations, resulting in lower technology production costs and improved information management capabilities," and that it "get[s] better visibility" into its claims inventory as it "get[s] more efficient and ha[s] fewer systems." (Opp. at 11-12 (citing AC ¶¶ 62, 67).) But the Amended Complaint pleads no fact showing that those statements were false. Plaintiff does not dispute that WellPoint completed systems migrations in 2007 or that those migrations lowered technology production costs. Moreover, the entire premise of the Amended Complaint is that WellPoint did not complete its systems integration

(Geida Dec., Ex. 25, Jan. 23, 2008, Conf. Call Final Tr. at 18.)

quickly enough and that its "multitude of claims processing systems" made it "nearly impossible" to provide accurate information to management.  (AC ¶ 5.)  Thus, Plaintiff's claim of falsity is undermined by the Amended Complaint itself, which concedes both that claims systems migrations occurred and that they were beneficial.  (AC ¶¶ 5, 7, 8, 10-11, 13, 62-63, 84.)

Plaintiff further claims that Mr. DeVeydt falsely stated on January 23, 2008, that WellPoint had "really accelerated paying some of that [claims] backlog down," and that its "cycle time has really shrunk between when we're receiving the claims and when we're paying it."  (Opp. at 12.)  But those statements are consistent with WellPoint's disclosure on that same date regarding the "days in claims payable" metric:  "Days in claims payable as of December 31, 2007 was 45 days, a decrease of 1.8 days from 46.8 days as of September 30, 2007."  (Geida Dec., Ex. 25 at 7.)  Plaintiff makes no allegation that this disclosure was false or that WellPoint did not increase the speed of its claims processing during the fourth quarter of 2007.

Plaintiff also contends WellPoint falsely indicated that its claims systems consolidations, which were intended to reduce costs, were "having a positive effect on the Company's benefit expense ratio" because the consolidated "systems ***are currently operating today***, processing millions of claims on an accurate and timely basis."  (AC ¶ 73; Opp. at 12.)  Again, Plaintiff misrepresents what WellPoint actually said.  While WellPoint's statement generically referred to the claims systems consolidations as an attempt to "driv[e] cost out of the system," the statement expressly distinguished between WellPoint's administrative expense savings from systems consolidation and its anticipated reduction in benefit expenses.  After discussing the expected decline in the benefit expense ratio from 82.4% in 2007 to 81.6% in 2008, WellPoint's spokesman next identified ***other*** savings that it anticipated "***[i]n addition to*** the benefit expenses."  (Geida Dec., Ex. 26, Final Tr. of Jan. 30, 2008, WellPoint, Inc. at Wachovia Healthcare Conf. at 5 (emphasis added).)  WellPoint expected these additional savings to result

-6-

from reducing "selling, general, and administrative expenses" to 14.4%, including lower costs

resulting from the consolidation of claims processing systems, and from "eliminat[ing] redundant

levels of management." (*Id.*)  Thus, there is no basis for Plaintiff's assertion that WellPoint

claimed systems consolidation savings would reduce its benefit expense ratio.  Similarly,

Plaintiff's claim that WellPoint falsely stated that its systems conversions experienced no "big

hiccups" (Opp. at 12) misleadingly wrests a single phrase out of WellPoint's explanation of its

methodology of migrating members to new claims systems in a slow, gradual manner:

> **We do systems migrations on a very low-risk methodology. It is not a big bang conversion where as one day you can throw a switch and everybody is changed. What we do is we start to move from system A, the old system; to system B, the new system.**  Both of these systems are currently operating today, processing millions of claims on an accurate and timely basis.

(Geida Dec., Ex. 26 at 5) (omissions made by Plaintiff in bold).)  Plaintiff points to no fact

showing that any statements actually made on January 30, 2008, were false.

### 2.    Plaintiff Misrepresents WellPoint's Statements About Membership Trends.

Plaintiff also fundamentally misrepresents Ms. Braly's statement on January 23 about the

new member projections by quoting only the first sentence of her statement.  (*See* Opp. at 11.)

Her full statement reads:

> Although we are only three weeks into the new year, we continue to have good visibility into our original guidance of one million net new members. **We're running slightly ahead of expectations in National Accounts and behind expectations in Medicare Advantage. However, in light of our decision to terminate the Ohio CFC Medicaid program, we're lowering our full-year membership growth guidance by 200,000 and now expect 800,000 net new members for 2008.**

(Geida Dec., Ex. 25 at 3) (omissions by Plaintiff in bold).)  Plaintiff presents Ms. Braly's

statement as if she cited this "good visibility" to reaffirm WellPoint's original membership

projections.  But when Ms. Braly's statement is read in full, it is clear the "visibility" she spoke

of enabled WellPoint to see it would ***not*** reach one million net new members and led it to ***reduce***

its original guidance by 20% to 800,000. Plaintiff does not (and cannot) allege Ms. Braly's description of membership trends in National Accounts or Medicare Advantage was false.

### 3.    Plaintiff Misrepresents WellPoint's Statements About Its Reserves.

Plaintiff argues Mr. DeVeydt's January 23, 2008, statements that WellPoint had "carefully evaluated [its] year-end reserves" and that those reserves were "consistent, conservative, and appropriate" were false. (Opp. at 12.) But, once again, Plaintiff herself created any misleading impression by deceptively using ellipsis to trim a multi-page portion of the January 23 earnings call down to just a few short lines and then boldly proclaiming "falsity."

The full text of Mr. DeVeydt's statement describes how WellPoint carefully evaluated its year-end reserves and continued to establish its reserves in a consistent and conservative manner. (Geida Dec., Ex. 25 at 5-7.) Among other things, he explained in the omitted text that WellPoint had experienced (1) a decrease in the days in claims payable metric, showing that WellPoint was paying claims more quickly, and (2) a "significant positive prior-year reserve development of $333 million[,]" which "demonstrate[d] the adequacy and consistency of prior year reserves." (*See id.*) These developments – combined with the fact that in setting its reserves WellPoint had conservatively assumed both that it would experience a higher amount of claims for every member each month and that it would pay those claims more slowly, both of which lead to higher reserves[2] – provided a reasonable and accurate basis for describing WellPoint's reserving for outstanding claims as "careful" and "conservative." Plaintiff points to nothing misleading or false about that description.

In any event, the language Plaintiff actually quotes makes clear that Mr. DeVeydt's reference to "careful and conservative" reserving referred to WellPoint's maintaining its practice of setting reserves based on a "high single-digit margin for adverse development." (*Id.* at 5.)

---

[2] "A couple things we did at year end though is we did slow the completion factors down a bit. And we also increased our incurred PMPM on the reserves . . . ." (Geida Dec., Ex. 25, Jan. 23, 2008, Conf. Call Final Tr. at 8.)

Plaintiff does not allege (and would have no factual basis for alleging) that WellPoint changed the way it calculated its reserves or reduced the high single-digit margin on which it based those reserves.  In short, when Mr. DeVeydt's statement is read in its entirety, it is clear that his statement was accurate and that Plaintiff's Amended Complaint alleges no facts to the contrary. (*Id*. at 2-3.)

## III.    WELLPOINT'S JANUARY 23, 2008, EARNINGS PROJECTIONS ARE PROTECTED BY BOTH PRONGS OF THE REFORM ACT SAFE HARBOR.

WellPoint's earnings and membership projections are protected by both prongs of the Reform Act safe harbor.  *See* 15 U.S.C. § 78u-5(c)(1).  The two prongs act independently and provide independent reasons for dismissing Plaintiff's Amended Complaint.  *See Southland Sec. Corp. v. INSpire Ins. Solutions Inc*., 365 F.3d 353, 371 (5th Cir. 2004) (The safe harbor has "two independent prongs;" under the first prong, there is no liability if the forward-looking statement is accompanied by meaningful cautionary language; under the second prong, there is no liability if the forward-looking statement was not made with actual knowledge of falsity.).

### A.    Meaningful Warnings Accompanied WellPoint's Earnings Projections.

The safe harbor's first prong protects WellPoint's projections because they were accompanied by detailed, meaningful cautionary warnings.  Plaintiff argues that the Court should disregard the warnings contained in WellPoint's then current 2006 10-K because it issued eleven months before WellPoint's January 23 projections.  (Opp. at 18-19.)  Plaintiff ignores that the Safe Harbor Statement accompanying WellPoint's January 23 earnings projections expressly incorporated the detailed warnings set forth in WellPoint's SEC filings, including its 2006 10-K, and that WellPoint also referred investors to those detailed cautionary statements during both its January 23, 2008, Earnings Call and its presentation at the January 30, 2008, Wachovia HealthCare Conference.  (Geida Dec., Ex. 25 at 2; Ex. 26 at 1.)  (*See* Appendix I.)  By incorporating those warnings, WellPoint put investors on notice that WellPoint's January 23,

2008, projections were subject to the warnings contained in WellPoint's 2006 10-K. *See, e.g., Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) (appropriate during April 1999 earnings projections conference call to refer investors to current Form 10-K issued ten months earlier "for a discussion of the most important factors" affecting those projections); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 677-78 (6th Cir. 2003) (proper in assessing whether cautionary language was meaningful to look to risk disclosures in company's Form 10-K where cautionary language cited those disclosures). And where, as here, a plaintiff invokes a fraud-on-the-market theory, the plaintiff "must acknowledge that all public information is reflected in the [stock] price." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004). Thus, cautionary statements contained in SEC filings are deemed absorbed into the market and must be considered in determining whether the forward-looking statements were accompanied by meaningful cautionary language. (*Id.*)

Plaintiff self-edits WellPoint's warnings to make them appear thin, and then stridently exclaims they were insufficient boilerplate. (Opp. at 18-19.) Plaintiff cannot edit her way from WellPoint's detailed cautionary statements, including:

- *Costs*. "Relatively small differences between predicted and actual health care costs as a percentage of premium revenues can result in significant changes in our results of operations."
  \*\*\*
  "Actual experience [on reserve estimates] will likely differ from assumed experience, and to the extent the actual claims experience is less favorable than estimated based on our underlying assumptions, our incurred losses would increase and future earnings could be adversely affected." (Geida Dec., Ex. 4, 2006 10-K at 22.)

- *Membership*. "A shift of enrollees from more profitable products [i.e., fully-insured products] to less profitable products [i.e., self-funded products] could have a material adverse effect on our financial condition and results of operations." (*Id.* at 24.)

- *IT Systems Consolidation*. "As a result of our merger and acquisition activities, we have acquired additional systems. Our failure to maintain effective and efficient information systems, or our failure to efficiently and

effectively consolidate our information systems to eliminate redundant or obsolete applications, could have a material adverse effect on our business, financial condition and results of operations." (*Id*. at 30.)

- ***Economic Conditions.*** "Regional concentrations of our business may subject us to economic downturns in those regions. . . . If economic conditions in these states deteriorate, we may experience a reduction in existing and new business, which could have a material adverse effect on our business, financial condition and results of operations." (*Id.* at 27.)

These detailed warnings described the risks in WellPoint's January 23 projections. Courts routinely find similar warnings to be sufficient. *See e.g., Institutional Investors Group v. Avaya, Inc*., 564 F.3d 242, 257-58 (3rd Cir. 2009) (warning that identified a company's future ability to control costs and expenses, as well as "general industry market conditions" and "general domestic and international economic conditions" provided meaningful cautionary language); *Matria*, 324 F. Supp. 2d at 1382 (company's statement that its key information technology was "exposed to technology failure and obsolescence risk" constituted a meaningful warning).

Third, Plaintiff also argues that WellPoint's warnings were insufficient because WellPoint had not changed its safe harbor warnings during the two years preceding the January 23 projections. (*See* Opp. at 16-17.) Plaintiff cites no authority requiring safe harbor warnings to be automatically changed, and for good reason – the effectiveness of a safe harbor statement is measured by its specificity to the risks actually realized and not by some arbitrary date change. *See Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (cautionary language meaningful "when an investor has been warned of risks of a significance similar to that actually realized"). Indeed, WellPoint warned of the precise risks that Plaintiff herself says led WellPoint to revise its 2008 projections. This is dispositive of the issue of whether WellPoint's warnings were sufficient. *Avaya*, 564 F.3d at 257-58 (finding cautionary language listing the very risks that allegedly caused the missed projections sufficient under the Reform Act); *Stavros v. Exelon Corp*., 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (cautionary language sufficient where the

language warned of risks of a significance similar to that actually realized); *Desai v. General Growth Properties, Inc.,* __ F. Supp. 2d __, 2009 WL 2971065, at *6 (N.D. Ill. Sept. 17, 2009) (almost "farcical" to claim that cautionary statements identifying "the exact risks that have been identified in Plaintiffs' Complaint" were boilerplate). In any event, it is clear from WellPoint's SEC filings that it did in fact make changes to the risks disclosed, both in the safe harbor portion of its press releases and in the disclosures set forth in its 2006 10-K, based on the specific uncertainties that could potentially affect its earnings projections.[3]

### B.    Plaintiff Pleads No Actual Knowledge Of Falsity.

WellPoint's projections are also protected by the safe harbor's second prong because Plaintiff points to no facts showing that any Defendant had actual knowledge that the projections were false when announced. *See* 15 U.S.C. § 78u-5(c)(1). Plaintiff begins by arguing the wrong standard, asserting that the test is either recklessness or whether WellPoint's projections lacked "a reasonable basis." (Opp. at 13.) The Reform Act makes clear, however, that "actual knowledge" is the appropriate standard for forward-looking statements. *See* 15 U.S.C. § 78u-5(c)(1)(B); *see also Avaya,* 564 F.3d at 274 ("knowing deception," not lesser standard, is appropriate standard for forward-looking statements).

Plaintiff also argues that her request for relief need only be "plausible" to survive a motion to dismiss. (Opp. at 7.) But the governing standard in a securities fraud case requires allegations create a strong inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). This standard is higher than plausibility. *Id* at 314. (Reform Act requires an inference of scienter "be more than merely plausible or reasonable.").

---

[3] To see the changes in the risk factors set forth in WellPoint's 2005, 2006, and 2007 10-Ks *see* http://www.sec.gov/Archives/edgar/data/1156039/000119312506037706/d10k.htm at 19-29 (2005); Geida Dec., Ex. 4 at 21-32 (2006); Geida Dec., Ex. 2 at 22-33 (2007). One relevant example of the differences is that WellPoint added language to its 2006 10-K specifically stating that problems with its claims systems conversions could cause "material adverse effects" on WellPoint's business.

Plaintiff has not, and cannot, overcome this high hurdle. WellPoint revised its 2008 projections just six weeks after it issued its initial guidance based on its review of its results for the first two months of 2008. The revised guidance was based on information that was not, and could not have been, known on January 23, when WellPoint announced its projections, and Plaintiff does not allege otherwise. Thus, no Defendant could have had *actual knowledge* that the 2008 earnings projections were false on January 23.[4]

      **1.**      **None Of Plaintiff's Allegations Regarding Confidential Witnesses Support An Inference Of Actual Knowledge.**

Plaintiff's Amended Complaint relied heavily on its 19 Confidential Witnesses (CWs) to provide purported evidence of Defendants' scienter. Defendants' motion showed those CWs should be steeply discounted because, among other things, several left the Company long before the putative class period began, and none point to any contemporaneous report or other information that indicated WellPoint's projections were knowingly false when issued. (*See* Mot. at 21-27.) Plaintiff argues that her CW allegations are sufficient because "nothing more is required" than alleging "when the witnesses were employed at WellPoint, the witnesses' titles, positions, and responsibilities, and the basis for the witnesses' knowledge." (Opp. at 26.) But the issue is not Plaintiff's identification of the CWs but rather that Plaintiff's substantive allegations showed that *none of the CWs were in any position to support the necessary strong inference of actual knowledge of fraud by Defendants*. Similarly, Plaintiff contends that she "describes with particularity numerous reports (¶¶ 89, 94-96) witness statements (¶¶ 88, 92, 96),

---

[4] Plaintiff argues that "the short, six-week period" between WellPoint's January 23 original projections and its March 10 revised projections "supports an inference of scienter." (Opp. at 28.) However, Plaintiff's argument ignores the fact that, as explained in WellPoint's moving papers (*See* Mot. at 9-11), neither WellPoint's early 2008 results nor its revised earnings projections were unique to WellPoint. To the contrary, most of WellPoint's significant competitors also revised their earnings projections downward shortly after WellPoint did. Thus, the short period between WellPoint's original projections and its revised projections demonstrates only that WellPoint moved quickly to announce its revised projections after it concluded it was necessary to do so based on its results during January and February 2008. Treating such prompt action as supporting an inference of scienter, as Plaintiff urges, would undermine Congress' intent to encourage companies to provide investors with information about management's expectations for the future. (*See* Mot. at 14-15.)

and information (¶¶ 89-91, 93, 95, 97) provided to Defendants ….”  (Opp. at 26.)  But neither the

Amended Complaint nor the Opposition identifies any specific report, witness statement or any

other contemporaneous adverse information by author, recipient, date or contents purportedly

provided to the Defendants that contradicted WellPoint’s projections on January 23, 2008.[5]

**2.    Plaintiff Pleads No Facts Showing That Any Defendant Had Actual Knowledge Of Any Statement’s Falsity.**

None of the hodge podge of other “facts” upon which Plaintiff relies supports actual

knowledge of falsity by any Defendant.  *First*, Plaintiff contends that the March 11, 2008,

resignation of WellPoint’s former Chief Accounting Officer, Jamie Miller, was “highly

suspicious” because it occurred so close in time to the March 10 announcement revising the 2008

guidance.  (Opp. at 29-30.)  Plaintiff conveniently fails to mention that the announcement of Ms.

Miller’s departure disclosed that she left to become the Chief Accounting Officer of General

Electric Company.[6]  Her move from one Fortune 50 company to another, obviously in the works

for some time prior to March 10, can hardly create a compelling inference of scienter, let alone

the requisite strong inference.  In any event, Plaintiff makes no allegation of improper accounting

and the departure of WellPoint’s Chief Accounting Officer therefore proves nothing.

*Second*, Plaintiff seriously misrepresents her own allegations regarding an alleged

internal WellPoint meeting in mid-February 2008.  Paragraph 54 of the Amended Complaint

asserts that CW19 “attended quarterly Managers meetings, which were attended by all high-

ranking executive officers, including the Individual Defendants,” that the Company’s financial

---

[5] Plaintiff states that CW6 and CW7 “describe two major corporate initiatives to solve the systems integration problems and that they were both woefully behind schedule prior to and at the time of the Class Period.  ¶¶ 41-42.” (Opp. at 27.)  The Amended Complaint, however, contains no such tales of woe.  All CW6 or CW7 allegedly say is that there was an ongoing effort to integrate and consolidate information systems.  (*See* AC ¶¶ 41-42.)  None of the allegations from CW6 and CW7 point to any fact that was inconsistent with WellPoint’s public statements.

[6] (*See* Supplemental Dec. of Lindsay L. Geida in Supp. of Defs.’ Mot. to Dismiss Pl.’s Am. Compl. (“Supp. Geida Dec.”) Ex. 30, Mar. 12, 2008, WellPoint Form 8-K (“Jamie S. Miller notified WellPoint, Inc. (the ‘Company’) that she is resigning as Chief Accounting Officer, Senior Vice President and Controller of the Company effective as of April 4, 2008, in order to become the Vice President – Comptroller and Chief Accounting Officer at General Electric Company.”); *see also id*. Ex. 32, Mar. 7, 2008 and Apr. 30, 2008 General Electric Forms 8-K).)

performance was the customary topics at these quarterly meetings, and that "[d]uring a Managers meeting in mid-February 2008, defendant Braly told CW19 and other attendees that they would hear 'rumors' about issues that WellPoint was going to announce to the public." The Opposition stretches those thin allegations by positing that Defendant Glasscock attended the February meeting and that the Defendants admitted at the meeting that they "knew of [WellPoint's] problems and [also knew] that, as a result, WellPoint would not achieve its 2008 guidance." (Opp. at 5-6.) This is sheer fabrication – the Amended Complaint does not allege Mr. Glasscock attended the meeting and never says what the "rumors" were. Indeed, the Opposition's claim that Mr. Glasscock was at the meeting contradicts the Amended Complaint's allegation that the quarterly meetings were attended by executive officers because Mr. Glasscock ceased being an executive officer in mid-2007. Similarly, paragraph 54's assertion regarding Ms. Braly's alleged warning to managers about unidentified "rumors" does not mean, as the Opposition claims, that the Defendants "admitted" WellPoint would not achieve its projected earnings. In any event, none of the allegations regarding the mid-February 2008 meeting provide any insight about the state of mind of any Defendant on January 23, when WellPoint issued its 2008 projections.

*Third*, Plaintiff's Opposition also misconstrues the record by simply failing to acknowledge that WellPoint disclosed unfavorable information on January 23, 2008. For instance, Plaintiff alleges that "Defendants also knew, as a result of the nation-wide economic downturn and based on the results of WellPoint's open enrollment period for 2008 (i.e., October 2007 to December 2007), that WellPoint's membership growth was decreasing, shifting away from its more profitable Fully-Insured products and that … WellPoint was not securing the number of projected enrollments." (*See id*. at 13-14.) But Plaintiff ignores the fact that WellPoint disclosed unfavorable enrollment developments on January 23, 2008, and revised its original enrollment projections downward. (*See* Geida Dec., Ex. 25 at 3.) As a result, Plaintiff

does not and cannot allege with any specificity that WellPoint disregarded known enrollment trends in generating its projections. Similarly, the Amended Complaint alleges that "Defendants were also aware in 2007 that the Company's claims cost trends had become increasingly worse, and that these trends would continue into 2008." (*See* AC ¶ 93.) But, again, Plaintiff ignores the fact that WellPoint disclosed this increasing cost trend on January 23. (Geida Dec., Ex. 25 at 3.) The Amended Complaint does not allege that WellPoint disregarded the known cost trends, or the plan of action to address those trends, in generating its projections.

*Fourth,* Plaintiff contends that the problems associated with WellPoint's systems migrations resulted in sanctions in January 2009 by the U.S. Centers for Medicare & Medicaid Services ("CMS"). (*See* Opp. at 1, 27; AC ¶¶ 7, 14, 49, 78(f).) The CMS action is irrelevant. The Amended Complaint certainly pleads no facts that would show how a CMS action in January *2009* – ten months after Plaintiff's proposed class period ends – demonstrates that WellPoint knew its 2008 earnings projections were false when announced *a year earlier*.[7] Nor does the Opposition explain how a 2009 CMS action related to certain narrow aspects of WellPoint's business even relates to WellPoint's January 2008 overall earnings projections.[8]

*Fifth*, Plaintiff's reliance on the July 9, 2009, Indiana State Medical Association ("ISMA") letter is entirely misplaced and should be disregarded. The July 2009 letter is from the state physicians' organization in a single state, and relates to the 2005 settlement of a wholly unrelated case. Plaintiff's Amended Complaint says nothing about ISMA, and Plaintiff never explains any relationship between the July 2009 letter and events at WellPoint over a year earlier in January 2008. Plaintiff herself concedes that the Court may not rely on the unproven

---

[7] CW15's generic allegation that computer system issues caused CMS to sanction WellPoint is groundless. CW15 is simply in no position to know the reasons for CMS sanctions as he is not alleged to have worked at CMS at any time and had allegedly left WellPoint a full six months before CMS issued the sanctions. In any event, there are no facts alleged that would show the CMS "computer system issues" were in any way related to WellPoint's revised projections. (*See* AC ¶ 50.)
[8] Regardless, the CMS sanctions were lifted on September 9, 2009 (effective October 1, 2009). (Supp. Geida Dec., Ex. 31, Sept. 9, 2009, WellPoint Form 8-K.)

allegations in the letter.  (*See* Pl.'s Request for Judicial Notice at 3 n.3.)

*Sixth*, Plaintiff may not use Defendants Braly's or DeVeydt's Sarbanes Oxley

certifications or their alleged involvement in WellPoint's "core operations" as a proxy for actual

knowledge of falsity.  (*See* Opp. at 33-34, 24-25.)  SOX certifications are insufficient as a matter

of law to show actual knowledge of falsity.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

981, 1003-04 (9th Cir. 2009) (certifications under Sarbanes-Oxley "add nothing substantial to the

scienter calculus" and noting that "[o]ur sister circuits to rule on such questions have

unanimously agreed that allowing Sarbanes-Oxley certifications to create an inference of scienter

in 'every case where there was an accounting error or auditing mistake made by a publicly traded

company' would 'eviscerat[e] the pleading requirements for scienter set forth in the PSLRA'").

Reliance on a claim of defendants' involvement in their company's "core operations" also is

generally inadequate by itself to meet the Reform Act's pleading standards.  *Id.* at 1000 (noting

"we have previously found inadequate complaints alleging that 'facts critical to a business's core

operations or an important transaction generally are so apparent that their knowledge may be

attributed to the company and its key officers.'" (quoting *In re Read-Rite Corp. Sec. Litig.*, 335

F.3d 843, 848 (9th Cir. 2003))).  Allegations that senior management "closely reviewed" the

disputed information, "and that top executives had several meetings in which they discussed [the

disputed information]" likewise are insufficient.  *See id.*  Plaintiff offers nothing apart from these

general allegation concerning Defendants receipt of various unidentified financial reports (Opp.

at 24-25), and her reliance on this rarely-invoked theory should be disregarded.

> **3.     Contrary To Plaintiff's Assertions, Defendants Did Not Admit Their
>         Statements Were False.**

As if taking Defendants' statements out of context and creatively editing them were not

enough, Plaintiff also makes the outlandish claim that "defendants have ***admitted*** that they knew

as early as 2007 that they were not accurately forecasting cost trends."  (Opp. at 23.)  To support

that assertion, Plaintiff points to a non-defendant's supposed comment that "as we headed

towards the end of 2007 … we realized that, frankly, we just missed [cost trends]."  (*Id.*)  What

was actually said, however, confirms that WellPoint recognized the adverse developments with

its cost of care in early 2008:

> One is that, as we headed towards the end of 2007 ***and early this year***, we
> realized that, frankly, we just missed ***(technical difficulty). We thought
> we had a complete view of what our cost of care expenses were, and we
> recognized that we did not. So, this led to prior-period [adverse]
> development, which is larger than we had anticipated, and the
> carryforward of that recognition affected our 2008 projected results.***  So
> certainly, that recognition caused us to recognize that our cost trends were
> higher than we had suspected.

(Supp. Geida Dec., Ex. 28, Final Tr. of Mar. 13, 2008, WellPoint, Inc. at Bear, Stearns & Co.,

Inc. London Healthcare Conference at 6 (Plaintiff's omissions in bold).)  The full statement is

entirely consistent with WellPoint's announcement of the revised guidance.  The statement

makes clear that WellPoint's original earnings projections were based on what it then believed to

be an accurate and "complete view" of its cost of care expenses, and that its revised projections

were based on new information that made WellPoint realize those expenses "were higher than

[it] had suspected."[9]

Plaintiff also misleadingly claims Defendants admitted WellPoint's statement that its

claims processing times improved in the fourth quarter of 2007 was false.  WellPoint disclosed

issues with claims processing systems migrations in 2006 and 2007, and a resulting slow down in

claims processing, when it announced its earnings projections on January 23, but that is not

inconsistent with WellPoint's claims processing cycle times improvement during the fourth

quarter of 2007.  The Opposition also contends that Mr. DeVeydt admitted that the claims

processing slow down that resulted from the 2006 and 2007 migration issues "created some of

---

[9] "The Company incurred higher-than-expected medical costs ***during the first two months of 2008*** and has revised
its full year outlook for Individual and Local Group fully insured medical cost trends to a range of 8.0 percent, plus
or minus 50 basis points.  Medical cost trends are also being impacted by less favorable than expected prior year
reserve development ***in 2008***." (Geida Dec., Ex. 3, Mar. 10, 2008, Press Release at 1 (emphasis added).)

our current pricing issues that we've incurred [during the Class Period]." (Opp. at 13.) But Plaintiff never alleges that Mr. DeVeydt, or any Defendant, knew on January 23 that those migration issues would create, let alone *had created*, the "current" pricing issues referenced on March 19, 2008. Indeed, Mr. DeVeydt specifically stated on March 19 that those issues only had come into focus in March 2008. (Supp. Geida. Dec., Ex. 29, Final Tr. of Mar. 19, 2008, WellPoint, Inc. at Lehman Brothers Healthcare Conference at 6 ("Let me spend just a few minutes on the information technology strategy, because this has been, I think, a real touch point for us, especially in the last two weeks. …").)

### 4.    Mr. Glasscock's Stock Sales Pursuant To SEC Rule 10b5-1 Plans Are Protected And Do Not Support An Inference Of Actual Knowledge.

Defendants showed that Mr. Glasscock's class period sales do not support an inference of actual knowledge because they were consistent with Mr. Glasscock's prior trading history and were made pursuant to two pre-approved SEC Rule 10b5-1 Plans – the first adopted May 4, 2007, and the second adopted February 11, 2008. (Mot. at 27-30.) Rule 10b5-1 precludes liability for trades made pursuant to a properly created plan because such trades are deemed "not 'on the basis of' material nonpublic information." 17 C.F.R. § 240.10b5-1(c).

Plaintiff incorrectly contends that Mr. Glasscock's SEC Rule 10b5-1 plans are irrelevant because they cannot be considered at the pleading stage and one was entered during the class period. (Opp. at 33.) But SEC Rule 10b5-1 plans are routinely considered at the pleading stage. *See, e.g., Avaya*, 564 F.3d at 279 (sales by defendants, some which were made pursuant to SEC Rule 10b5-1 plan, did not enhance inference of scienter). Plaintiff also ignores that Mr. Glasscock's February 6, 2008, trades were made pursuant to the May 4, 2007, plan, adopted almost ten months before the start of the class period. Under that plan, from May 2007 through and including early February 2008, Mr. Glasscock sold an equal number of shares roughly every two weeks. He then entered into the February 11, 2008, plan immediately after his May 4, 2007,

plan automatically expired pursuant to its terms.  (*See* Geida Dec., Ex. 5.)  There are simply no allegations that the trading plans were not properly implemented under SEC Rule 10b5-1.

The Amended Complaint also pleads ***no facts*** supporting Plaintiff's assertion that Mr. Glasscock entered into either of his Rule 10b5-1 plans while in possession of material, nonpublic information.  Plaintiff's Opposition invents Mr. Glasscock's attendance at the alleged mid-February 2008 managers meeting but the Amended Complaint does not place him there. Regardless, the alleged mid-February meeting sheds no light on whether the January 23 projections were knowingly false when made.  Neither Mr. Glasscock's Rule 10b5-1 sales nor the prompt renewal of his plan is consistent with Plaintiff's theory that Mr. Glasscock's stock sales were "suspicious in both timing and amount."  (Opp. at 31.)  *See Elam v. Neidorff*, 544 F.3d 921, 928-29 (8th Cir. 2008) (finding "[n]o inference of scienter arises from [defendants'] stock sales" because they were prescheduled pursuant to SEC Rule 10b5-1 plan).

## IV.   PLAINTIFF STILL FAILS TO ATTRIBUTE ANY ALLEGED MISSTATEMENT TO MR. GLASSCOCK.

Finally, in yet another mischaracterization of the allegations in the Amended Complaint, Plaintiff argues that Mr. Glasscock "reviewed WellPoint's January 23, 2008, press release, which contained numerous false and misleading statements, and had knowledge of adverse material facts."  (Opp. at 34 (citing AC ¶¶ 30-34, 55-58).)  But the Amended Complaint contains no such allegation and Plaintiff attributes no alleged misstatement to Mr. Glasscock.  Mr. Glasscock's signature on WellPoint's 2007 10-K does not, by itself, create Rule 10(b) liability.  (Mot. at 33.) Thus, the claims against him should be dismissed.

DATED:  October 23, 2009

                                                s/ Matthew T. Albaugh
                                                Christopher G. Scanlon (#1583-49)
                                                James H. Ham III (#7401-49)
                                                Matthew T. Albaugh (#23293-49)
                                                BAKER & DANIELS LLP
                                                300 North Meridian Street, Suite 2700

Indianapolis, IN  46204
317-237-0300 telephone
317-237-1000 facsimile
chris.scanlon@bakerd.com
jay.ham@bakerd.com
matthew.albaugh@bakerd.com

Seth Aronson
Michael Maddigan
Jorge deNeve
Lindsay Geida
O'MELVENY & MYERS, LLP
400 South Hope Street
Los Angeles, California 90071
213-430-6000 telephone
213-430-6407 facsimile
saronson@omm.com
mmaddigan@omm.com
jdeneve@omm.com
lgeida@omm.com

*Attorneys for Defendants WellPoint, Inc.,
Angela F. Braly, Wayne S. DeVeydt, and
Larry C. Glasscock*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 23, 2009, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Irwin B. Levin
ilevin@cohenandmalad.com

Scott D. Gilchrist
sgilchrist@cohenandmalad.com

Richard E. Shevitz
rshevitz@cohenandmalad.com

David A. Rosenfeld
drosenfeld@csgrr.com

Deborah Ruth Gross
debbie@bernardmgross.com

Ex Kano S. Sams, II
exkanos@csgrr.com

Laura M. Andracchio
lauraA@csgrr.com

X. Jay Alvarez
jaya@csgrr.com

Robert Paul Frutkin
rpf@bernardmgross.com

Sarah Renee Holloway
sholloway@csgrr.com

I certify that on October 23, 2009, a copy of the foregoing was sent to the

following via U.S. Mail, First Class postage prepaid:

      Mario Alba, Jr.
      Coughlin Stoia Geller Rudman & Robbins, LLP
      58 South Service Road, Suite 200
      Melville, NY  11747

                s/  Matthew T. Albaugh
                Matthew T. Albaugh

# APPENDIX 1
# Excerpt of WellPoint Inc.'s 2006 10-K

10-K 1 d10k.htm FORM 10-K

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

*(Mark One)*

☒

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended **December 31, 2006**

OR

☐

### TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from            to

Commission file number 001-16751

# WELLPOINT, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Indiana** | **35-2145715** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **120 Monument Circle** | |
| **Indianapolis, Indiana** | **46204** |
| **(Address of principal executive offices)** | **(Zip Code)** |

Registrant's telephone number, including area code: **(317) 488-6000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, Par Value $0.01 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.  Yes ☐  No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

**Table of Contents**

Chauffeurs, Warehousemen and Helpers of America, Local No. 614; 17 employees in the New York city metropolitan area with the Office and Professional Employees International Union, Local 153; and 149 employees in Milwaukee, Wisconsin with the Office and Professional Employees International Union, Local 9. Our employees are an important asset, and we seek to develop them to their full potential. We believe that our relationship with our employees is good.

**ITEM 1A. RISK FACTORS.**

The following factors, among others, could cause actual results to differ materially from those contained in forward-looking statements made in this Annual Report on Form 10-K and presented elsewhere by management from time to time. Such factors, among others, may have a material adverse effect on our business, financial condition, and results of operations and you should carefully consider them. It is not possible to predict or identify all such factors. Consequently, you should not consider any such list to be a complete statement of all our potential risks or uncertainties. Because of these and other factors, past performance should not be considered an indication of future performance.

**Changes in state and federal regulations, or the application thereof, may adversely affect our business, financial condition and results of operations.**

Our insurance, managed health care and health maintenance organization, or HMO, subsidiaries are subject to extensive regulation and supervision by the insurance, managed health care or HMO regulatory authorities of each state in which they are licensed or authorized to do business, as well as to regulation by federal and local agencies. We cannot assure you that future regulatory action by state insurance or HMO authorities will not have a material adverse effect on the profitability or marketability of our health benefits or managed care products or on our business, financial condition and results of operations. In addition, because of our participation in government-sponsored programs such as Medicare and Medicaid, changes in government regulations or policy with respect to, among other things, reimbursement levels, could also adversely affect our business, financial condition and results of operations. In addition, we cannot assure you that application of the federal and/or state tax regulatory regime that currently applies to us will not, or future tax regulation by either federal and/or state governmental authorities concerning us could not, have a material adverse effect on our business, operations or financial condition.

State legislatures and Congress continue to focus on health care issues. A number of states, including California, Connecticut, and Pennsylvania, are contemplating significant reform of their health insurance markets. These proposals include provisions affecting both public programs and privately-financed health insurance arrangements. Broadly stated, these proposals attempt to increase the number of insured by raising the eligibility levels for public programs and compelling individuals and employers to purchase health coverage. At the same time, they reform the underwriting and marketing practices of health plans. As these proposals are still being debated in the various legislatures, we cannot assure you that, if enacted into law, these proposals would not have a negative impact on our business, operations or financial condition.

From time to time, Congress has considered various forms of managed care reform legislation which, if adopted, could fundamentally alter the treatment of coverage decisions under ERISA. Additionally, there have been legislative attempts to limit ERISA's preemptive effect on state laws. If adopted, such limitations could increase our liability exposure and could permit greater state regulation of our operations. Other proposed bills and regulations, including those related to HIPAA standard transactions and code sets, consumer-driven health plans and health savings accounts and insurance market reform, at state and federal levels may impact certain aspects of our business, including premium receipts, provider contracting, claims payments and processing and confidentiality of health information. While we cannot predict if any of these initiatives will ultimately become effective or, if enacted, what their terms will be, their enactment could increase our costs, expose us to expanded liability or require us to revise the ways in which we conduct business. Further, as we continue to implement our e-business initiatives, uncertainty surrounding the regulatory authority and requirements in this area may make it difficult to ensure compliance.

Table of Contents

**Our inability to contain health care costs, implement increases in premium rates on a timely basis, maintain adequate reserves for policy benefits, maintain our current provider agreements or avoid a downgrade in our ratings may adversely affect our business and profitability.**

Our profitability depends in large part on accurately predicting health care costs and on our ability to manage future health care costs through underwriting criteria, medical management, product design and negotiation of favorable provider contracts. The aging of the population and other demographic characteristics and advances in medical technology continue to contribute to rising health care costs. Government-imposed limitations on Medicare and Medicaid reimbursement have also caused the private sector to bear a greater share of increasing health care costs. Changes in health care practices, inflation, new technologies, the cost of prescription drugs, clusters of high cost cases, changes in the regulatory environment and numerous other factors affecting the cost of health care may adversely affect our ability to predict and manage health care costs, as well as our business, financial condition and results of operations. Relatively small differences between predicted and actual health care costs as a percentage of premium revenues can result in significant changes in our results of operations.

In addition to the challenge of managing health care costs, we face pressure to contain premium rates. Our customer contracts may be subject to renegotiation as customers seek to contain their costs. Alternatively, our customers may move to a competitor to obtain more favorable premiums. Fiscal concerns regarding the continued viability of programs such as Medicare and Medicaid may cause decreasing reimbursement rates or a lack of sufficient increase in reimbursement rates for government-sponsored programs in which we participate. A limitation on our ability to increase or maintain our premium or reimbursement levels or a significant loss of membership resulting from our need to increase or maintain premium or reimbursement levels could adversely affect our business, financial condition and results of operations.

The reserves that we establish for health insurance policy benefits and other contractual rights and benefits are based upon assumptions concerning a number of factors, including trends in health care costs, expenses, general economic conditions and other factors. Actual experience will likely differ from assumed experience, and to the extent the actual claims experience is less favorable than estimated based on our underlying assumptions, our incurred losses would increase and future earnings could be adversely affected.

In addition, our profitability is dependent upon our ability to contract on favorable terms with hospitals, physicians and other health care providers. The failure to maintain or to secure new cost-effective health care provider contracts may result in a loss in membership or higher medical costs. In addition, our inability to contract with providers, or the inability of providers to provide adequate care, could adversely affect our business.

Claims-paying ability and financial strength ratings by recognized rating organizations are an important factor in establishing the competitive position of insurance companies and health benefits companies. Rating organizations continue to review the financial performance and condition of insurers. Each of the rating agencies reviews its ratings periodically and there can be no assurance that our current ratings will be maintained in the future. We believe our strong ratings are an important factor in marketing our products to customers, since ratings information is broadly disseminated and generally used throughout the industry. If our ratings are downgraded or placed under surveillance or review, with possible negative implications, the downgrade, surveillance or review could adversely affect our business, financial condition and results of operations. These ratings reflect each rating agency's opinion of our financial strength, operating performance and ability to meet our obligations to policyholders and creditors, and are not evaluations directed toward the protection of investors in our common stock.

22

Table of Contents

**A reduction in the enrollment in our health benefits programs could have an adverse effect on our business and profitability.**

A reduction in the number of enrollees in our health benefits programs could adversely affect our business, financial condition and results of operations. Factors that could contribute to a reduction in enrollment include: failure to obtain new customers or retain existing customers; premium increases and benefit changes; our exit from a specific market; reductions in workforce by existing customers; negative publicity and news coverage; failure to attain or maintain nationally recognized accreditations; and general economic downturn that results in business failures.

**There are risks associated with being a contractor with the Centers for Medicare & Medicaid Services to provide Medicare Part D Prescription Drug benefits.**

The Medicare Prescription Drug, Improvement and Modernization Act of 2003, or MMA, became law in December 2003. The MMA significantly changed and expanded Medicare coverage. The MMA added the availability of prescription drug benefits for all Medicare eligible individuals starting January 1, 2006. Effective January 1, 2006, we began offering Medicare approved prescription drug plans to Medicare eligible individuals nationwide. In addition, we are also providing various administrative services for other entities offering prescription drug plans to their employees and retirees through our pharmacy benefit management and other affiliated companies. We are also the United States default plan for point of service facilitated enrollment, as defined by the Centers for Medicare & Medicaid Services, or CMS. While we believe we have adequately reviewed our assumptions and estimates regarding this complex and recent program, including those related to collectability of receivables and establishment of liabilities, the actual results may be different than our assumptions and estimates. Risks associated with the Medicare prescription drug plans include potential uncollectability of receivables resulting from processing and/or verifying enrollment (including facilitated enrollment), inadequacy of underwriting assumptions, inability to receive and process information, uncollectability of premiums from members, increased pharmaceutical costs, and the underlying seasonality of this business.

**We are subject to funding risks with respect to revenue received from participation in Medicare and Medicaid programs.**

We participate as a payer in Medicare Advantage, Medicare Part D and Medicaid programs and receive revenues from the Medicare and Medicaid programs to provide benefits under these programs. Revenues for these programs are dependent upon annual funding from the federal government and/or applicable state governments. Funding for these programs is dependent upon many factors outside of our control including general economic conditions at the federal or applicable state level and general political issues and priorities. An unexpected reduction or inadequate government funding for these programs may adversely affect our revenues and financial results.

**The health benefits industry is subject to negative publicity, which can adversely affect our business and profitability.**

The health benefits industry is subject to negative publicity. Negative publicity may result in increased regulation and legislative review of industry practices, which may further increase our costs of doing business and adversely affect our profitability by: adversely affecting our ability to market our products and services; requiring us to change our products and services; or increasing the regulatory burdens under which we operate.

In addition, as long as we use the Blue Cross and Blue Shield names and marks in marketing our health benefits products and services, any negative publicity concerning the Blue Cross and Blue Shield Association or other Blue Cross and Blue Shield Association licensees may adversely affect us and the sale of our health benefits products and services. Any such negative publicity could adversely affect our business, financial condition and results of operations.

23

Table of Contents

**We face competition in many of our markets and customers and brokers have flexibility in moving between competitors.**

As a health benefits company, we operate in a highly competitive environment and in an industry that is currently subject to significant changes from business consolidations, new strategic alliances, legislative reform, aggressive marketing practices by other health benefits organizations and market pressures brought about by an informed and organized customer base, particularly among large employers. This environment has produced and will likely continue to produce significant pressures on the profitability of health benefits companies.

We are dependent on the services of independent agents and brokers in the marketing of our health care products, particularly with respect to individuals, seniors and small employer group members. Such independent agents and brokers are typically not exclusively dedicated to us and may frequently also market health care products of our competitors. We face intense competition for the services and allegiance of independent agents and brokers. We cannot assure you that we will be able to compete successfully against current and future competitors or that competitive pressures faced by us will not materially and adversely affect our business, financial condition and results of operations.

**A change in our health care product mix may impact our profitability.**

Our health care products that involve greater potential risk generally tend to be more profitable than administrative services products and those health care products where we are able to shift risk to employer groups. Individuals and small employer groups are more likely to purchase our higher-risk health care products because such purchasers are generally unable or unwilling to bear greater liability for health care expenditures. Typically, government-sponsored programs also involve our higher-risk health care products. A shift of enrollees from more profitable products to less profitable products could have a material adverse effect on our financial condition and results of operations.

From time to time, we have implemented price increases in certain of our health care businesses. While these price increases may improve profitability, there can be no assurance that this will occur. Subsequent unfavorable changes in the relative profitability between our various products could have a material adverse effect on our financial condition and results of operations.

**Our pharmacy benefit management companies operate in an industry faced with a number of risks and uncertainties in addition to those we face with our core health care business.**

The following are some of the pharmacy benefit industry-related risks that could have a material adverse effect on our business, financial condition and results of operations:

- the application of federal and state anti-remuneration laws;

- compliance requirements for pharmacy benefit manager fiduciaries under ERISA, including compliance with fiduciary obligations under ERISA in connection with the development and implementation of items such as formularies, preferred drug listings and therapeutic intervention programs, contracting network practices, specialty drug distribution and other transactions and potential liability regarding the use of patient-identifiable medical information;

- a number of federal and state legislative proposals are being considered that could adversely affect a variety of pharmacy benefit industry practices, including without limitation, the receipt of rebates from pharmaceutical manufacturers, the regulation of the development and use of formularies, and legislation imposing additional rights to access to drugs for individuals enrolled in managed care plans;

- the application of federal and state laws and regulations related to the operation of Internet and mail-service pharmacies;

- our inability to contract on favorable terms with pharmaceutical manufacturers.

24

Table of Contents

The failure to adhere to these or other relevant laws and regulations could expose our pharmacy benefit management business to civil and criminal penalties. There can be no assurance that our business will not be subject to challenge under various laws and regulations or contractual arrangements. Any such noncompliance or challenge may have a material adverse effect on our business, financial condition and results of operations.

**As a holding company, we are dependent on dividends from our subsidiaries. Our regulated subsidiaries are subject to state regulations, including restrictions on the payment of dividends and maintenance of minimum levels of capital.**

We are a holding company whose assets include all of the outstanding shares of common stock of our subsidiaries including our intermediate holding companies and regulated insurance and HMO subsidiaries. As a holding company, we depend on dividends from our subsidiaries. Among other restrictions, state insurance and HMO laws may restrict the ability of our regulated subsidiaries to pay dividends. Our ability to repurchase shares or pay dividends in the future to our shareholders and meet our obligations, including paying operating expenses and debt service on our outstanding and future indebtedness, will depend upon the receipt of dividends from our subsidiaries. An inability of our subsidiaries to pay dividends in the future in an amount sufficient for us to meet our financial obligations may materially adversely affect our business, financial condition and results of operations.

Most of our regulated subsidiaries are subject to RBC standards, imposed by their states of domicile. These laws are based on the RBC Model Act adopted by the National Association of Insurance Commissioners, or NAIC, and require our regulated subsidiaries to report their results of risk-based capital calculations to the departments of insurance and the NAIC. Failure to maintain the minimum RBC standards could subject our regulated subsidiaries to corrective action, including state supervision or liquidation. Our regulated subsidiaries are currently in compliance with the risk-based capital or other similar requirements imposed by their respective states of domicile. As discussed in more detail below, we are a party to license agreements with the Blue Cross and Blue Shield Association which contain certain requirements and restrictions regarding our operations, including minimum capital and liquidity requirements, which could restrict the ability of our regulated subsidiaries to pay dividends.

**We face risks related to litigation.**

We are, or may be in the future, a party to a variety of legal actions that affect any business, such as employment and employment discrimination-related suits, employee benefit claims, breach of contract actions, tort claims and intellectual property-related litigation. In addition, because of the nature of our business, we are subject to a variety of legal actions relating to our business operations, including the design, management and offering of our products and services. These could include: claims relating to the denial of health care benefits; claims relating to the rescission of health insurance policies; medical malpractice actions; allegations of anti-competitive and unfair business activities; provider disputes over compensation and termination of provider contracts; disputes related to self-funded business; disputes over co-payment calculations; disputes related to the pharmacy benefit management business; claims related to the failure to disclose certain business practices; and claims relating to customer audits and contract performance.

Recent court decisions and legislative activity may increase our exposure for any of these types of claims. In some cases, substantial non-economic, treble or punitive damages may be sought. We currently have insurance coverage for some of these potential liabilities. Other potential liabilities may not be covered by insurance, insurers may dispute coverage or the amount of insurance may not be enough to cover the damages awarded. In addition, certain types of damages, such as punitive damages, may not be covered by insurance, and insurance coverage for all or certain forms of liability may become unavailable or prohibitively expensive in the future. Any adverse judgment against us resulting in such damage awards could have an adverse effect on our cash flows, results of operations and financial condition.

25

Table of Contents

In addition, we are also involved in pending and threatened litigation of the character incidental to the business transacted, arising out of our operations and our 2001 demutualization, and are from time to time involved as a party in various governmental investigations, audits, reviews and administrative proceedings. These investigations, audits and reviews include routine and special investigations by various state insurance departments, state attorneys general and the U.S. Attorney General. Such investigations could result in the imposition of civil or criminal fines, penalties and other sanctions. We believe that any liability that may result from any one of these actions, or in the aggregate, is unlikely to have a material adverse effect on our consolidated results of operations or financial position.

For additional information concerning legal actions affecting us, see Part I, Item 3, Legal Proceedings.

**We are a party to license agreements with the Blue Cross and Blue Shield Association that entitle us to the exclusive and in certain areas non-exclusive use of the Blue Cross and Blue Shield names and marks in our geographic territories. The termination of these license agreements or changes in the terms and conditions of these license agreements could adversely affect our business, financial condition and results of operations.**

We use the Blue Cross and Blue Shield names and marks as identifiers for our products and services under licenses from the Blue Cross and Blue Shield Association. Our license agreements with the Blue Cross and Blue Shield Association contain certain requirements and restrictions regarding our operations and our use of the Blue Cross and Blue Shield names and marks, including: minimum capital and liquidity requirements imposed by the Blue Cross and Blue Shield Association; enrollment and customer service performance requirements; participation in programs that provide portability of membership between plans; disclosures to the Blue Cross Blue and Shield Association relating to enrollment and financial conditions; disclosures as to the structure of the Blue Cross and Blue Shield system in contracts with third parties and in public statements; plan governance requirements; a requirement that at least 80% (or, in the case of Blue Cross of California, substantially all) of a licensee's annual combined local net revenue attributable to health benefit plans within its service areas must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks; a requirement that at least 66 2/3% of a licensee's annual combined national net revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks; a requirement that neither a plan nor any of its licensed affiliates may permit an entity other than a plan or a licensed affiliate to obtain control of the plan or the licensed affiliate or to acquire a substantial portion of its assets related to licensable services; a requirement that we guarantee certain contractual and financial obligations of our licensed affiliates; and a requirement that we indemnify the Blue Cross and Blue Shield Association against any claims asserted against it resulting from the contractual and financial obligations of any subsidiary that serves as a fiscal intermediary providing administrative services for Medicare Parts A and B. Failure to comply with the foregoing requirements could result in a termination of the license agreements.

The standards under the license agreements may be modified in certain instances by the Blue Cross and Blue Shield Association. For example, from time to time there have been proposals considered by the Blue Cross and Blue Shield Association to modify the terms of the license agreements to restrict various potential business activities of licensees. These proposals have included, among other things, a limitation on the ability of a licensee to make its provider networks available to insurance carriers or other entities not holding a Blue Cross or Blue Shield license. To the extent that such amendments to the license agreements are adopted in the future, they could have a material adverse effect on our future expansion plans or results of operations.

Upon the occurrence of an event causing termination of the license agreements, we would no longer have the right to use the Blue Cross and Blue Shield names and marks in one or more of our geographic territories. Furthermore, the Blue Cross and Blue Shield Association would be free to issue a license to use the Blue Cross and Blue Shield names and marks in these states to another entity. Events that could cause the termination of a license agreement with the Blue Cross Blue and Shield Association include failure to comply with minimum capital requirements imposed by the Blue Cross and Blue Shield Association, a change of control or violation of the Blue Cross and Blue Shield Association ownership limitations on our capital stock, impending financial insolvency and the appointment of a trustee or receiver or the commencement of any action against a licensee

26

**Table of Contents**

seeking its dissolution. We believe that the Blue Cross and Blue Shield names and marks are valuable identifiers of our products and services in the marketplace. Accordingly, termination of the license agreements could have a material adverse effect on our business, financial condition and results of operations.

Upon termination of a license agreement, the Blue Cross and Blue and Shield Association would impose a "Re-establishment Fee" upon us, which would allow the Blue Cross and Blue Shield Association to "re-establish" a Blue Cross and or Blue Shield presence in the vacated service area. Through December 31, 2006 the fee was set at $83.41 per licensed enrollee. As of December 31, 2006, we reported 28.5 million Blue Cross and or Blue Shield enrollees. If the Re-establishment Fee was applied to our total Blue Cross and or Blue Shield enrollees, we would be assessed approximately $2.4 billion by the Blue Cross and Blue Shield Association.

**Our investment portfolios are subject to varying economic and market conditions, as well as regulation. If we fail to comply with these regulations, we may be required to sell certain investments.**

The market values of our investments vary from time to time depending on economic and market conditions. For various reasons, we may sell certain of our investments at prices that are less than the carrying value of the investments. In addition, in periods of declining interest rates, bond calls and mortgage loan prepayments generally increase, resulting in the reinvestment of these funds at the then lower market rates. We cannot assure you that our investment portfolios will produce positive returns in future periods. Our regulated subsidiaries are subject to state laws and regulations that require diversification of our investment portfolios and limit the amount of investments in certain riskier investment categories, such as below-investment-grade fixed maturity securities, mortgage loans, real estate and equity investments, which could generate higher returns on our investments. Failure to comply with these laws and regulations might cause investments exceeding regulatory limitations to be treated as non-admitted assets for purposes of measuring statutory surplus and risk-based capital, and, in some instances, require the sale of those investments.

**As a Medicare fiscal intermediary, we are subject to complex regulations. If we fail to comply with these regulations, we may be exposed to criminal sanctions and significant civil penalties.**

Like a number of other Blue Cross and Blue Shield companies, we serve as a fiscal intermediary for the Medicare program, which generally provides coverage for persons who are 65 or older and for persons with end-stage renal disease. Part A of the Medicare program provides coverage for services provided by hospitals, skilled nursing facilities and other health care facilities. Part B of the Medicare program provides coverage for services provided by physicians, physical and occupational therapists and other professional providers. Part B also includes coverage for durable medical equipment such as diabetic supplies and wheelchairs. As a fiscal intermediary, we receive reimbursement for certain costs and expenditures, which is subject to adjustment upon audit by CMS. The laws and regulations governing fiscal intermediaries for the Medicare programs are complex, subject to interpretation and can expose a fiscal intermediary to penalties for non-compliance. If we fail to comply with these laws and regulations, we could be subject to criminal fines, civil penalties or other sanctions.

**Regional concentrations of our business may subject us to economic downturns in those regions.**

Most of our revenues are generated in the states of California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin. Due to this concentration of business in these states, we are exposed to potential losses resulting from the risk of an economic downturn in these states. If economic conditions in these states deteriorate, we may experience a reduction in existing and new business, which could have a material adverse effect on our business, financial condition and results of operations.

27

**Table of Contents**

**Large-scale medical emergencies may have a material adverse effect on our business, financial condition and results of operations.**

Large-scale medical emergencies can take many forms and can cause widespread illness and death. For example, there have been various incidents of suspected bioterrorist activity in the United States. To date, these incidents have resulted in related isolated incidents of illness and death. However, federal and state law enforcement officials have issued warnings about additional potential terrorist activity involving biological and other weapons. In addition, natural disasters such as the hurricanes experienced in the southeastern part of the United States in 2005 and the potential for a wide-spread pandemic of influenza coupled with the lack of availability of appropriate preventative medicines can have a significant impact on the health of the population of wide-spread areas. If the United States were to experience widespread bioterrorist or other attacks, large-scale natural disasters in our concentrated coverage areas or a large-scale pandemic or epidemic, our covered medical expenses could rise and we could experience a material adverse effect on our business, financial condition and results of operations or, in the event of extreme circumstances, our viability.

**We have built a significant portion of our current business through mergers and acquisitions and we expect to pursue acquisitions in the future.**

The following are some of the risks associated with acquisitions that could have a material adverse effect on our business, financial condition and results of operations:

- some of the acquired businesses may not achieve anticipated revenues, earnings or cash flow;

- we may assume liabilities that were not disclosed to us or which were under-estimated;

- we may be unable to integrate acquired businesses successfully and realize anticipated economic, operational and other benefits in a timely manner, which could result in substantial costs and delays or other operational, technical or financial problems;

- acquisitions could disrupt our ongoing business, distract management, divert resources and make it difficult to maintain our current business standards, controls and procedures;

- we may finance future acquisitions by issuing common stock for some or all of the purchase price, which could dilute the ownership interests of our shareholders;

- we may also incur additional debt related to future acquisitions; and

- we would be competing with other firms, some of which may have greater financial and other resources, to acquire attractive companies.

**We have substantial indebtedness outstanding and may incur additional indebtedness in the future. As a holding company, we are not able to repay our indebtedness except through dividends from subsidiaries, some of which are restricted in their ability to pay such dividends under applicable insurance law and undertakings. Such indebtedness could also adversely affect our ability to pursue desirable business opportunities.**

As of December 31, 2006, we had indebtedness outstanding of approximately $7.0 billion and had available borrowing capacity under our revolving credit facility of approximately $1.2 billion, which credit facility expires on September 30, 2011. Our debt service obligations require us to use a portion of our cash flow to pay interest and principal on debt instead of for other corporate purposes, including funding future expansion. If our cash flow and capital resources are insufficient to service our debt obligations, we may be forced to seek extraordinary dividends from our subsidiaries, sell assets, seek additional equity or debt capital or restructure our debt. However, these measures might be unsuccessful or inadequate in permitting us to meet scheduled debt service obligations.

As a holding company, we have no operations and are dependent on dividends from our subsidiaries for cash to fund our debt service and other corporate needs. Our subsidiaries are separate legal entities. Furthermore,

**Table of Contents**

our subsidiaries are not obligated to make funds available to us, and creditors of our subsidiaries will have a superior claim to certain of our subsidiaries' assets. State insurance laws restrict the ability of our regulated subsidiaries to pay dividends, and in some states we have made special undertakings that may limit the ability of our regulated subsidiaries to pay dividends. In addition, our subsidiaries' ability to make any payments to us will also depend on their earnings, the terms of their indebtedness, business and tax considerations and other legal restrictions. We cannot assure you that our subsidiaries will be able to pay dividends or otherwise contribute or distribute funds to us in an amount sufficient to pay the principal of or interest on the indebtedness owed by us.

We may also incur future debt obligations that might subject us to restrictive covenants that could affect our financial and operational flexibility. Our breach or failure to comply with any of these covenants could result in a default under our credit agreements. If we default under our credit agreements, the lenders could cease to make further extensions of credit or cause all of our outstanding debt obligations under our credit agreements to become immediately due and payable, together with accrued and unpaid interest. If the indebtedness under our notes or our credit agreements is accelerated, we may be unable to repay or finance the amounts due. Indebtedness could also limit our ability to pursue desirable business opportunities, and may affect our ability to maintain an investment grade rating for our indebtedness.

**The value of our intangible assets may become impaired.**

Due largely to our recent acquisitions, goodwill and other intangible assets represent a substantial portion of our assets. Goodwill and other intangible assets were approximately $22.8 billion as of December 31, 2006, representing approximately 44% of our total assets. If we make additional acquisitions it is likely that we will record additional intangible assets on our balance sheet. In accordance with applicable accounting standards, we periodically evaluate our goodwill and other intangible assets to determine whether all or a portion of their carrying values may no longer be recoverable, in which case a charge to earnings may be necessary. Any future evaluations requiring an impairment of our goodwill and other intangible assets could materially affect our results of operations and shareholders' equity in the period in which the impairment occurs. A material decrease in shareholders' equity could, in turn, negatively impact our debt ratings or potentially impact our compliance with existing debt covenants.

**We face intense competition to attract and retain employees.**

We are dependent on retaining existing employees and attracting and retaining additional qualified employees to meet current and future needs and achieving productivity gains from our investments in technology. We face intense competition for qualified employees, and there can be no assurance that we will be able to attract and retain such employees or that such competition among potential employers will not result in increasing salaries. An inability to retain existing employees or attract additional employees could have a material adverse effect on our business, financial condition and results of operations.

**An unauthorized disclosure of sensitive or confidential member information could have an adverse effect on our business, reputation and profitability.**

As part of our normal operations, we collect, process and retain sensitive and confidential member information. We are subject to various federal and state laws and rules regarding the use and disclosure of sensitive or confidential member information, including HIPAA and the Gramm-Leach-Bliley Act. Despite the security measures we have in place to ensure compliance with applicable laws and rules, our facilities and systems, and those of our third party service providers, may be vulnerable to security breaches, acts of vandalism, computer viruses, misplaced or lost data, programming and/or human errors or other similar events. Any security breach involving the misappropriation, loss or other unauthorized disclosure of sensitive or confidential member information, whether by us or by one of our vendors, could have a material adverse effect on our business, reputation and results of operations.

**The failure to effectively maintain and modernize our information systems and e-business organization could adversely affect our business.**

Our business depends significantly on effective information systems, and we have many different information systems for our various businesses. Our information systems require an ongoing commitment of

29

Table of Contents

significant resources to maintain and enhance existing systems and develop new systems in order to keep pace with continuing changes in information processing technology, evolving industry and regulatory standards, and changing customer preferences. In addition, we may from time to time obtain significant portions of our systems-related or other services or facilities from independent third parties, which may make our operations vulnerable to such third parties' failure to perform adequately.

As a result of our merger and acquisition activities, we have acquired additional systems. Our failure to maintain effective and efficient information systems, or our failure to efficiently and effectively consolidate our information systems to eliminate redundant or obsolete applications, could have a material adverse effect on our business, financial condition and results of operations. In addition, as we convert or migrate members to our more efficient and effective systems, the risk of disruption in our customer service is increased during the migration or conversion process and such disruption could have a material adverse effect on our business, financial condition and results of operations.

Also, our vision for the future includes becoming a premier e-business organization by modernizing interactions with customers, brokers, agents, providers, employees and other stakeholders through web-enabling technology and redesigning internal operations. The goal of our e-business strategy is to become widely regarded as an e-business leader in the health benefits industry. The strategy includes not only sales and distribution of health benefits products on the Internet, but also implementation of advanced self-service capabilities benefiting customers, agents, brokers, providers, partners and employees. We cannot assure you that we will be able to realize successfully our e-business vision or integrate e-business operations with our current method of operations. The failure to maintain successful e-business capabilities could result in competitive and cost disadvantages to us as compared to our competitors.

**We are dependent on the success of our relationship with a large vendor for a significant portion of our information system resources and certain other vendors for various other services.**

We have an agreement with International Business Machines Corporation, or IBM, pursuant to which we outsourced a portion of our core applications development as well as a component of our data center operations and help desk to IBM. We are dependent upon IBM for these support functions. If our relationship with IBM is terminated for any reason, we may not be able to find an alternative partner in a timely manner or on acceptable financial terms. As a result, we may not be able to meet the demands of our customers and, in turn, our business, financial condition and results of operations may be harmed. The contract with IBM includes several service level agreements, or SLAs, related to issues such as performance and job disruption with significant financial penalties if these SLAs are not met. We also outsource a component of our data center to another vendor, which could assume much of the IBM work and mitigate business disruption should a termination with IBM occur. We may not be adequately indemnified against all possible losses through the terms and conditions of the agreement. In addition, some of our termination rights are contingent upon payment of a fee, which may be significant.

We have also entered into agreements with large vendors pursuant to which we have outsourced certain functions such as data entry related to claims and billing processes and call center operations for member and provider queries as well as certain Medicare Part D sales. If these vendor relationships were terminated for any reason, we may not be able to find alternative partners in a timely manner or on acceptable financial terms. As a result, we may not be able to meet the full demands of our customers and, in turn, our business, financial condition and results of operations may be harmed.

**We may experience difficulties integrating the business of WellChoice with our business and may incur substantial costs in connection with the integration, which could cause us to lose many of the anticipated potential benefits of the acquisition.**

We acquired WellChoice with the expectation that the acquisition will result in various benefits, including, among others, benefits relating to a stronger and more diverse network of doctors and other health care providers, expanded and enhanced affordable health care services, enhanced revenues, a strengthened market position for us across the United States, cross-selling opportunities, technology, cost savings and operating efficiencies. Achieving the anticipated benefits of the acquisition is subject to a number of uncertainties, including whether

30

**Table of Contents**

we integrate WellChoice in an efficient and effective manner, and general competitive factors in the marketplace. Failure to achieve these anticipated benefits could result in increased costs, decreases in the amount of expected revenues and diversion of management's time and energy and could materially impact our business, financial condition and results of operations.

**Indiana law, and other applicable laws, and our articles of incorporation and bylaws, may prevent or discourage takeovers and business combinations that our shareholders might consider in their best interest.**

Indiana law and our articles of incorporation and bylaws may delay, defer, prevent or render more difficult a takeover attempt that our shareholders might consider in their best interests. For instance, they may prevent our shareholders from receiving the benefit from any premium to the market price of our common stock offered by a bidder in a takeover context. Even in the absence of a takeover attempt, the existence of these provisions may adversely affect the prevailing market price of our common stock if they are viewed as discouraging takeover attempts in the future.

We are regulated as an insurance holding company and subject to the insurance holding company acts of the states in which our insurance company subsidiaries are domiciled, as well as similar provisions included in the health statutes and regulations of certain states where these subsidiaries are regulated as managed care companies or HMOs. The insurance holding company acts and regulations and these similar health provisions restrict the ability of any person to obtain control of an insurance company or HMO without prior regulatory approval. Under those statutes and regulations, without such approval (or an exemption), no person may acquire any voting security of a domestic insurance company or HMO, or an insurance holding company which controls an insurance company or HMO, or merge with such a holding company, if as a result of such transaction such person would "control" the insurance holding company, insurance company or HMO. "Control" is generally defined as the direct or indirect power to direct or cause the direction of the management and policies of a person and is presumed to exist if a person directly or indirectly owns or controls 10% or more of the voting securities of another person.

Further, the Indiana corporation law contains business combination provisions that, in general, prohibit for five years any business combination with a beneficial owner of 10% or more of our common stock unless the holder's acquisition of the stock was approved in advance by our Board of Directors. The Indiana corporation law also contains control share acquisition provisions that limit the ability of certain shareholders to vote their shares unless their control share acquisition is approved in advance.

Our articles of incorporation restrict the beneficial ownership of our capital stock in excess of specific ownership limits. The ownership limits restrict beneficial ownership of our voting capital stock to less than 10% for institutional investors and less than 5% for non-institutional investors, both as defined in our articles of incorporation. Additionally, no person may beneficially own shares of our common stock representing a 20% or more ownership interest in us. These restrictions are intended to ensure our compliance with the terms of our licenses with the Blue Cross and Blue Shield Association. By agreement between us and the Blue Cross and Blue Shield Association, these ownership limits may be increased. Our articles of incorporation prohibit ownership of our capital stock beyond these ownership limits without prior approval of a majority of our continuing directors (as defined in our articles of incorporation). In addition, as discussed above in the risk factor describing our license agreements with the Blue Cross and Blue Shield Association, such license agreements are subject to termination upon a change of control and re-establishment fees would be imposed upon termination of the license agreements.

Certain other provisions included in our articles of incorporation and bylaws may also have anti-takeover effects and may delay, defer or prevent a takeover attempt that our shareholders might consider in their best interests. In particular, our articles of incorporation and bylaws: permit our Board of Directors to issue one or more series of preferred stock; divide our Board of Directors into three classes serving staggered three-year terms; restrict the maximum number of directors; limit the ability of shareholders to remove directors; impose

31

**Table of Contents**

restrictions on shareholders' ability to fill vacancies on our Board of Directors; prohibit shareholders from calling special meetings of shareholders; impose advance notice requirements for shareholder proposals and nominations of directors to be considered at meetings of shareholders; and impose restrictions on shareholders' ability to amend our articles of incorporation and bylaws.

**Certain hedging activities may affect the value of our common stock.**

The New York Public Asset Fund (the "Fund") sold 7,000,000 shares of our common stock in a public offering which closed on September 22, 2006. Concurrently, the Fund sold in a private sale approximately 5,900,000 shares of our common stock to affiliates of J.P. Morgan Securities, Inc. ("JP Morgan"). The Fund used substantially all of the net proceeds from its sale of the shares to purchase two tranches of cash settled, equity-linked notes, each tranche relating to approximately 6,336,550 of our shares, which will mature approximately 6.5 and 12.5 months, respectively, after September 22, 2006. These notes were issued by an affiliate of JPMorgan, and the return on these notes is linked to the future performance of our common stock.

At the time of the offering, we were advised that JPMorgan Chase Bank, National Association (London Branch) ("JPMorgan Chase Bank") expected to enter into hedging transactions through one or more of its affiliates in connection with the issuance of the equity-linked notes to the Fund. We were further advised that after establishing its initial hedge, JP Morgan Chase Bank and/or its affiliates would modify its hedge position from time to time prior to the maturity or early redemption of the equity-linked notes by entering into or unwinding various derivatives and/or purchasing or selling our common stock. In particular, these hedging transactions are likely to occur shortly before the maturity or early repayment of the equity-linked notes. Holders of the equity-linked notes may demand early redemption at any time prior to their maturity.

The effect, if any, of these transactions on the market price for our common stock will depend on market conditions and cannot be ascertained at this time, but any of these activities could reduce the price of our common stock and/or lead to periods of heightened volatility in the price of our common stock. We do not make any representations or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the shares of our common stock. In addition, no representation is made that JPMorgan Chase Bank and/or its affiliates will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

**We also face other risks that could adversely affect our business, financial condition or results of operations, which include:**

- any requirement to restate financial results in the event of inappropriate application of accounting principles;

- a significant failure of internal controls over financial reporting;

- failure of our prevention and control systems related to employee compliance with internal polices, including data security;

- provider fraud that is not prevented or detected and impacts our medical costs or those of self-insured customers;

- failure to protect our proprietary information; and

- failure of our corporate governance policies or procedures.

**ITEM 1B. UNRESOLVED SEC STAFF COMMENTS.**

None.

**ITEM 2. PROPERTIES**

We have set forth below a summary of our principal office space (locations greater than 100,000 square feet). We believe that our facilities will be sufficient to meet our needs for the foreseeable future.

32