UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DOROTHY WADE, On Behalf of Herself )
and All Others Similarly Situated, )
        Plaintiff, )
  )
    vs. )        1:08-cv-00357-SEB-DML
  )
WELLPOINT, INC., et. al., )
       Defendants. )

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

This cause comes before the Court on the Motion to Dismiss [Docket No. 72] filed

by Defendants, Wellpoint, Inc. ("Wellpoint") and its officers and directors,[1] pursuant to

Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation

Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 et seq.  Plaintiff Dorothy Wade brought this

suit alleging that Defendants violated provisions of the Securities Exchange Act of 1934

by artificially inflating the price of Wellpoint stock and causing significant harm to

Wellpoint's investors.  Pursuant to their motion, Defendants argue that Plaintiff has failed

to satisfy the heightened pleading requirements imposed by the PSLRA and that any

alleged misstatements are further protected by the statute's safe harbor.  Defendants also

---

[1]The other defendants in this action are senior officers and/or directors of Wellpoint.  The
defendants named in the Amended Complaint ("Compl.")[Docket No. 68] are: Angela F. Braly
(Braly), Wellpoint's President, CEO, and Director, Wayne S. DeVeydt (DeVeydt), Wellpoint's
Executive Vice President and Chief Financial Officer, and Larry C. Glasscock (Glasscock),
Wellpoint's Chairman of its Board of Directors and former CEO.

assert that because Plaintiff has failed to assert a primary violation of §10(b) and Rule

10b-5, Plaintiff's 20(a) claim must necessarily be dismissed, and that Plaintiff has failed

to attribute any alleged misstatement to Defendant Glasscock. For the reasons detailed

herein, we <u>GRANT</u> Defendants' Motion to Dismiss.

## **<u>Factual Background</u>**[2]

Wellpoint is a nationwide healthcare benefits company offering network-based

plans to employers, individuals, Medicaid, and senior markets. Compl. ¶ 2. The

Company is a licensee of the Blue Cross and Blue Shield Association and is licensed,

through its subsidiaries, to conduct insurance operations in all 50 states. <u>Id.</u> On January

23, 2008, WellPoint issued a press release and held a conference call announcing

relatively positive guidance, especially in light of what appears to have been a difficult

---

[2]Concurrent with their filing of this Motion to Dismiss, Defendants requested that this Court take judicial notice of 27 separate documents, Exhibits 1-27. [Docket No. 75]. The Court found it necessary to refer only to documents which Plaintiff did not oppose, namely Exhibits 1-4 and 25-27. This Factual Background is taken from the Amended Complaint as well as those exhibits, which, although not attached to the Complaint, are referred to therein and central to Plaintiff's claims. The Court may "examine documents that a defendant attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim." <u>Asher v. Baxter</u>, 2003 U.S. Dist. LEXIS 12905, *2, fn. 1 (N.D. Ill. July 17, 2003) (quoting <u>Albany Bank & Trust Co. v. Exxon Mobil Corp.</u>, 310 F.3d 969, 971 (7th Cir. 2002)). Accordingly, Defendants' Motion is <u>GRANTED</u> as to these exhibits.

The Court did not reference any of the contested exhibits offered in resolving Defendants' Motion, namely, Defendants' Exhibits 5-17, or Exhibits 28-32 attached to Defendants' Supplemental Motion for Judicial Notice. [Docket No. 83]. Thus, these requests are <u>DENIED AS MOOT</u>.

Concurrent with their Response in Opposition to Defendants' Motion to Dismiss [Docket No. 76], Plaintiff filed her own Motion for Judicial Notice with 22 corresponding exhibits. [Docket No. 79]. Although Defendants did not respond to this Motion, this request is also <u>DENIED AS MOOT</u>, given that the Court did not refer to any of these exhibits to resolve Defendants' Motion to Dismiss Plaintiff's Amended Complaint.

year financially for the company in 2007. The company expressed confidence that many of the problems that had adversely affected the company in 2007 would not impact the 2008 results. Plaintiff claims that WellPoint's management knew or recklessly disregarded the falsity of these statements. In particular, Plaintiff claims that WellPoint knew that it was experiencing problems related to claims processing, system integration, actuarial forecasting, enrollment trends, medical costs, and reserve levels. Because the company was continuing to experience these problems, Plaintiff alleges, there was no basis for the company's positive projections. Plaintiff's Amended Complaint relies, in part, on the statements of 19 Confidential Witnesses ("CWs"). Defendants argue that Plaintiff has failed to state a claim for which relief can be granted because: (1) the Amended Complaint does not meet the heightened pleading standards for securities fraud cases, and (2) WellPoint's statements are shielded from liability by the Safe Harbor provided by the PSLRA. A more detailed recitation of the facts underlying these issues follows below:

### January 23, 3008 Press Release

On January 23, 2008, WellPoint issued a Press Release reporting its results for the fourth quarter of 2007 and for that entire fiscal year. Compl. ¶ 55. The Press Release included the following expectations (among others) for 2008 in a section entitled "Outlook":

- The Company continues to expect net income of $6.41 per share, representing growth of 15.3% over 2007.

•      Year-end medical enrollment is now expected to be approximately 35.6 million members, representing growth for the year of approximately 800,000 members.

•      The benefit expense ratio is expected to be approximately 81.6 percent.[3]

Defs.' Ex. 1; Compl. ¶ 56. The Press Release also contained the following statement

from Defendant Chief Financial Officer Wayne DeVeydt:

> We remain confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3 percent. We expect to continue generating strong cash flow in excess of our net income, and we plan to utilize our capital to expand product offerings, enhance services and improve returns for our shareholders. We expect to repurchase more than $4.0 billion of our stock during 2008, subject to market conditions.

Compl. ¶ 55. The Press Release also expressed confidence in the 81.6 percent benefit

expense ratio despite the fact that the company's benefit expense ratio had been higher in

2007 than in 2006 (an increase from 81.2 to 82.4 percent). Compl. ¶ 57. WellPoint

attributed the 2007 increase to higher than expected claims costs, business mix changes,

---

[3]The benefit expense ratio is one metric that WellPoint and industry analysts use to track WellPoint's profitability. Compl. ¶ 3. This metric, also sometimes referred to as the medical loss ratio or medical cost ratio, is equal to the cost of medical services divided by the premium received from WellPoint's services. Id. The lower the benefit expense ratio, the more profitable the Company. Id. One aspect of determining WellPoint's benefit expense ratio consists of actuarial estimates of claims incurred but not yet reported or paid. Id. These claims, which Plaintiff deems "IBNR" claims, are those that WellPoint anticipates will be incurred for medical services, but which are not yet quantifiable because the claims have not yet been processed by WellPoint. Id. WellPoint's actuaries use historical claims data (gleaned from lag studies) along with assumptions of claims to be filed to calculate the dollar value of IBNR claims and WellPoint's benefit expense ratio. Id. As the projected claims materialize, adjustments are made and recorded in the period in which the need for such an adjustment arises. WellPoint maintains a level of "financial reserves" to cover the variations in actual and estimated claims. Id. WellPoint's alleged failure to maintain a sufficient reserve level is central to many of the allegations that are the subject of this lawsuit.

and less favorable than expected reserve development, partially caused by a slowdown of claims processing resulting from systems migration.  Id.  Specifically, WellPoint explained that "[a]pproximately 80 basis points of the increase was driven by the medical business of the Specialty, Senior and State Sponsored Business reporting segment."  Id. In addition, WellPoint explained that, in the fourth quarter, the company's Commercial and Consumer Business ("CCB") segment had experienced "a business mix shift[], including a decline in Individual membership, and less favorable than expected reserve development in 2007."  Id.  WellPoint attributed its more positive projection for 2008 to "the strong full year 2007 operating results in its CCB segment, its outlook for stable medical cost trends in 2008 and the expected improvements in its State Sponsored operations."  Id.

In its discussion of Membership, the Press release touted an increase of 708,000 new members over the course of 2007.  Defs.' Ex. 1 at 2.  The Press Release discussed membership developments in a few specific segments, including the conversion of 144,000 members in Connecticut's Medicaid managed care programs from fully-insured to self-funded policies during the fourth quarter of 2007.[4]  Id.  The Press Release disclosed that the "self-funded arrangement [would] expire[] on February 29, 2008, unless

_____

[4]Wellpoint's group insurance customers can be either "fully-insured" or "self-funded." Wellpoint charges its fully insured customers a premium and, in return, assumes all of the financial risk for health care costs of those members.  Compl. ¶ 2; Defs.' Mot. at 3.  Wellpoint does not assume this risk for its self-funded customers but still manages the policy for a service fee.  Id.  Wellpoint's fully insured products are far more profitable than their self-funded products.  Compl. ¶ 2; Defs.' Mot. at 3-4.

extended."  Id.

The Press Release also stated that WellPoint expected its medical cost trends to continue to remain below 8.0 percent in 2008, as the costs had in 2007.  Compl. ¶ 58; Defs.' Ex. 1 at 3.

The last page of WellPoint's January 23, 2008 Press Release included a section entitled, "Safe Harbor Statement Under The Private Securities Litigation Reform Act of 1995."  There, WellPoint noted that the Press Release contained forward-looking information about the company that was "subject to certain risks and uncertainties . . . that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward looking information and statements."  The warning then included a litany of risks, including the following, as noted in Defendants' brief:

- "trends in health care costs and utilization rates;"

- "reduced enrollment, as well as a negative change in our health care product mix;"

- "changes in economic and market conditions;" and

- "an inability to receive and process information" and the "failure to effectively maintain and modernize [its] information systems."[5]

### January 23, 2008 Earnings Conference Call

---

[5]In the past, WellPoint expanded its business through acquisitions.  Compl. at ¶ 5.  Each time these acquisitions occurred, WellPoint inherited a separate data and claims processing system.  Id.  WellPoint's actuaries used these systems to calculate their estimates, including the benefit expense ratio referenced above.  Id.  The more these various component systems were integrated, the easier it was for WellPoint's actuaries to calculate those estimates and, presumably, the more accurate those estimates could be.  Id.

Also on January 23, 2008, Wellpoint held its 4Q07 Earnings Conference Call announcing Wellpoint's results for the fourth quarter of 2007 and for that entire fiscal year. Compl. ¶¶ 10; 59. Defendants Angela Braly and Wayne DeVeydt served as spokespersons for the company. Compl. ¶ 59. Numerous analysts joined the Call. <u>Id.</u> Wellpoint began the Call by warning that some forward-looking statements would be made during the Call. Defs.' Ex. 25 at 2. The warning stated:

> Listeners are cautioned that these statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the control of WellPoint. These risks and uncertainties can cause actual results to differ materially from our current expectations and we advise listeners to review the risk factors discussed in our press release this morning and other periodic filings we make with the SEC.

<u>Id.</u> As in the Press Release, WellPoint estimated during the Call that the company would achieve $6.41 earnings per share (constituting a 15.3% increase over 2007), an increase of 800,000 total new members, and an 81.6% benefit expense ratio. Compl. ¶ 11.

Defendant Angela Braly stated:

> Our expected growth in 2008 and beyond results in part from a number of milestones we've accomplished during 2007. During the year, we expanded the services and value we offer to our members. We also improved our operational efficiency and reduced administrative costs as a percentage of revenue. We improved the selling, general, and administrative expense ratio by 120 points during 2007 when compared to 2006. General and administrative expenses actually declined in 2007 while we served more than 700,000 new members. And we accomplished this while making strategic investments to grow our business in the future and provide superior service to our members.

Defs.' Ex. 25 at 3; Compl. ¶ 62.

Among other 2007 achievements, Braly noted that WellPoint had "complet[ed]

several system migrations, resulting in lower technology production costs and improved information management capabilities." Defs.' Ex. 25 at 4; Compl. ¶ 62.

With regard to membership, Braly repeated that WellPoint's business had shifted to 51% self-funded and 49% fully-insured over the course of 2007. Defs.' Ex. 25 at 2-3; Compl. ¶ 61. In part, Braly attributed this shift to the Connecticut Medicaid membership conversion referenced earlier. Id. Braly stated that despite the 2007 shift in business, there had been only "nominal contributions [on] EPS" allowing the company to stand by its $6.41 EPS guidance for 2008. Id. at 3; Compl. ¶ 61. Braly also repeated that they expected 800,000 new members in 2008. Defs.' Ex. 25 at 2-3. This figure was apparently 200,000 fewer than a prior projection. Id. at 3.

When asked further about the business shift, DeVeydt explained that some offsetting factors had mitigated the negative effects of that shift to the point that DeVeydt felt confident with the guidance being issued at that time. Again, DeVeydt cautioned, "We have a number of moving parts here, and again, we are three weeks into the year at this point, so it's hard to have 100% visibility." Defs.' Ex. 28 at 10-11.

With regard to the benefit expense ratio, Braly explained that the increase in 2007 to 82.4% (up from 81.2% in 2006) was attributable to "higher than expected claims costs in the medical business of our Specialty, Senior and State Sponsored business reporting segment . . . as well as business mix changes and less favorable than expected reserve development in 2007." Defs.' Ex. 25 at 3. DeVeydt elaborated:

As we previously discussed, 2007 was unfavorably impacted by 2006 reserves

that developed less favorably in 2007 than anticipated. This contributed 60 basis points of a difference between our 4Q '06 and 4Q '07 benefit expense ratios. In addition, higher than anticipated medical claims in our Ohio and Connecticut state-sponsored operations impacted the fourth-quarter 2007 benefit expense ratio by about 40 basis points. We incurred operating losses in both of these programs in 2007. We've taken fiscally responsible action in our problematic State Sponsored programs in Ohio and Connecticut. . . . we are currently in the process of exiting the Ohio CFC Medicaid program due to the inability to obtain fiscally sound rates. The Connecticut Medicaid contract converted to a self-funded arrangement during the fourth quarter of 2007 and also in California, we resolved pricing in all but one county and we expect resolution in the county this quarter.

Forty basis points of the difference in benefit expense ratio include a mix shift with a larger proportion of our business being in higher loss ratio products, and other items.

And finally, we also experienced a relatively high level of intra-year reserve adjustments in the CCB segment during the fourth quarter of 2007, and this unfavorably impacted the comparison to the fourth quarter of 2006 by another 50 basis points. We are migrating to fewer claims systems and streamlining our operations and processes. As a result, we've seen a slowdown of certain claims processing and our September 30, 2007 reserves did not completely adjust for this slowdown. In the fourth quarter, we dedicated resources to address this issue and improved the timeliness of affected claims processing. We have carefully evaluated our year-end reserves. We've adjusted our completion factors to better take business process changes into consideration and are confident that our reserving is consistent, conservative, and appropriate, maintaining our high single-digit margin for adverse development.

Defs.' Ex. 25 at 5; Compl. ¶ 63.

Because much of what had caused the increase had apparently occurred in the fourth quarter, DeVeydt stated, "[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008." Defs.' Ex. 25 at 5; Comp. ¶ 63. DeVeydt further explained:

So our 2008 benefit expense ratio guidance remains at 81.6% for the year,

9

given the strong full year 2007 operating results in our CCB segment, our continued outlook for stable medical cost trends in 2008, and the expected improvements in our State Sponsored operations.  We continue to price our business so that our expected premium yield exceeds total cost trend, where total cost trend includes medical costs and selling, general and administrative expenses.  As evidenced by our announced withdrawal from the Ohio CFC Medicaid program, we remain very disciplined in our underwriting approach and do not pursue business that we believe is priced below our profitability targets.  Our 2007 medical cost trend was less that 8% and we continue to expect our 2008 medical cost trend to also be less than 8%.

Id.  When Braly and DeVeydt were asked to elaborate further on their confidence that the benefit expense ratio would fall in 2008, Braly explained that there had been some system migration but that WellPoint had increased its claims processing timeliness and had better transparency with regard to reserves as a result of a focus on excellent service.  Defs.' Ex. 25 at 8; Compl. ¶ 65.  DeVeydt was more specific, explaining that a slowdown in claims processing had occurred in 2007 as a result of the company's migration of systems.  Defs.' Ex. 25 at 8.  He explained that the company's ability to pay down some of its backlog in the fourth quarter of 2007 along with some other changes, however, had allowed for more transparency surrounding the reserves.  Id.  He stated, "I would say I feel very confident that we've got our reserves at that high single digit level they've been at historically and that we're going to start the new year off very strong."  He added, however, "But these types of items do occur."  Id.

In discussing the Company's reserves for medical costs, DeVeydt stated, "One of the things that we've met with the actuaries on and talked about is the fact that we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall

short. It's still an estimate. I can't tell you that it's going to be exactly 100% right. It could be a little over, it could be a little under. But at this point in time we're still looking at it. The other thing is, our cycle time has really shrunk between when we're receiving the claims and when we're paying it. And that's part of our initiative to drive better customer service." Defs.' Ex. 25 at 14-15; Compl. ¶67. Braly added, "Well, also, we do have fewer claims processing systems now than we had at the end of '06. And we're seeing the benefit of that in a number of ways. We can get our arms around the inventories, the claims processing metrics. We get better visibility as we get more efficient and have fewer systems." Compl. ¶ 67.

An analyst from Morgan Stanley asked DeVeydt about the possibility of having to re-price later on in the year given that medical trends had come in higher than expected in 2007 causing the company to increase its reserves for that year. Defs.' Ex. 25 at 13; Compl. ¶ 66. DeVeydt admitted that the "medical trend was slightly higher than . . . expected [in 2007]" but explained that he was very confident in WellPoint's pricing for 2008. Id.

Another analyst asked Braly and DeVeydt about WellPoint's system migration process in 2007 versus the plan for 2008. Defs.' Ex. 28 at 18; Compl. ¶ 69. Braly explained that there had been "quite a bit of migration movement over '06 and '07. . . . we had some flawless execution around those migrations. So our plan is to continue to migrate in the way that we have with the process improvement so we are doing so slowly and cautiously and making good decisions around each element of the process. . .". Id. DeVeydt repeated Braly's views on continuing the systems migration. Id.

An analyst from Deutsche Bank asked how DeVeydt was approaching its projections given the slowing economy at the time. Defs.' Ex. 21-22; Compl. ¶ 70. DeVeydt responded as follows:

> It's interesting, we have baked into our guidance an assumption for a slowdown . . . .  Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good.  But I think we are far from having this economy downturn be final.  And so we're not ready to declare victory there that we've got it 100% right.  But right now I would say some of our assumptions appear to be conservative at this point.
>
> Flip side is, we all know that when we start to see reductions in jobs, that you actually end up having an uptick in utilization initially because you have individuals who are taking advantage of those elective services that they didn't have done before.  When they know they're losing their job, they try to take advantage of that.  So that is something we all have to keep an eye on for the next year relative to that.  But we did bake in some of that into our original guidance and right now, and we appear to be okay on that.

Id.

WellPoint also repeated warnings with regard to its estimates, however, that the company was only three weeks into the new year, that estimates may not be "exactly 100% right," that "you get better data as the year goes on,"  the economic downturn could continue, that the company was still migrating multiple IT systems, and that the company's agreement with Connecticut Medicaid would expire in February.  Defs.' Ex. 25 at 15, 16, 18, 22. In addition, as it had in the Press Release, the transcript from the Earnings Conference Call finished with a section entitled, "Safe Harbor Statement Under the Private Securities Litigation Reform Act of 1995." Id. at 24-25.

**Wachovia Healthcare Conference**

On January 30, 2008, Michael Kleinman, WellPoint's Vice President of Investment Relations, participated in the Wachovia Healthcare Conference. Kleinman's presentation began with the usual cautionary words, that forward-looking statements would be made during the presentation and that those statements were "subject to certain risks and uncertainties that [were] spelled out more fully in our SEC filings available on our website." Defs.' Ex. 26 at 1.

Again, the projection for a decreased benefit expense ratio was discussed. Defs.' Ex. 26 at 5; Compl. ¶ 73. Kleinman stated, "Year over year, the medical loss ratio did go up 120 basis points . . . [W]e feel good going forward that we've got those issues under control." Id. Kleinman attributed the anticipated decrease in that metric to the loss of a very "high loss ratio" account and efforts to decrease expenses, including standardizing processes and eliminating certain levels of management. Defs.' Ex. 26 at 5. Kleinman explained that another contributing factor to the lower benefit expense ratio projection was the continuing systems migrations. He stated, "Part of the ways that we're driving cost out of the system is through consolidating systems. . . . Now we are standardizing our processes and are doing a very good job of coming down." Defs.' Ex. 26 at 5; Compl. ¶ 73. Kleinman said that the company expected to have three "base claims-processing systems [by] 2010-2011; and ultimately continue to move lower from there." Defs.' Ex. 26 at 5. He also provided what he described as an "oversimplified" explanation of the systems migration process. Id. In sum, with regard to the benefit expense ratio, Kleinman stated, "We have talked extensively about some of the issues that we had with particular states and about the actions that we've

taken. So we feel good going forward that we've got those issues under control." Defs.' Ex. 26 at 7.

**2007 Form 10-K**

On February 21, 2008, Braly, DeVeydt, and Glasscock signed WellPoint's 2007 Form 10-K. Compl. ¶ 75.

With regard to WellPoint's benefit expense ratio, the 10-K included the following statement (as included in the Amended Complaint):

> The most judgmental accounting estimate in our consolidated financial statements is our liability for medical claims payable. . . . We record this liability and the corresponding benefit expense for incurred but not paid claims including the estimated costs of processing such claims. Incurred but not paid claims include (1) an estimate for claims that are incurred but not reported, as well as claims reported to us but not yet processed through our systems; . . . and (2) claims reported to us and processed through our systems but not yet paid . . . .
>
> Liabilities for both claims incurred but not reported and reported but not yet processed through our systems are determined in aggregate, employing actuarial methods that are commonly used by health insurance actuaries and meet Actuarial Standards of Practice. Actuarial Standards of Practice require that the claim liabilities be adequate under moderately adverse circumstances. We determine the amount of the liability for incurred but not paid claims by following a detailed actuarial process that entails using both historical claim payment patterns as well as emerging medical cost trends to project our best estimate of claim liabilities. . . .
>
> For the most recent incurred months (generally the most recent two months), the percentage of claims paid for claims incurred in those months is generally low. This makes the completion factor methodology less reliable for such months. Therefore, incurred claims for recent months are not projected from historical completion and payment patterns; rather they are projected by estimating the claims expense for those months based on recent claims expense levels and health care trend levels, or "trend factors."

Compl. ¶ 75.

The 10-K did not revise any of the projections the company had issued in January, even though Plaintiff alleges that guidance was no longer viable in light of "a significant rise in medical costs and an unprofitable shift in new enrollment to Self-Funded members" up to that date. Compl. ¶ 77. Furthermore, Plaintiff alleges that WellPoint failed to disclose the fact that the company "lacked the ability to adequately forecast pricing trends and medical cost reserves because of its system integration issues, had significantly understated its medical cost reserves and priced its 2008 products at less profitable levels . . .". Id.

**WellPoint's Revised Guidance and Aftermath**

On March 10, 2008, WellPoint issued a press release entitled, "WellPoint Revises 2008 Earnings Per Share Guidance." Compl. ¶ 79; Defs.' Ex. 3. Once again, that Press Release opened with a safe harbor statement. Defs.' Ex. 3. WellPoint revised its forecast of $6.41 earnings per share to $5.76 to $6.01, assuming net realized investment gains of approximately $0.06 per share. Id. This amount still constituted an increase over the $5.56 per share reported for 2007. Id. The company also revised its 800,000 new member projection to 500,000 members and increased its forecasted benefit expense ratio from 81.6% to a range of 82.8 to 83.1 percent. Id.

WellPoint attributed the revisions to higher than expected medical costs, less favorable than expected prior year reserve development, lower than expected fully insured enrollment, and the changing economic environment. Id. The release included the following explanation from Angela Braly:

We are making these revisions to our prior earnings guidance due to higher than expected medical costs, lower than expected fully insured enrollment and, to a lesser extent, the changing economic environment in which we are operating. While we are disappointed with having to revise our 2008 outlook, we are still expecting growth this year, with record levels of membership, revenue and earnings per share. We are taking actions and making investments in our business to further improve our performance during the balance of this year and beyond.

WellPoint also held a conference call on March 10 to discuss the revised guidance. During that Call, Braly addressed each of the reasons WellPoint provided for the company's revision of its guidance.

With regard to higher than expected medical costs, Braly explained that, "while [WellPoint] continue[d] to have favorable reserve development for the first two months of 2008, it was still less than [their] targeted level," meaning that the original trend assumptions for 2008 were understated. Defs.' Ex. 27. Braly explained that the higher medical costs had impacted a number of WellPoint's product lines. Id. When it was DeVeydt's turn to speak, he explained, "A primary driver of this increase is related to increased medical trend; a portion is due to the underwriting results in our Senior products; part is related to the California state-sponsored revenue reduction; while the remainder of the increase is related to business mix as individual business becomes a small portion of our revenue base." Id. He admitted that, "it is generally in most markets where we missed the trend for 2008." Id. In the same vein, Braly admitted, "When we looked at where the trend was in December, we did make adjustments in our completion factors, thinking that would be sufficient to address it. We have now seen January and February and realize our completion factors weren't

adjusted enough." Id. In addition, although steps had been taken to decrease claims processing times, WellPoint's "claim cycle times continued to increase in 2008." Id. With regard to WellPoint's revised membership projection, Braly explained that "[w]hile our total enrollment levels to date are close to our expectations, the growth has been weighted more towards self-funded customers than we had planned." Id. Braly attributed approximately half of the reduction in membership projection to the potential loss of the Connecticut Medicaid ASO contract. Braly stated, "While we're hopeful that we could keep this contract under reasonable terms, our guidance assumes the possible exit from the Connecticut Medicaid business later this year." Id. Braly also surmised that the nation's weakening economy was impacting certain segments of WellPoint's membership. Id. The day after WellPoint's guidance revision, the price of WellPoint common stock dropped $18.66, a decline of 28.3%. Compl. ¶ 85. That same day, WellPoint's CAO, Senior Vice President and Controller announced that she would be resigning from the company, effective April 4, 2008. Compl. ¶ 83.

### Plaintiff's Allegations

Plaintiff filed her original complaint on March 18, 2008. Her Amended Complaint [Docket No. 68], asserts a six week putative class from January 23, 2008 to March 10, 2008. Compl. ¶ 112. Plaintiff alleges that Defendants knew or recklessly disregarded that statements within the January 23 Press Release, the January 23 Conference Call, the January 30 Presentation, and the 2007 Form 10-K were false and misleading. Compl. ¶ 78. The Amended Complaint indicates that evidence of this knowledge may be found in ¶¶ 5-9, 12-

18, 36-54, 78 (a-j), 86-101. In addition to certain stock sales by Defendant Glasscock that Plaintiff characterizes as "suspicious,"[6] Plaintiff claims as evidence of Defendants' scienter that Defendants knew that WellPoint was experiencing the following at the time of the January 23 announcements:

As mentioned previously, as WellPoint had acquired companies in the past, it had also acquired various unintegrated data processing systems – an apparent headache for the company. In mid-2007, WellPoint sought to create an integrated and centralized data depository. Compl. ¶ 6. According to the Amended Complaint, this data depository encountered several challenges throughout 2007 and into the first quarter of 2008. Id. The project had not moved beyond its "infant stages" by the start of the Class Period. Id.¶¶ 6, 78(b). In fact, CW 6 claims that as of January 2008, the company was still operating on at least 13-14 different unintegrated "stand-alone" systems. Compl. ¶ 78(b). Moreover, according to CW2, CW7, and CW12, at least eight companies acquired before 2004, all with their own data warehouses, processes and procedures for data collection, storage, analysis, and reporting, had not been integrated into WellPoint's information system. Id.

Plaintiff alleges that these integration challenges meant that the problems created by

---

[6]Weeks before the revised guidance was issued, Defendant Glasscock, along with two other WellPoint managers, sold portions of their WellPoint stock. According to the Amended Complaint, Glasscock sold 26.8% of his shares (or 6.59%, including options) during the Class Period. Compl. ¶ 98. Plaintiff alleges that Glasscock made over $6.6 million from the sale and that the sales show "defendants' knowledge that their fiscal year 2008 guidance was baseless, that WellPoint's systems integration problems continued to hamper the Company's operations and that the truth about the foregoing, once known to the market, would batter the Company's stock price." Compl. ¶ 20.

the lack of system integration in 2007 continued during the Class Period. <u>Id.</u> at ¶¶ 6, 12, 78(a). For instance, CW9 reports that the lack of integration hampered WellPoint's visibility into its future medical costs, meaning the company "could not accurately forecast medical costs, reserves, or price trends." Compl. ¶ 78(a). Moreover, WellPoint's actuaries continued to receive data in different formats from various systems, making analysis for reserves and pricing forecasts "extremely difficult." <u>Id.</u> ¶ 12, 78(c). Indeed, according to CW 13, the lack of visibility into claims data was a "direct cause" of WellPoint's overstated projections in January, 2008. Compl. ¶78(c).

Plaintiff alleges that one consequence of WellPoint's inability to integrate all of these systems was the impact it had on company's ability to timely and accurately process current medical claims. <u>Id.</u> at 7. As a result, WellPoint allegedly had a significant increase in its medical claims backlog by January 2008. <u>Id.</u> at 7, 39, 40, 49, 78(e-g). In fact, by the time CW4 left the company in September 2008, the processing department where he worked was just finishing processing claims received in July of that year. <u>Id.</u> ¶ 78(h). Weekly reports reflected this increase and WellPoint's Suspended Claims group identified a backlog of thousands of claims in January 2008 that had been denied in late 2007. <u>Id.</u> at ¶ 14; 40, 45, 78(g-h). WellPoint also experienced an increase in returned claims that had been submitted to CMS for reimbursement due to computer and submission errors. <u>Id.</u> at 14. As a result, WellPoint had to write off millions of dollars in late 2007 or early 2008. <u>Id.</u> at 14, 49, 78(e-f). Plaintiff's CW 14 avers that this issue was communicated directly to DeVeydt. <u>Id.</u> ¶ 14, 49.

According to Plaintiff, WellPoint's medical claims cost trends began to deteriorate in late 2006/early 2007.  In response to this problem, WellPoint's CEO Braly to announce a new reorganization strategy at WellPoint beginning in 2008, in an attempt to control the increasing cost of care.  Id. at ¶¶ 8, 16, 44, 78(i).

Plaintiff alleges that WellPoint's problems with systems integration and lack of visibility into claims data or medical cost trends made the company unable to accurately forecast medical reserves or the benefit expense ratio, or to accurately price its product.[7] Compl. ¶ 13, 78(b-c).  This resulted in a significant understatement of reserves for 2008 medical costs.  Compl. ¶ 78(c).  Furthermore, WellPoint's focus on the system integration problems took attention away from processing claims and further "deteriorated the reliability of the company's forecasting data."  Id.  ¶¶ 13, 78(d).  Plaintiff alleges Defendants were aware of this problem based on their experience in 4Q07 and discussed the effect the forecasting problems would have on the company in the future.  Compl. ¶ 15.  During the Class Period, Defendant Braly sought to remedy the problem by extending the Company's forecast from six to 11 months.  This new forecast was not completed until February 22, 2008.  Id. at 15, 44.

In addition to the company's difficulties with system integration and its medical claims cost trends, WellPoint's business also began to shift toward more self-funded policies

---

[7]As mentioned above, one aspect of determining WellPoint's benefit expense ratio consists of actuarial estimates of claims incurred but not yet reported or paid.  Compl. ¶ 3.  As the projected claims materialize, adjustments are made and recorded in the period in which the need for such an adjustment arises.  WellPoint maintains a level of "financial reserves" to cover the variations in actual and estimated claims.  Id.

(as opposed to the more profitable, fully-funded ones) by the end of 2007. Id. at ¶ 9, 17, 43, 51, 78(j). CW 16 stated that it was "obvious" by October 2007 that the shift was occurring. Id. ¶ 78(j). This shift, at least in part, was a result of the economic downturn the country began to experience at that time. Id. Plaintiff alleges that WellPoint tried to mitigate the effect of this shift by increasing rates over the course of 2007. Compl. ¶ 9. However, Plaintiff alleges that this plan did not work and only exacerbated the shift in business. Id. Defendants allegedly knew that WellPoint was not securing the number of enrollees that it projected for 2008 by December 2007 based on WellPoint's open enrollment period from October to December 2007. Compl. ¶ 17, 78(j).

Plaintiff alleges that Defendant Braly admitted knowledge that WellPoint could not achieve its 2008 guidance at a WellPoint managers meeting in mid-February 2008. At the meeting, Braly told attendees that they would hear "rumors" about "issues" that WellPoint was going to announce to the public. Compl. ¶¶ 18, 54. According to Plaintiff's CW 19, Defendant Braly urged the attendees not to engage in such rumors but to wait until the issues were properly disclosed to the public. Id. ¶ 54.

In sum, it is knowledge of these facts, that WellPoint was experiencing (1) system integration problems; (2) claims processing problems; (3) growing claims backlog; (4) lack of visibility into claims data; (5) inability to adequately calculate IBNR claims; (6) inability to establish adequate reserves; (7) problems in adequately pricing products; (8) a rising benefit expense ratio; and (9) a continuing shift in membership away from its more profitable fully-insured products toward the less profitable self-funded ones, as well as Braly's

management meeting comment and Defendant Glasscock's allegedly suspiciously timed stock sales, that Plaintiff argues demonstrate scienter on behalf of Defendants. Defendants deny these allegations but seek dismissal of the Complaint for its pleading deficiencies.

<u>**Legal Analysis**</u>

## I.      Standards of Review

Plaintiff's claims assert violations of § 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 thereunder, and § 20(a) of the Exchange Act, alleging control person liability of Braly, DeVeydt, and Glasscock. The standards of review applicable to Plaintiff's claims are drawn from the Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the PSLRA, 15 U.S.C. § 78u-4(b).

### <u>Section 10(b) and Rule 10b-5</u>

Section 10(b) of the Securities Exchange Act states, in relevant part, that:

> It shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawf.ul:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the

purchase or sale of any security.

17 C.F.R. § 240.10b-5. As the Supreme Court reiterated in <u>Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.</u>, Rule 10b-5 only encompasses conduct already prohibited by § 10(b) of the Exchange Act, and a private right of action for § 10(b) violations is implied in the words of the statute and regulation. 552 U.S. 148, 155 (2008). In order to successfully assert a violation of § 10(b), a plaintiff must allege (and ultimately prove) the following six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. <u>Id.</u> (citing <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005)).

### Rule 12(b)(6), Rule 9(b), and the PSLRA

A motion to dismiss filed pursuant to Rule 12(b)(6) -- including one in which the pleading standards are heightened by Rule 9(b) and the PSLRA -- requires the Court to treat all well-pleaded facts as true and draw all reasonable inferences from those facts in favor of the plaintiff. <u>See</u> <u>Makor Issues & Rights, Ltd. v. Tellabs Inc.</u>, 513 F.3d 702, 705 (7th Cir. 2008) (citing <u>Borsellino v. Goldman Sachs Group, Inc.</u>, 477 F.3d 502, 506-07 (7th Cir. 2007)). Federal Rule of Civil Procedure 9(b) governs pleading requirements in fraud actions generally, providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). This mandated heightened pleading requirement responds "to the great harm to the reputation of a business firm or other enterprise a fraud claim can do." <u>Borsellino</u>, 477 F.3d at 507 (internal quotation

marks omitted). Therefore, a plaintiff "'claiming fraud . . . must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate.' . . . A complaint alleging fraud must provide . . . 'the who, what, when, where, and how.'" Id. (quoting Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)).

In addition to these particularity requirements of Rule 9(b), the PSLRA further heightens the pleading standard for plaintiffs alleging securities fraud claims. This heightened pleading standard is meant to require plaintiffs to do more than the usual investigation before filing a complaint. The Act requires that, if a plaintiff alleges that the defendant either made an untrue statement of material fact or failed to state a material fact necessary in order to keep statements from being misleading, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, a plaintiff must, "with respect to each act or omission, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## II. Discussion

Defendants assert two primary arguments for dismissal of Plaintiff's 10(b) claim against all Defendants: first, that Plaintiff has failed to satisfy the heightened standards for pleading securities fraud under the PSLRA; and second, that the statements at issue are

protected by the safe harbor of the PSLRA. Because we agree with Defendants that the Amended Complaint fails to satisfy the heightened pleading standards of the PSLRA, we address that argument first and most thoroughly.

### A.    Adequacy of Plaintiff's Scienter Allegations

As mentioned above, one of the heightened pleading standards in securities fraud cases is that a plaintiff must, "with respect to each act or omission, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has interpreted the term "strong inference" to mean "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). The Court explained further that in determining scienter, "courts must consider the complaint in its entirety," as well as judicially noticed documents and documents incorporated by reference into the complaint; "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23. Moreover, the Court is directed to engage in a "comparative inquiry," . . . "tak[ing] into account opposing inferences." Id. That required state of mind is recklessness[8] for statements generally, Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d

---

[8]Recklessness is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 704 (7th Cir. 2008)(citation omitted).

1033, 1044-45 (7th Cir. 1977), and, by virtue of the PSLRA's safe harbor, "actual knowledge" for statements that are forward-looking. 15 U.S.C. §78u-5(c)(1)(B).

The Seventh Circuit has "rejected the 'group pleading doctrine,' a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." Pugh v. Tribune Co., 521 F.3d 686, 693-94 (7th Cir. 2008) (citing Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008)). However, a defendant's position within a company is not irrelevant. Desai v. General Growth Prop. Inc., 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009). "While a court cannot 'presume' scienter, a strong inference of scienter may . . . be credited where 'it is almost inconceivable' that an individual would be unaware of the matters at issue [by virtue of the individual's position.]" Id.

Plaintiff's Amended Complaint explains that evidence of Defendants' scienter is alleged in ¶¶ 5-9, 12-18, 36-54, 78 (a-j), 86-101. These paragraphs are apparently supposed to be applied to the statements included in paragraphs 55-78, those that Plaintiff entitles, "Defendants' Materially False and Misleading Statement Made During the Class Period."[9]

_____

[9] We note that it is improper for counsel to place the burden on this Court to parse out which statements within these 22 paragraphs Plaintiff is actually alleging are actionable. It is unclear whether we are expected to examine the quoted portions of the statements issued by WellPoint, only the bolded portions of those quotations, the projections included in these statements, or the conditions within the company that those projections were based upon. And, once that is determined, Plaintiff has additionally asked the Court to "sort through the alleged misrepresentations and then match them with the corresponding adverse facts," a task expressly deemed improper under the PSLRA pleading standards twice previously. See Plumbers &

(continued...)

For the reasons stated below, after considering the allegations in the Amended Complaint as a whole and weighing opposing inferences, we find that Plaintiff has failed to create the strong inference of recklessness mandated by the Supreme Court in Tellabs. 551 U.S. at 314.

The largest deficiency in the Amended Complaint is that the vast majority of Plaintiff's purported allegations regarding scienter are actually allegations that attempt to show the falsity of the statements at issue. Although Plaintiff does throw in an occasional reference to Defendants' awareness of certain problems, there is actually very little discussion devoted to any disregarded risk of falsity. In Paragraphs 5-9, for example, rather than making statements regarding any particular defendant's knowledge, Plaintiff alleges WellPoint's problems with its information technology systems and consequences of those problems. In fact, the only reference whatsoever to a defendant's knowledge within these paragraphs is the single sentence, "Aware of [a deterioration of WellPoint's medical claims cost trends] Chief Executive Officer . . . Braly internally announced plans to reorganize WellPoint in an attempt to control the increasing cost of care, beginning in 2008." Compl. ¶ 8.

Likewise, the vast majority of Plaintiff's 19 CWs (allegations in paragraphs 36-54)

---

[9](...continued)
Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc., 673 F. Supp. 2d 718, 733 n. 14 (S.D. Ind. 2009) (J. Barker); In re Guidant Corp. Sec. Litig., 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008) (J. Barker); accord In re Harley Davidson, Inc. Secs. Litig., 660 F. Supp. 2d 969, 984 (E.D. Wis. 2009).

apparently have nothing to say regarding any specific Defendant's knowledge.[10]  The only CWs that say anything about Defendants are CWs 9, 11, 12, 13, 14, 16, and 19.  But Defendants correctly point out that none of these CWs supports an inference of Defendants' recklessness as to the falsity of the January 23 statements.  CW 9 allegedly "worked directly with Defendant Braly," but none of the things that CW 9 allegedly knows about Defendant Braly bear on her (Braly's) mindset at the time she made the alleged misstatements.[11]  CW 11 avers that Braly was a participant on quarterly conference calls but makes no further accusation as to what was discussed on such calls.  CW 12 allegedly "knew, from conversations with his/her supervisor, that the CEO of the Company reviewed and influenced the Actuarial Reports."  However, CW 12 apparently left the company in 2006, two years before the alleged misstatements. CW 13 was allegedly aware of "defendants' review of the actuaries' forecasted data during the Class Period."  But Defendants' actions *during* the Class Period do not have any bearing on their scienter at the time the alleged misstatements were made.  Furthermore, the paragraph contains no allegation that any specific forecasted data that defendants allegedly "reviewed" contained information conflicting with the January 23

---

[10]We also note that the Seventh Circuit has stated that "allegations from 'confidential witnesses' must be 'discounted' rather than ignored.  Usually that discount will be steep." Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir.  2007).  For the reasons stated herein, however, there is little need to "discount" these allegations as most of them are off point.

[11]As discussed further below, knowledge of steps that Braly or WellPoint may have taken to improve the forecasting process, or control costs does not create a strong inference of recklessness on Braly's part.  Furthermore, allegations that Braly "monitor[ed] the Company's financial condition" or received reports or updates regarding the Company's financial results are, without more, unremarkable.

statements. CW 14 alleges that Defendant DeVeydt was aware that the company had to write-off $3 to $4 million at the end of 2007 or beginning of 2008. Defendants are correct, however, that it is unclear how this knowledge translates to recklessness as to the falsity of the alleged misstatements. CW 16 claims that the "increase in Self-Funded products was 'obvious' by October 2007." However, this is not necessarily in conflict with WellPoint's January 23 statements, which included the following: "Given this and other shift in business mix, our overall membership base was 51% self-funded and 49% fully insured at December 31st, 2007 compared with 51% fully insured and 49% self-funded at December 31st, 2006." Defs.' Ex. 28. CW 19 was allegedly at the managers meeting in mid February 2008 where Braly told attendees "that they would hear 'rumors' about issues that WellPoint was going to announce to the public." Compl. ¶ 54. Again, this allegation simply says nothing about Braly's state of mind at the time of the alleged misstatements.

The next deficiency in Plaintiff's allegations is that much of the "evidence" that Plaintiff relies upon to create its "strong inference of scienter"are steps taken by the Company to mitigate challenges that Plaintiff alleges Defendants knew the Company was facing. For instance, the allegation in Paragraph 8 regarding Braly's announcement to reorganize the company in an attempt to control the increasing cost of care does not imply knowledge that Braly knew that any of her January 23 statements were false. To the contrary, this statement shows that, despite knowledge of a problem with the cost trends in the past, Braly had initiated plans that could potentially mitigate that problem beginning in 2008. The same problem arises in connection with Plaintiff's allegation that "defendants

knew, based, in part on their recent experience in 4Q07, that their inability to accurately forecast medical claims resulted in their understating 2008 medical cost reserves." Compl. ¶ 15. As evidence, Plaintiff claims that Braly sought to remedy the problem by extending the company's forecast out from six to eleven months. Compl. ¶ 15. Braly's attempt to improve the accuracy of WellPoint's medical claims forecasting certainly does not create a "strong inference" that she recklessly disregarded the falsity of her statements on January 23. Furthermore, "drawing an inference from such facts does not comport with Federal Rule of Evidence 407, which provides that subsequent remedial measures may not be used as evidence of liability." <u>Pugh v. Tribune Co.</u>, 521 F.3d 686, 695 (7th Cir. 2008).

Some of Plaintiff's allegations appear to allege that each of the Defendants must be charged with knowledge of certain problems at WellPoint because of their positions at the company. <u>See</u>, <u>e.g.</u> Compl. ¶¶30-34. But none of WellPoint's alleged problems – 1) system integration problems; (2) claims processing problems; (3) growing claims backlog; (4) lack of visibility into claims data; (5) inability to adequately calculate IBNR claims; (6) inability to establish adequate reserves; (7) problems in adequately pricing products; (8) a rising benefit expense ratio; and (9) adverse business mix shift – rise to the level of a "deep and pervasive corporate illness" such that Plaintiff could argue that Defendants were reckless in not knowing about them solely by virtue of the Defendants' positions at WellPoint. <u>See</u> <u>Desai</u>, 654 F. Supp. 2d at 860.

The allegations in Paragraphs 78(a-j) and 86-101 suffer from the same deficiencies as earlier paragraphs, although we appreciate Plaintiff's attempt to splice its generalized

allegations of the alleged troubles at WellPoint with the corroborating evidence offered by CWs. Paragraph 78 begins, "Defendants knew, but failed to disclose . . . the following adverse facts." But providing such an opening does not provide the type of particularized allegations of scienter required here. The allegations in Paragraphs 86-101, which Plaintiff has entitled "Additional Scienter Allegations," are not truly additional. Rather, Plaintiff has repeated the same allegations of what Defendants may have known at some point in the past or during the Class Period (as opposed to at the time the alleged misstatements were made) and of remedial measures taken by the company "in order to clarify the forecasting process and avoid future forecast misses" or to "control the increasing cost of care."

Plaintiff also includes allegations regarding Glasscock's fortuitous stock sales as support of scienter. It is well settled that "insider trading *may* constitute circumstantial evidence of scienter. However, because executives sell stock all the time, the stock sales must be "unusual or suspicious." In re Harley Davidson, Inc. Secs. Litig., 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009) (emphasis in original). "In order to rise to the level of 'unusual' or 'suspicious,' the insider trading must be 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Johnson v. Tellabs, Inc., 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003)(quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)).

Plaintiff alleges that Glasscock's sale of 6.59% of his stock (including options),[12]

---

[12]It is proper to consider exercisable stock options when determining whether a stock sale
(continued...)

during the Class Period was suspicious in timing and amount. Compl. ¶¶ 98-101. Plaintiff alleges only that the timing of those sales was suspicious because they occurred after the mid-February managers meeting where Braly made a reference to "rumors" about issues that were going to be announced publicly. There are no allegations related to Glasscock's prior trading practices, beyond the fact that Glasscock had recently entered a new trading plan pursuant to Rule 10b5-1. Without more, we can find nothing suspicious or unusual about Glasscock's stock sales that would support a strong inference of scienter.

Finally, the Amended Complaint very rarely attempts to allege any particular knowledge on the part any particular Defendant. Rather, the allegations are made collectively against "Defendants." Beyond the instances already discussed herein, i.e. the write-off that DeVeydt was allegedly informed of, Braly's actions to mitigate problems at the Company and her announcement at the mid-February managers meeting, and Glasscock's stock sales, there is hardly any accusation directed specifically toward any of the individual Defendants.[13] Instead, the Amended Complaint summarily lumps all Defendants together alleging "Defendants knew," "Defendants lacked visibility," "Defendants admitted," etc. Perhaps the most egregious example is Paragraph 78, which opens, "Defendants knew, but

---

[12](...continued)
is suspicious in amount. See, e.g., In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986-87 (9th Cir. 1999).

[13]Paragraphs 89 and 90 do pertain to Defendant Braly specifically but only allege that Braly was "kept informed of financial results compared to forecasts" and that she "monitored WellPoint's operations." As explained above, neither paragraph alleges Braly's recklessness as to the truth of the January 23 statements.

failed to disclose . . . the following adverse facts" and in parts (a-j) repeats the same problems Plaintiff claims plagued WellPoint during the Class Period. "Such generalized allegations are insufficient under the PSLRA." In re Harley Davidson, Inc. Secs. Litig., 660 F. Supp. 2d at 999.

For these reasons, we find that Plaintiff has failed to create a strong inference that any Defendant was reckless as to the falsity of the alleged misstatements. Because we have found that Plaintiff has failed to allege liability on the part of any individual Defendant, there is no liability to impute to WellPoint. See In re Harley Davidson, Inc. Secs. Litig., 660 F. Supp. 2d at 1003 (citations omitted).

## B.  Application of the PSLRA Safe Harbor

Even if Plaintiff had fulfilled her burden of establishing a strong inference of recklessness on the part of Defendants, the vast majority of Defendants' statements would be protected under the safe harbor provision of the PSLRA. Under the PSLRA safe harbor, a person may not be liable for a forward-looking statement where the statement is (i) identified as forward-looking and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (iii) made without actual knowledge. 15 U.S.C. § 78u-5(c)(1).

With the exception of portions of the statements in Paragraphs 61, 62, 65, 67-70, 73,[14]

_____

[14]Although these statements are not exempted from liability by the PSLRA safe harbor,
(continued...)

all of the allegedly false statements are either projections, plans, statements of optimism in the projections, or other statements the veracity of which could not be determined at the time the statements were made. These statements fall within the PSLRA's definition of a forward-looking statement. See 15 U.S.C. § 78u-5(i)(1).

Although we have few doubts that WellPoint's forward-looking statement would be considered meaningful cautionary language,[15] we need not reach this question. Given the deficiencies of Plaintiff's scienter pleadings discussed above in Part A, Plaintiff has clearly failed to create a strong inference of actual knowledge on the part of Defendants as required for forward-looking statements pursuant to the PSLRA.

### C.      Control Person Liability Under Section 20(a)

Section 20(a) of the Securities and Exchange Act provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such

---

[14](...continued)
as previously discussed in Part A, Plaintiff has failed to establish a strong inference that any Defendant was reckless as to their falsity as required under the heightened pleading standards of the PSLRA.

[15]The statement in WellPoint's January 23 Press Release identified the very risks that Plaintiff alleges came to pass, forcing the company to revise its guidance. For instance, Plaintiff alleges that WellPoint overestimated the number of new enrollees that would choose a fully-funded (as opposed to self-funded) policy. It is hard to imagine a warning that would have been more apt than "reduced enrollment, as well as **a negative change in our health care product mix**." Defs.' Ex. 1 (emphasis added). Likewise, the vast majority of Plaintiff's allegations regarding the troubles at WellPoint relate to the company's challenges in integrating its many information technology systems. The risk that the company would continue to encounter these difficulties is expressed directly by the warning that WellPoint may "fail[] to effectively maintain and modernize [its] information systems." Defs.' Ex. 1.

controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Accordingly, a claim pursuant to §20(a) is cognizable only where there has been an underlying primary violation of the Exchange Act.  Because Plaintiff has not adequately alleged such a violation, their §20(a) claim necessarily fails.  See Davis v. SPSS, Inc., 431 F. Supp. 2d 823, 833 (N.D. Ill. 2006).

## III.    Conclusion

For the reasons outlined herein, Plaintiff's Amended Complaint fails to satisfy the heightened pleading standard of the PSLRA.  Therefore, Defendants' Motion to Dismiss Amended Complaint is GRANTED, without prejudice.  Plaintiff is allowed 45 days within which to seek leave to amend its Complaint to conform to these rulings. Failure to do so within the allotted time shall result in the entry of final judgment with prejudice.

IT IS SO ORDERED.


Date:    09/22/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Mario  Alba, Jr.
ROBBINS GELLER RUDMAN & DOWD LLP
200 Broadhollow Road
Suite 406
Melville, NY 11747

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

X. Jay Alvarez
ROBBINS GELLER RUDMAN & DOWD LLP
jaya@rgrdlaw.com

Seth  Aronson
O'MELVENY & MYERS LLP
saronson@omm.com

Anne L. Box
ROBBINS GELLER RUDMAN & DOWD LLP
AnneB@rgrdlaw.com

J. Jorge DeNeve
O&quot;MELVENY & MYERS LLP
jdeneve@omm.com

Robert Paul Frutkin
LAW OFFICES OF BERNARD M. GROSS
rpf@bernardmgross.com

Lindsay L. Geida
O'MELVENY & MYERS LLP
lgeida@omm.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Deborah Ruth Gross
LAW OFFICE OF BERNARD M. GROSS PC
debbie@bernardmgross.com

Sarah Renee Holloway
ROBBINS GELLER RUDMAN & DOWD LLP
sholloway@rgrdlaw.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Michael M. Maddigan
O'MELVENY & MYERS LLP
mmaddigan@omm.com

David A. Rosenfeld
ROBBINS GELLER RUDMAN & DOWD LLP
drosenfeld@csgrr.com

Christopher G. Scanlon
BAKER & DANIELS - Indianapolis
chris.scanlon@bakerd.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com