UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOROTHY WADE, on Behalf of Herself and All Others Similarly Situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:08-cv-00357-SEB-DKL |
| vs. | ) | |
| | ) | |
| WELLPOINT, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND
AMENDED COMPLAINT**

Before the Court is Plaintiff's Motion for Leave to File a Second Amended

Complaint [Docket No. 100], filed on November 8, 2010.   Plaintiff's motion comes in

response to this court's September 22, 2010 order [Docket No. 99] dismissing the First

Amended Complaint ("FAC") without prejudice.   At that time, we found that the FAC fell

short of the heightened pleading requirements applicable to securities fraud litigation, and

we granted Plaintiff forty-five days within which to seek leave to amend the FAC to

conform to our ruling.   *Wade v. WellPoint, Inc.*, 740 F. Supp. 2d 994, 1013 (S.D. Ind.

2010) ("*Wade I*").   Plaintiff has petitioned for such relief, but Defendants rejoin that

Plaintiff's Proposed Second Amended Complaint ("PSAC") fails to remedy the FAC's

deficiencies, rendering leave to amend futile.   The instant motion is fully briefed, and the

Court, being duly advised in the matter, now DENIES Plaintiff's motion.

**Factual and Procedural Background**[1]

This lawsuit is a securities class action brought on behalf of investors in WellPoint, Inc. ("WellPoint" or "the Company") against multiple defendants:   the Company; its President, Chief Executive Officer ("CEO"), and Director, Angela F. Braly ("Braly"); its Executive Vice President and Chief Financial Officer, Wayne S. DeVeydt ("DeVeydt"); and its former CEO and Chairman of the Board of Directors, Larry C. Glasscock ("Glasscock").   Plaintiff, Dorothy Wade, alleges that Defendants violated provisions of the Securities Exchange Act of 1934 ("the Exchange Act") by making several misrepresentations and omissions to Company investors between January 23, 2008 and March 10, 2008 (the "Original Class Period"[2]), thereby artificially inflating the market price of WellPoint's common stock and causing significant harm to investors.   As a result of Defendants' alleged malfeasance, Plaintiff asserts a claim for compensatory damages, including all reasonable fees and costs, in an amount to be proven at trial.

## I.  Plaintiff's Previous Allegations

WellPoint is a nationwide health care benefits company offering network-based managed care plans to employers, individuals, Medicaid, and senior markets.   The Company is a licensee of the Blue Cross and Blue Shield Association; through its subsidiaries, it is licensed to conduct insurance operations in all fifty states.   Am. Compl. ¶ 2.   On January 23, 2008, WellPoint issued a press release and held a conference call

---

[1]Many of the underlying facts of this case are detailed in the Court's September 22, 2010 order and Plaintiff's Amended Complaint [Docket No. 68].   However, given that the instant motion requires us to test the sufficiency of Plaintiff's factual allegations as a whole, we restate those facts to the extent they are relevant and add those that are newly alleged by Plaintiff.

[2]The PSAC would expand the Class Period to begin on October 24, 2007 and end on March 10, 2008.   PSAC ¶ 1.

announcing somewhat surprisingly positive guidance after 2007, which had been a difficult financial year for the Company.   In these communications, the Company expressed confidence that many of the problems that had adversely affected WellPoint in 2007 would not impact its 2008 results.   Relying in part on the statements of nineteen confidential witnesses ("CWs"), Plaintiff asserts that WellPoint's management either knew or recklessly disregarded the falsity of the Company's communications to investors. Plaintiff specifically contends that WellPoint was aware of its problems in the areas of claims processing, system integration, actuarial forecasting, enrollment trends, medical costs, and reserve levels.   Accordingly, Plaintiff avers that there was no basis for WellPoint's positive projections to investors.

### A.   The January Press Release

WellPoint issued a press release on January 23, 2008 ("the January Press Release") to report the Company's results for the fourth quarter of 2007 and the entire 2007 fiscal year.   Am. Compl. ¶ 55.   The January Press Release included an "Outlook" section, which set the following expectations for 2008:

- net income of $6.41 per share, representing growth of 15.3% over 2007;
- year-end medical enrollment of approximately 35.6 million members, representing growth of approximately 800,000 members over 2007; and
- an approximation of 81.6% for the 2008 benefit expense ratio.[3]

---

[3]The "benefit expense ratio" (alternatively dubbed "medical loss ratio" or "medical cost ratio") is one metric employed by WellPoint and industry analysts to track the Company's profitability.   Am. Compl. ¶ 3.   This ratio represents the cost of medical services divided by the premium received from WellPoint's services.   *Id.*   WellPoint's profitability is inversely related to its benefit expense ratio.   One aspect of determining this metric involves actuarial estimates of claims that have been incurred but not reported or paid ("IBNR claims").   *Id.*   IBNR claims are not yet quantifiable because WellPoint has not processed them.   The Company's actuaries use

*Id.* ¶ 56.   The January Press Release also contained the following statement issued by

DeVeydt:

> We remain confident in our earnings per share target of $6.41 for 2008,
> which represents annual growth of 15.3 percent. . . . We expect to continue
> generating strong cash flow in excess of our net income, and we plan to
> utilize our capital to expand product offerings, enhance services[,] and
> improve returns for our shareholders.   We expect to repurchase more than
> $4.0 billion of our stock during 2008, subject to market conditions.

*Id.* ¶ 55.   Moreover, the January Press Release expressed confidence in the projected

81.6% benefit expense ratio for 2008 despite the fact that this value had been higher in

2007 than in 2006 (an increase from 81.2% to 82.4%).   *Id.* ¶ 57.   WellPoint attributed the

2007 value to unusually higher claims costs, business mix changes, and unexpectedly less

favorable reserve development, which had been caused in part by slower claims processing

from system migration.   The Company explained that "[a]pproximately 80 basis points of

the increase was driven by the medical business of the Specialty, Senior and State

Sponsored Business reporting segment."   *Id.*   WellPoint justified the remaining increase

in basis points by noting that its Commercial and Consumer Business ("CCB") segment

had experienced "a business mix shift[], including a decline in [i]ndividual membership[]

and less favorable than expected reserve development in 2007."   *Id.*   According to

_____

historical claims data and their own assumptions regarding future claims to calculate the dollar
value of IBNR claims and WellPoint's benefit expense ratio.   *Id.*   As the projected claims
materialize, adjustments are made and recorded in the period during which the need to adjust
arises.   Based on these forecasted needs, WellPoint maintains a level of "financial reserves" to
cover the variations in actual and estimated claims.   *Id.*   The Company's alleged failure to
maintain sufficient financial reserves underlies many of the allegations contained in this lawsuit.

4

WellPoint, its positive projection for 2008 was attributable to "the strong full year 2007 operating results in its CCB segment, its outlook for stable medical cost trends in 2008[,] and the expected improvements in its State Sponsored operations." *Id.*

In the section titled "Membership," the January Press Release boasted burgeoning enrollment—specifically, the addition of 708,000 new members over the course of 2007. Jan. Press Release at 2. The January Press Release addressed these membership developments in a few notable segments, *e.g.*, the conversion of 144,000 members of Connecticut's Medicaid managed care programs from fully insured to self-funded policies during the fourth quarter of 2007.[4] *Id.* According to the January Press Release, unless extended, the self-funded arrangement for these members was set to expire on February 29, 2008. *Id.*

The January Press Release also discussed WellPoint's expectations regarding medical cost trends as follows:

> Medical cost trends were below 8.0 percent in 2007, with the primary driver being unit cost increases. The Company continues to expect that medical cost trends will remain below 8.0 percent in 2008[] and continues to price its business so that expected premium yield exceeds total cost trend, where total cost trend includes medical costs and selling, general and administrative . . . expense.

Am. Compl. ¶ 58; Jan. Press Release at 3.

The last page of the January Press Release included a section entitled "Safe Harbor

___

[4]WellPoint's group insurance customers can be either "fully insured" or "self-funded." The Company charges its fully insured customers a premium; in return, it assumes all of the financial risk for those members' health care costs. WellPoint does not weather this risk for its self-funded customers, but it will manage the policy for a service fee. WellPoint's fully insured products are far more profitable than its self-funded products. Am. Compl. ¶ 2.

Statement Under The Private Securities Litigation Reform Act of 1995."   In that section, WellPoint informed its audience that the January Press Release contained forward-looking information about the Company that was "subject to certain risks and uncertainties . . . that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward looking information and statements."   Jan. Press Release at 15. The Company bolstered its warning by including a litany of risks, to wit:

- "trends in health care costs and utilization rates";
- "reduced enrollment, as well as a negative change in our health care product mix";
- "changes in economic and market conditions";
- "inability to receive and process information"; and
- "failure to effectively maintain and modernize [its] information systems."[5]

*Id.*

### B.   The January Call

On January 23, 2008, WellPoint also held an earnings conference call ("the January Call") announcing its results for the fourth quarter of 2007 and the entire 2007 fiscal year. Am. Compl. ¶¶ 10, 59.   Braly and DeVeydt served as spokespersons for the Company during the January Call and were joined by numerous financial analysts.   *Id.* ¶ 59.   At the start of the Call, WellPoint's Chief Accounting Officer advised listeners that some forward-looking statements would be made.   Jan. Call Tr. at 2.   He expressed the

---

[5]WellPoint previously expanded its business through acquisitions.   Am. Compl. ¶ 5. With each of these acquisitions, the Company inherited a separate data and claims processing system.   *Id.*   The Company's actuaries used these systems to calculate estimates such as the benefit expense ratio referenced above.   Integration of the various component systems facilitated the estimation process and presumably made the estimates as accurate as possible.   *Id.*

6

following warning:

> Listeners are cautioned that these statements are subject to certain risks and
> uncertainties, many of which are difficult to predict and generally beyond the
> control of WellPoint.   These risks and uncertainties can cause actual results
> to differ materially from our current expectations[,] and we advise listeners
> to review the risk factors discussed in our press release this morning and
> other periodic filings we make with the SEC.

*Id.*

As it had in the January Press Release, WellPoint estimated during the January Call

that the Company would achieve $6.41 earnings per share ("EPS") (constituting a 15.3%

increase over 2007), an increase of 800,000 total new members, and an 81.6% benefit

expense ratio.   Am. Compl. ¶ 11.   To justify the 2008 projections, Braly stated:

> Our expected growth in 2008 and beyond results in part from a number of
> milestones we've accomplished during 2007.   During the year, we
> expanded the services and value we offer to our members.   We also
> improved our operational efficiency and reduced administrative costs as a
> percentage of revenue.   We improved the selling, general, and
> administrative expense ratio by 120 points during 2007 when compared to
> 2006.   General and administrative expenses actually declined in 2007 while
> we served more than 700,000 new members.   And we accomplished this
> while making strategic investments to grow our business in the future and
> provide superior service to our members.

Jan. Call Tr. at 3; *see* Am. Compl. ¶ 62.   Among the Company's other 2007 achievements,

Braly noted that WellPoint had "[c]omplet[ed] several system migrations, resulting in

lower technology production costs and improved information management capabilities."

*Id.*; Jan. Call Tr. at 4.

In terms of membership, Braly reiterated that the Company's business mix had

shifted to 51% self-funded and 49% fully insured over the course of 2007.   Jan. Call Tr. at

7

2-3; Am. Compl. ¶ 61.   Braly explained this change in part by reference to the abovementioned Connecticut Medicaid membership conversion.   *Id.*; Jan. Call Tr. at 2. She also noted that, notwithstanding the 2007 business mix change, there had been only "nominal contributions to EPS," which allowed the Company to stand by its $6.41 EPS guidance for 2008.   *Id.* at 3; Am. Compl. ¶ 61.   Further, Braly confirmed WellPoint's expectation of 800,000 new members in 2008.   This figure apparently represented "lowering [of WellPoint's] full-year membership growth guidance by 200,000."   Jan. Call Tr. at 3.

When DeVeydt fielded additional questions about the Company's business shift, he explained that certain mitigating factors allowed him to remain confident in the guidance being issued at that time.   At the same time, he cautioned, "[W]e have a number of moving parts here, and again, we are three weeks into the year at this point, so it's hard to have 100% visibility."   Jan. Call Tr. at 10-11.   DeVeydt did, however, note that "we think when you net [the competing factors] all out, we are still going to be dead on with our original guidance."   *Id.* at 11.

With regard to the benefit expense ratio, Braly attributed the increase between 2006 and 2007 (from 81.2% to 82.4%) to "higher than expected claims costs in the medical business of our Specialty, Senior[,] and State Sponsored business reporting segment . . . as well as business mix changes and less favorable than expected reserve development in 2007."   Jan. Call Tr. at 3.   DeVeydt later elaborated on this issue, saying:

As we previously discussed, 2007 was unfavorably impacted by 2006

8

reserves that developed less favorably in 2007 than anticipated.   This contributed 60 basis points of a difference between our 4Q '06 and 4Q '07 benefit expense ratios.   In addition, higher than anticipated medical claims in our Ohio and Connecticut state-sponsored operations impacted the fourth-quarter 2007 benefit expense ratio by about 40 basis points.   We incurred operating losses in both of these programs in 2007.   We've taken fiscally responsible action in our problematic State Sponsored programs in Ohio and Connecticut. . . . [W]e are currently in the process of exiting the Ohio CFC Medicaid program due to the inability to obtain fiscally sound rates.   The Connecticut Medicaid contract converted to a self-funded arrangement during the fourth quarter of 2007 and also in California, we resolved pricing in all but one county and we expect resolution in the county this quarter.

Forty basis points of the difference in benefit expense ratio include a mix shift with a larger proportion of our business being in higher loss ratio products, and other items.

And finally, we also experienced a relatively high level of intra-year reserve adjustments in the CCB segment during the fourth quarter of 2007, and this unfavorably impacted the comparison to the fourth quarter of 2006 by another 50 basis points.   We are migrating to fewer claims systems and streamlining our operations and processes.   As a result, we've seen a slowdown of certain claims processing and our September 30, 2007 reserves did not completely adjust for this slowdown.   In the fourth quarter, we dedicated resources to address this issue and improved the timeliness of affected claims processing.   We have carefully evaluated our year-end reserves.   We've adjusted our completion factors to better take business process changes into consideration and are confident that our reserving is consistent, conservative, and appropriate, maintaining our high single-digit margin for adverse development.

Jan. Call Tr. at 5; *see* Am. Compl. ¶ 63.

Because many of the factors contributing to the increase had ostensibly occurred in the fourth quarter, DeVeydt stated that "[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008."   Jan. Call Tr. at 5; Am. Compl. ¶ 63.   DeVeydt further explained:

> [O]ur 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results in our CCB segment, our continued outlook for stable medical cost trends in 2008, and the expected improvements in our State Sponsored operations.   We continue to price our business so that our expected premium yield exceeds total cost trend, where total cost trend includes medical costs and selling, general and administrative expenses.   As evidenced by our announced withdrawal from the Ohio CFC Medicaid program, we remain very disciplined in our underwriting approach and do not pursue business that we believe is priced below our profitability targets.   Our 2007 medical cost trend was less that 8% and we continue to expect our 2008 medical cost trend to also be less than 8%.

*Id.*

Both Braly and DeVeydt were asked to justify their shared belief that the Company's benefit expense ratio would fall in 2008.   Braly explained that, despite some system migration, WellPoint had achieved greater timeliness in claims processing and better transparency with its reserves—changes stemming from the Company's focus on excellent service.   Jan. Call Tr. at 8; Am. Compl. ¶ 65.   DeVeydt provided a more specific answer:   slower claims processing in 2007 were attributable to the Company's migration of systems.   Jan. Call Tr. at 8.   However, DeVeydt asserted that certain changes, *e.g.*, the Company's ability to pay down some of its backlog in the fourth quarter of 2007, had enabled more transparency surrounding the reserves.   *Id.*   He stated, "I would say I feel very confident that we've got our reserves at that high single digit level they've been at historically and that we're going to start the new year off very strong.   But these types of items do occur."   *Id.*

When discussing the Company's reserves for medical costs, DeVeydt pronounced:

> [O]ne of the things that we've met with the actuaries on and talked about is the fact

> that we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall short.   It's still an estimate.   I can't tell you that it's going to be exactly 100% right.   It could be a little over, it could be a little under. But at this point in time we're still looking at it.   The other thing is, our cycle time has really shrunk between when we're receiving the claims and when we're paying it.   And that's part of our initiative to drive better customer service.

Jan. Call Tr. at 15; Am. Compl. ¶ 67.   Braly added the following comments:

> Well, also, we do have fewer claims processing systems now than we had at the end of '06.   And we're seeing the benefit of that in a number of ways.   We can get our arms around the inventories, the claims processing metrics.   We get better visibility as we get more efficient and have fewer systems.

Jan. Call Tr. at 15; Am. Compl. ¶ 67.

A Morgan Stanley analyst asked DeVeydt whether WellPoint would adjust pricing later that year.   To substantiate her question, the analyst cited higher than expected medical trends in 2007, which had caused the Company to increase its reserves for that year.   Jan. Call Tr. at 13; Am. Compl. ¶ 66.   In response, DeVeydt conceded that the "medical trend was slightly higher than . . . expected [in 2007]" but restated his confidence in WellPoint's pricing for 2008.   Jan. Call Tr. at 13.

Another analyst asked Braly and DeVeydt to discuss WellPoint's 2007 system migration process in terms of hypothetical 2008 migrations.   Jan. Call Tr. at 18; Am. Compl. ¶ 69.   Braly replied that there had been "quite a bit of migration movement over '06 and '07 . . . . We had some flawless execution around those migrations.   So our plan is to continue to migrate in the way that we have with the process improvement[,] so we are doing so slowly and cautiously and making good decisions."   Jan. Call Tr. at 18.   She also repeated her views on continuing the system migration.   *Id.*

11

Later in the January Call, an analyst from Deutsche Bank inquired how WellPoint was approaching its projections in light of the slowing economy.   Jan. Call Tr. at 21-22; Am. Compl. ¶ 70.   DeVeydt responded accordingly:

> It's interesting, we have baked into our guidance an assumption for a slowdown . . . . Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good.   But I think we are far from having this economy downturn be final.   And so we're not ready to declare victory there that we've got it 100% right.   But right now I would say some of our assumptions appear to be conservative at this point.
>
> Flip side is, we all know that when we start to see reductions in jobs, that you actually end up having an uptick in utilization initially because you have individuals who are taking advantage of those elective services that they didn't have done before.   When they know they're losing their job, they try to take advantage of that.   So that is something we all have to keep an eye on for the next year relative to that.   But we did bake in some of that into our original guidance and right now . . . we appear to be okay on that.

Jan. Call Tr. at 22.

Nevertheless, WellPoint's representatives also made several cautionary statements about the Company's estimates:   that only three weeks of 2008 had elapsed; that estimates might not be "exactly 100% right"; that "better data as the year goes on" was typical; that the economic downturn could continue; that the Company was still migrating multiple information technology systems; and that WellPoint's agreement with Connecticut Medicaid would expire in February.   Jan. Call Tr. at 15-16, 18, 22.   The January Call's final transcript, like the January Press Release, also concluded with a "Safe Harbor Statement Under the Private Securities Litigation Reform Act of 1995" section.   *Id.* at 24-25.

12

## C.  The Conference

On January 30, 2008, WellPoint sent Michael Kleinman, its Vice President of

Investment Relations ("Kleinman"), as its representative for participation in the Wachovia

Healthcare Conference ("the Conference").   Am. Compl. ¶ 73.   Kleinman began his

Conference presentation with the usual cautionary words—namely, that he would be

making forward-looking statements that were "subject to certain risks and uncertainties

that [were] spelled out more fully in our SEC filings available on our website."   Conf. Tr.

at 1.

Once again, the projection of a decreased benefit expense ratio arose.   Conf. Tr. at

5; Am. Compl. ¶ 73.   Kleinman addressed the issue, stating, "Year over year, the medical

loss ratio did go up 120 basis points . . . [but] we feel good going forward . . . ."   Conf. Tr.

at 7.   He attributed the expected decrease in that metric to the Company's loss of a "high

loss ratio" account and its efforts to decrease expenses by standardizing processes and

eliminating certain levels of management.   Kleinman also explained that the ongoing

system migrations factored into the lower benefit expense ratio projection, noting that

"[p]art of the way[] that we're driving cost out of the system is through consolidating

systems. . . . Now we are standardizing our processes and are doing a very good job of

coming down."   *Id.* at 5; Am. Compl. ¶ 73.   According to Kleinman, the Company

forecasted three "base claims-processing systems [by] 2010-2011[] and [would] ultimately

continue to move lower from there."   Conf. Tr. at 5.   He also provided an (admittedly

self-described) "oversimplified" explanation of the system migration process.   *Id.*   In his

13

concluding remarks, Kleinman declared, "We have talked extensively about some of the issues that we had with particular states and about the actions that we've taken.   So we feel good going forward that we've got those issues under control."   *Id.* at 7.

### D.   System Integration and Business Shift Problems

Along with the preceding allegations, Plaintiff claims as evidence of Defendants' fraudulent mindset (scienter) that Defendants were well aware of certain "system integration problems" at the time of the January announcements.   Plaintiff pleads this purported scienter as detailed in the ensuing section.

As mentioned previously, WellPoint acquired various unintegrated data processing systems whenever it absorbed another company.   *See* Am. Compl. ¶ 5.   Because this was evidently quite a headache, WellPoint initiated efforts to create the Enterprise Data Warehouse ("EDW"), an integrated and centralized data depository, in mid-2007.   The EDW faced several challenges throughout 2007 and during the first quarter of 2008; by the start of the Original Class Period, it had not progressed past its "infant stages."   *Id.* ¶¶ 6, 78(b).   In fact, Confidential Witness ("CW") 6 claims that the Company was utilizing at least thirteen to fourteen different "stand-alone" systems as of January 2008.   *Id.* ¶ 78(b). Three of Plaintiff's other CWs have stated that at least eight companies acquired before 2004—all with their own data warehouses, processes, and procedures for data collection, storage, analysis, and reporting—had not been integrated into WellPoint's information system as of 2008.   *Id.*

Plaintiff contends that these challenges caused the problems created by the lack of

14

system integration in 2007 to continue during the Original Class Period.   Am. Compl. ¶¶ 6, 12, 78(a).   For instance, CW9 reports that the lack of integration "hampered WellPoint's visibility into claims data and [its ability to] . . . accurately forecast medical costs, reserves or price trends."   *Id.* ¶ 78(a).   CW 13 adds that the lack of visibility into claims data was a "direct cause" of WellPoint's overstated projections during the Original Class Period.   *Id.* ¶ 78(c).   Meanwhile, WellPoint's actuaries continued to receive data in a variety of formats, making it "extremely difficult" to analyze reserves and forecast pricing.   *Id.*   The Company also had a significant increase in its medical claims backlog (including "thousands of claims" sent to the Suspended Claims Group and claims returned due to submission errors) by January 2008.   *Id.* ¶¶ 7, 14, 39, 40, 45, 49, 78(e)-(h).   As a result, WellPoint wrote off millions of dollars in late 2007 or early 2008.[6]   To complicate matters, the Company's medical claims cost trends had been deteriorating by that point. Braly responded in part to these problems by internally announcing a new reorganization strategy for 2008 aimed at controlling increasing costs of care.   *Id.* ¶¶ 8, 16, 44, 78(i).

It is Plaintiff's assessment that WellPoint's system integration woes and lack of visibility into claims data and medical cost trends left the Company unable to price its product accurately or to forecast its medical reserves or benefit expense ratio.   Am. Compl. ¶ 13, 78(b)-(c).   This conundrum caused the Company to make a significant understatement of reserves for its 2008 medical costs.   *Id.* ¶ 78(c).   WellPoint's focus on

---

[6]Plaintiff's CW 14 avers that this issue was communicated directly to DeVeydt.   Am. Compl. ¶¶ 14, 49.

system integration snags also diverted attention from processing claims and further "deteriorated the reliability of [the Company's] forecasting data."   *Id.* ¶¶ 13, 78(d). Based on the Company's experience in 4Q07, Plaintiff asserts that Defendants were aware of this dilemma and had discussed how the forecasting problems would affect WellPoint going forward.   *Id.* ¶ 15.   During the Original Class Period, Braly sought to extend the Company's forecast from six to at least eleven months "to help clarify the forecasting process and avoid future misses."   *Id.*   The new forecast was completed on February 22, 2008.

Other variables compounded WellPoint's existing difficulties with system integration and cost trends.   For instance, by the end of 2007 the Company's business had begun to shift toward more self-funded policies (as opposed to fully-funded policies, which tend to be more profitable).   Am. Compl. ¶¶ 9, 17, 43, 51, 78(j).   This trend was partly traceable to the economic downturn generally affecting the country, although CW 16 has stated that the move toward self-funded products was "obvious" to the Company by October 2007.   *Id.* ¶ 78(j).   According to Plaintiff, WellPoint tried to mitigate the effect of this change by increasing rates before 2008, which instead exacerbated the shift as more members chose self-funded plans.   *Id.* ¶ 9.   Plaintiff further alleges that Defendants knew the Company had not secured the number of projected 2008 enrollees by December 2007 based on WellPoint's October to December 2007 open enrollment period.   *Id.* ¶¶ 17, 78(j).

Bearing in mind each of these system integration and business shift problems, Plaintiff asserts that Defendants knew their 2008 guidance was inappropriate.   Plaintiff

16

specifically states that Braly admitted knowledge that the Company would not achieve its 2008 guidance at a WellPoint managers' meeting in mid-February 2008.   "[A]ll high-ranking executive officers [and] the Individual Defendants" traditionally attended WellPoint managers' meetings.   Am. Compl. ¶ 54.   At this particular meeting, Braly warned attendees that they would hear "rumors" about "issues" that WellPoint intended to announce to the public.   *Id.* ¶¶ 18, 54.   CW 19 has alleged that Braly advised attendees against engaging in any rumors, urging them to wait until the issues were properly disclosed to the public.   *Id.* ¶ 54.

### E.   2007 Form 10-K[7]

On February 21, 2008, Braly, DeVeydt, and Glasscock signed WellPoint's Form 10-K and filed it with the SEC.   Am. Compl. ¶ 75.   This form addressed the issue of the Company's benefit expense ratio projections as follows:

> The most judgmental accounting estimate in our consolidated financial statements is our liability for medical claims payable. . . .   We record this liability and the corresponding benefit expense for incurred but not paid claims including the estimated costs of processing such claims.   Incurred but not paid claims include (1) an estimate for claims that are incurred but not reported, as well as claims reported to us but not yet processed through our systems; . . . and (2) claims reported to us and processed through our systems but not yet paid . . . .
>
> Liabilities for both claims incurred but not reported and reported but not yet processed through our systems are determined in aggregate, employing actuarial methods that are commonly used by health insurance actuaries and meet Actuarial Standards of Practice.   Actuarial Standards of Practice

---

[7]Pursuant to the federal securities laws, publicly traded companies must disclose certain information on an ongoing basis.   Domestic issuers (other than small business issuers) submit annual reports to the SEC on Form 10-K.

require that the claim liabilities be adequate under moderately adverse circumstances.   We determine the amount of the liability for incurred but not paid claims by following a detailed actuarial process that entails using both historical claim payment patterns as well as emerging medical cost trends to project our best estimate of claim liabilities. . . .

For the most recent incurred months (generally the most recent two months), the percentage of claims paid for claims incurred in those months is generally low.   This makes the completion factor methodology less reliable for such months.   Therefore, incurred claims for recent months are not projected from historical completion and payment patterns; rather they are projected by estimating the claims expense for those months based on recent claims expense levels and health care trend levels, or "trend factors."

*Id.* ¶ 75.

WellPoint's Form 10-K did not revise any of the projections the Company had issued in January, although Plaintiff alleges that such guidance was no longer viable due to "a significant rise in medical costs and an unprofitable shift in new enrollment to [s]elf-[f]unded members" prior to that date.   Am. Compl. ¶ 77.   Furthermore, Plaintiff contends that WellPoint failed to disclose that the Company "lacked the ability to adequately forecast pricing trends and medical cost reserves because of its system integration issues . . . [and] had significantly understated its medical cost reserves and priced its 2008 products at less profitable levels."   *Id.*

### F.  WellPoint's March 2008 Revised Guidance and Aftermath

On March 10, 2008, WellPoint issued a press release entitled "WellPoint Revises 2008 Earnings Per Share Guidance."   Am. Compl. ¶ 79; Defs.' Ex. 3.   In keeping with previously issued communications, this press release also opened with a safe harbor statement.   Defs.' Ex. 3 at 2-3.   WellPoint revised its EPS forecast from $6.41 to "in the

18

range of $5.76 to $6.01 per share, assuming net realized investment gains of approximately

$0.06 per share."   *Id.* at 7.   This range still represented an increase over the $5.56 EPS

reported for 2007.   The Company also revised its member growth projection to 500,000

new members and increased its forecasted benefit expense ratio from 81.6% to "a range of

82.8 to 83.1 percent."   *Id.* at 7-8.   WellPoint attributed these revisions to higher than

expected medical costs, lower than expected prior year reserve development, lower than

expected fully insured enrollment, and the changing economic environment.   Defs.' Ex. 3

at 7.   The press release also included the following explanation from Braly:

> We are making these revisions to our prior earnings guidance due to higher
> than expected medical costs, lower than expected fully insured enrollment
> and, to a lesser extent, the changing economic environment in which we are
> operating. . . .   While we are disappointed with having to revise our 2008
> outlook, we are still expecting growth this year, with record levels of
> membership, revenue and earnings per share.   We are taking actions and
> making investments in our business to further improve our performance
> during the balance of this year and beyond.

*Id.*

WellPoint also held a conference call on March 10, 2008 ("the March Call") to

discuss its revised guidance.   During the March Call, Braly addressed each of the reasons

the Company cited in its latest press release to these revisions.

With regard to medical costs, Braly explained that, "while [WellPoint] continue[d]

to have favorable reserve development for the first two months of 2008, it was still less

than [the Company's] targeted level."   In other words, the original trend assumptions for

2008 had been understated.   Mar. Call Tr. at 2.   She noted that the higher medical costs

19

had impacted a number of the Company's product lines.   *Id.*   When it was DeVeydt's turn to speak, he informed listeners:

> A primary driver of this increase is related to increased medical trend; a portion is due to the underwriting results in our Senior products; part is related to the California state-sponsored revenue reduction; while the remainder of the increase is related to business mix as individual business becomes a small portion of our revenue base.

*Id.* at 4.   DeVeydt admitted that "it [was] generally in most markets where we missed the trend for 2008."   *Id.* at 5.   Later, in response to an analyst's question, Braly stated, "[W]hen we looked at where the trend was in December, we did make adjustments in our completion factors, thinking that would be sufficient to address it.   We have now seen January and February and realize our completion factors weren't adjusted enough."   *Id.* at 7.   In addition, she acknowledged that the Company's "claim cycle times continued to increase in 2008" despite steps taken to decrease processing times.   *Id.* at 2.

In the matter of WellPoint's revised membership projection, Braly explained, "While our total enrollment levels to date are close to our expectations, the growth has been weighted more towards self-funded customers than we had planned."   Mar. Call Tr. at 3.   Braly attributed approximately half of the reduction in membership projection to the potential loss of the Connecticut Medicaid ASO contract.   She further stated, "While we're hopeful that we could keep this contract under reasonable terms, our guidance assumes the possible exit from the Connecticut Medicaid business later this year."   *Id.* Finally, Braly surmised that the weakening national economy was significantly affecting certain segments of WellPoint's membership.   *Id.*

On March 11, 2008, the day after WellPoint issued its guidance revisions and only

six weeks after the January Call, the Company's common stock price dropped by $18.66.

Am. Compl. ¶ 85.   The closing price on that day, $47.26 per share, represented a 28.3%

decline.   *Id.*   That same day, Jamie Miller, WellPoint's Chief Accounting Officer, Senior

Vice President, and Controller, announced her resignation from the Company, effective

April 4, 2008.   *Id.* ¶ 83.

### G.   "Suspicious" Stock Sales

Weeks before the Company issued its revised guidance, Glasscock and two other

Company managers sold portions of their WellPoint stock.   Glasscock sold 87,113 shares

of his personally held stock (which represented 26.8% of his total holdings with the

Company, or 6.59%, including options) during the Original Class Period.   Am. Compl. ¶

98.   Plaintiff avers that these executives made over $7.3 million from their sales and that

Glasscock's portion of that total exceeded $6.6 million.   Additionally, Plaintiff contends

that the sales "demonstrate [D]efendants' knowledge that their fiscal year 2008 guidance

was baseless, that WellPoint's system[] integration problems continued to hamper the

Company's operations and that the truth about the foregoing, once known to the market,

would batter the Company's stock price."   *Id.* ¶ 20.

## II.   Plaintiff's "New" Allegations

Plaintiff filed her Motion for Leave to File a Second Amended Complaint with this

court on November 8, 2010.   In the PSAC, which is appended to the motion as Exhibit A,

she renews her prior allegations that Defendants knew or recklessly disregarded that

statements within the January Press Release, the January Call, the Conference, and the 2007 Form 10-K were false and misleading.   *See* PSAC ¶ 33.   Plaintiff also maintains that the PSAC "adds . . . new facts about a fraudulent scheme [the Company was] involved in with other major health care insurers."   Pl.'s Br. at 2.   This scheme ("the Ingenix Scheme"), which allegedly commenced well before the Original Class Period, changes the relevant class period so that it would encompass October 24, 2007 through March 10, 2008 ("the Putative Class Period").   *Id.*; *see* PSAC ¶ 1.   Plaintiff provides the following overview of these facts:   "WellPoint, along with the nation's other biggest health care insurers, created and used a flawed and conflict-ridden database owned by Ingenix Inc., to set artificially low reimbursement rates for out-of-network services in violation of the Company's contractual obligations to its members."   Pl.'s Br. at 2.   Specifically, Plaintiff directs the Court's attention to paragraphs 5-11, 18-33, 71-74, 95-99, 100-03, 106-15, 117-19, 133, and 135-73[8] of the PSAC, which she designates as the "new" basis for permitting leave to amend.   We enumerate Plaintiff's new allegations below.

### A.   Background on the Ingenix Scheme and Formal Investigation

When WellPoint members seek medical services from out-of-network providers, the Company reimburses them for these services "by paying the lesser of the billed charge or the 'usual and customary rate' (UCR) of doctors in the same or similar geographic area

---

[8]Some of these paragraphs lead the reader to other portions of the PSAC, which we cite accordingly.

for substantially the same service."[9]   PSAC ¶ 5.   The Company represents to its members

that the UCR for any given medical service is "the prevailing charge charged by most

providers of comparable services in the specific area where the member received the

service."   *Id.*   Importantly, WellPoint is contractually obligated to calculate accurate

UCRs and use these values when reimbursing members.   *Id.*   UCRs are also relevant to

the Company's benefit expense ratio; the dollar amount of out-of-network reimbursements

represents a significant portion of this metric.   *Id.* ¶ 6.

Here, Plaintiff avers that WellPoint, along with other insurers, impermissibly

colluded to manipulate reimbursement rates in a scheme that "had a direct impact on the

Company's financial results, causing it to significantly understate benefit expenses during

the Class Period."   PSAC ¶ 7.   Plaintiff alleges that WellPoint and other unnamed

companies created a flawed database to set UCRs and ensure that these values were

artificially low.   Ingenix Inc., a subsidiary of United Health Group, owned the database.

*Id.*   According to Plaintiff, Ingenix was the only commercial source of UCR data at that

time.   *Id.* ¶ 8.   Plaintiff asserts that the Company and other Ingenix Scheme participants

had a contractual relationship with Ingenix wherein Ingenix granted insurers access to

software and UCR data, and the insurers, in turn, provided claims data that Ingenix used to

create the database.   Further, Plaintiff contends that all Ingenix Scheme participants

received sizable software and access discounts because they contributed claims data to this

---

[9]Any remaining balance on an out-of-network bill above what the Company will pay is the
member's responsibility.   PSAC ¶ 5.

"closed loop system." *Id.* "[B]ecause of this inherent conflict of interest," Plaintiff

asserts, "WellPoint knew that the Ingenix[] database was defective and conflict-ridden

when it was relying on it for reimbursements." *Id.* ¶ 9.   Plaintiff additionally posits that

the database contained doubly "scrubbed" data; first, the Company discarded high

"outlier" costs before submitting values to Ingenix, and second, Ingenix applied its own

"scrubbing" methods to remove remaining high charges from their computations. *Id.*

Having thereby discarded its own definition of UCRs, WellPoint allegedly used artificially

low reimbursement rates—"in some cases, up to 30% lower than the actual rates for the

services." *Id.* ¶ 10.

One of Plaintiff's "new" allegations in the PSAC is that WellPoint was aware of

(and, in fact, acknowledged) its practice of underpaying for members' claims long before

the Original Class Period.   Awareness purportedly came from "complaints from

providers, patients and regulatory authorities."   PSAC ¶ 11.   Plaintiff asserts generally

that "WellPoint finally[10] publicly admitted after the Class Period that there were 'inherent

conflicts of interest' in the business relationship with Ingenix and [that] 'WellPoint

acknowledge[d] the conflicts of interest in the Ingenix database.'"   *Id.* ¶ 10.   More

specifically, Plaintiff cites an August 7, 2007 public hearing held by the California

Department of Managed Health Care to address the business practices of Blue Cross, one

of WellPoint's subsidiaries.   *Id.* ¶ 11.   Plaintiff also refers to a written announcement

---

[10]Plaintiff provides no date to accompany this allegation; rather, she states that WellPoint
made such admissions "[a]fter using Ingenix for several years."   PSAC ¶ 10.

authored by the California Medical Association which stated that "Blue Cross ha[d] engaged in abusive payment practices" since 2004.   *Id.*   Further, Plaintiff discusses the investigation of Ingenix undertaken by Andrew Cuomo, New York's then-Attorney General, in early 2008.   Pl.'s Br. at 2-3 (noting that Cuomo intended to subpoena a WellPoint subsidiary in connection with his investigation).   With respect to that investigation, Plaintiff notes a report published by Cuomo's office "confirm[ing] . . . [that] the Ingenix databases in fact under-reimburse[d] consumers."   PSAC ¶ 10 (internal quotation marks omitted).

On February 13, 2008, Cuomo proclaimed that the Office of the New York State Attorney General was charging Ingenix with fraud for having furnished a "defective and manipulative database . . . with rigged pricing for medical services" to WellPoint and other insurers.   PSAC ¶ 18.   The value of WellPoint stock immediately dropped after this announcement and the news of Cuomo's impending subpoenas.   Plaintiff asserts that "in the two weeks following . . . Cuomo's announcement and an internal disclosure by Braly in mid-February that [WellPoint's problems] would soon be announced publicly, [D]efendants sold off more than $4.8 million of their WellPoint stock holdings."   *Id.* Combined with Glasscock's alleged stock sale of $2.5 million on February 6, 2008, Plaintiff alleges that the named Defendants profited to the tune of at least $7.3 million before issuing the Company's revised guidance on March 10, 2008.   *Id.*

**B.   The October Press Release**

WellPoint issued a press release on October 24, 2007 ("the October Press Release")

25

in which it reported the Company's results for the third quarter of 2007.   PSAC ¶¶ 19, 66.

In the October Press Release, the Company made the following representations regarding

3Q07 finances:

- Net income had been $868 million, and net income per diluted share had been $1.45.
- The Company's benefit expense ratio had been 81.7%, which represented an increase of 50 basis points from the third quarter of 2006.
- Based on medical trends from previous quarters in that fiscal year, the Company believed it could appropriately forecast a 2007 medical cost trend estimate of less than 8%.

*Id.* ¶¶ 66-68.   The Company explained that the higher overall benefit expense ratio

stemmed from an increased value in the "Specialty, Senior, and State Sponsored Business"

reporting segment, which was offset in part by a decreased value in the "Commercial and

Consumer Business" reporting segment.   According to the October Press Release, the

decline in the latter value demonstrated "the Company's commitment to disciplined

pricing."   *Id.* ¶ 67.   The document also quoted Braly's optimistic view that the Company

was committed to a growth target of at least 15% for EPS.   *Id.* ¶¶ 19, 66.   "[I]n truth,"

Plaintiff asserts, "WellPoint's 3Q07 reported financial results were false because

WellPoint materially understated its 3Q07 benefit expenses by not recording any reserves

for the backlog of unreported claims tied to the system integration problems and by using

artificially low reimbursement rates for out-of-network service reimbursements."   *Id.* ¶

19.   Plaintiff similarly alleges that the Company's 2008 guidance was false because it was

based on the same purportedly altered Ingenix data.   Moreover, Plaintiff asserts that the

Company had "no reasonable basis" for the forecasts made at any time during the Putative

26

Class Period because (1) WellPoint was aware of, but did not publicly[11] acknowledge, its involvement in the Ingenix Scheme, and (2) CWs had informed WellPoint that "the same system integration problems which had caused WellPoint to miss its 4Q07 forecasts continued to negatively affect the Company."  *Id.* ¶ 23.

### C.   The October Call

At some point on October 24, 2007, WellPoint conducted a conference call to discuss the Company's 3Q07 earnings ("the October Call").   Braly repeated the EPS of $1.45 that the Company had reported in the October Press Release and stated, "[T]hese results are in line with our prior guidance[,] and we continue to have met or exceed our EPS guidance every quarter."   PSAC ¶ 69.   During the October Call, DeVeydt confirmed the 2007 medical cost trend of less than 8%.   DeVeydt also informed those on the call that the Company was "committed" to its EPS growth target (at least 15%) for 2008.  *Id.* ¶ 70.

### D.   2007 Form 10-Q

WellPoint's third significant act on October 24, 2007 was to file its Form 10-Q with the SEC.   In this form, Defendants restated the financial results summarized in the October Press Release and the October Call.   PSAC ¶ 71.   The form also included several statements made by Braly and DeVeydt, which represented the following certifications:[12]

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

---

[11]Nevertheless, Plaintiff asserts that Braly alluded to "rumors" about Company "issues" at a February 2008 managerial meeting.   Braly allegedly said that WellPoint would announce these "issues" publicly in the future.   PSAC ¶ 29.

[12]Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 require these certifications.

> in light of the circumstances under which such statements were made, not
> misleading with respect to the period covered by this report; [and]
> Based on my knowledge, the financial statements, and other financial information
> included in this report, fairly present in all material respects the financial condition,
> results of operations and cash flows of the registrant as of, and for, the periods
> presented in this report.

*Id.* ¶ 72.   Elsewhere in the document, Braly and DeVeydt certified that all information in

the Form 10-K "fairly present[ed] in all material respects" the Company's financial

condition and the results of its operations.   *Id.*

In sum, Plaintiff alleges that Defendants knew that the foregoing statements from

the October Press Conference, the October Call, and the Form 10-Q were fraudulent.   *See*

PSAC ¶ 74.   Plaintiff explains that such knowledge is evident from Defendants' failure to

disclose the Company's participation in the Ingenix Scheme and its system integration

problems.   Thus, according to Plaintiff, "WellPoint's benefit expense was materially

understated during the Class Period and caused WellPoint's 3Q07 financial results, issued

in [the October Press Release, the October Call, and the Form 10-Q], to be false and

misleading and in violation of GAAP and SEC rules."   *Id.*

### E.   New Allegations Regarding "Suspicious" Stock Sales

Plaintiff again submits that the stock sales of Glasscock, Sheila Burke, and Kenneth

Goulet[13] are facts from which the Court may (and, indeed, should) infer scienter.   PSAC ¶

131.   During the PSAC's Putative Class Period, "insiders" made over $23.1 million by

selling shares of their personal stock in the Company.   Plaintiff asserts that $5 million

---

[13]Burke is a WellPoint director; Goulet is the President and CEO of WellPoint's
commercial business unit.   PSAC ¶ 98.

dollars' worth of these sales took place after the WellPoint managers' meeting *and* Cuomo's February 13, 2008 announcement regarding his investigation into the alleged Ingenix Scheme. *Id.* Glasscock sold 273,779 shares of his WellPoint stock during the Putative Class Period, which Plaintiff has classified month-by-month for the Court. According to Plaintiff's chart, Glasscock sold 62,222 shares of his Company stock in November 2007, 62,222 shares in December 2007, 62,222 shares in January 2008, and 87,113 shares in February 2008. *Id.* It is Plaintiff's contention that Glasscock timed these sales "to take maximum advantage of the artificial price inflation" caused by Defendants' alleged misrepresentations. *Id.* ¶ 133.

Between May 4, 2005 and February 11, 2008, Glasscock sold his personally-owned WellPoint stock using a trading plan authorized by Rule 10b5-1 of the Exchange Act.[14] PSAC ¶ 134. He entered into a new Rule 10b5-1 trading plan on February 11, 2008.

### F.  Post-Class Period Allegations

After concluding his investigation of the Ingenix database, Cuomo published a report summarizing the study. The report was issued in January 2009 and included among its findings:

> Insurers mislead and obfuscate in their policy language. They promise to reimburse based on usual and customary rates – a form of market rate – but then reimburse on schedules complied by their own, the nation's second largest health insurer, which has an interest in depressing reimbursement rates. They hide this conflict from their members. They pretend an independent database underlies these rates – it does not. Our investigation found that the schedules themselves,

---

[14] 17 C.F.R. § 240.10b5-1.

created in a well of conflicts, are unreliable, inadequate and wrong – usually at the expense of the consumer.

PSAC ¶ 106.   Cuomo declared that WellPoint failed to disclose that "other health care insurers, including WellPoint, contributed information to the [Ingenix] database."   *Id.* ¶ 107.   He also opined that any alleged conflicts with the database were real, not hypothetical, "because the Ingenix databases in fact under-reimburse[d] consumers" and employed a fraudulent model for reimbursing out-of-network care.   *Id.* ¶ 108.   As per Cuomo's report, "[t]he lack of disclosure and conflicts of interest" produced the alleged fraud, and the resultant loss was "understated market rates for UCRs by up to 28% across New York State, which translates to at least hundreds of millions of dollars in losses to consumers over the past ten years across the country."   *Id.* ¶¶ 108-09 (internal quotation marks omitted).

Plaintiff further maintains that in February 2009, WellPoint entered into a pecuniary settlement with Cuomo and executed an Assurance of Discontinuance.[15]   This document stated that a WellPoint subsidiary contributed data to and used the Ingenix database and that, via other subsidiaries, the Company itself used Ingenix.   PSAC ¶ 110.   On the same day the Company agreed to settle with Cuomo, then-Executive Vice President Ken Goulet allegedly said, "WellPoint acknowledges the conflicts of interest in the Ingenix database which the Attorney General's investigation brought to light."   *Id.* ¶ 111.   A subsequent

---

[15]Plaintiff has not included a citation to this document or appended it to her motion for the Court's review.   Without more, we are not equipped to make a finding that this agreement clearly constituted any admission of wrongdoing by Defendants.

report of the U.S. Senate Committee on Commerce, Science, and Transportation

pronounced that:

> Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges.   Ingenix . . . used its own statistical "scrubbing" methods to remove valid high charges from their calculations.
>
> The results of these questionable statistical methods were estimates of "usual and customary" charges that consistently skewed reimbursement rates downwards – in a direction that allowed insurers to reduce their claims payments.
> . . . .
>
> Th[e] close . . . business relationship between Ingenix and the health insurance industry [has] existed for more than a decade.

*Id.* ¶ 113-14.

### G.   "Additional" Scienter Allegations

In the PSAC, Plaintiff attempts to bolster her prior scienter allegations concerning

the individually named Defendants.   She states that Braly and DeVeydt, both "new top

management" executives eager to prove their value to the Company, reported "repeatedly"

on various metrics and fielded analysts' questions.   PSAC ¶ 117.   "[B]ased on their

communication with investors," Plaintiff avers, "Braly and DeVeydt represented to the

market that they had intimate knowledge of the Company's financial results, including

expense benefits and related metrics."   *Id.*

 Next, Plaintiff reasserts that, "[a]s confirmed by the [Senate] report," WellPoint

used the Ingenix database to determine reimbursement rates before and during the Putative

Class Period.   PSAC ¶ 118.   Plaintiff mentions a letter in which the President and CEO of

a New Jersey-based WellPoint subsidiary wrote that he knew of no alternative data sources

31

for health care reimbursement rates.   She then contends that, "[a]s WellPoint's top

executives, [D]efendants knew that WellPoint contracted with Ingenix to obtain access to

Ingenix's databases and in turn . . . provided claims data for Ingenix[]." *Id.*   Moreover,

Plaintiff posits that because the nation's largest health insurers used Ingenix, "[D]efendants

knew, or recklessly disregarded, the inherent conflict of interest in using the Ingenix

database to calculate reimbursement rates." *Id.*   To corroborate her allegations that

Defendants knew or recklessly disregarded false statements, Plaintiff cites:   (1) an August

2007 California public hearing on Blue Cross of California's business practices; (2) a

statement by the California Medical Association discussing "information received from

physicians and patients" about Blue Cross's purportedly abusive payment practices"; and

(3) Cuomo's February 2008 announcement that he was investigating Ingenix.   *Id.*

Most of the PSAC's remaining supplementary paragraphs pertain to Plaintiff's

position that evidence of scienter lies in Defendants' alleged accounting misstatements and

disclosure violations.   Plaintiff asserts that the Company's Form 10-Q and Form 10-K

were materially false and misleading because Defendants materially understated certain

financial metrics and evaded disclosure of "material adverse" information regarding the

Ingenix Scheme and system integration allegations.   PSAC ¶ 140.   After listing several

distinctive Generally Accepted Accounting Principles ("GAAP") applicable to WellPoint

during the Putative Class Period, she pronounces that, "[i]n violation of [these] GAAP

rules, [D]efendants disregarded the available information after December 31, 2007 and

failed [to] adjust [the] fiscal year 2007 benefit expense and IBNR reserves in [the] 2007

32

Form 10-K." *Id.* ¶¶ 145-49, 152-54.   The first piece of "available information" to which she alludes is the Company's system integration problems that generated poor visibility into claims data and unreported claims.  *Id.* ¶ 143.   Secondly, she refers to Defendants' alleged failure to know the Company's actual costs and liabilities for Q307 and the 2007 fiscal year.   Thirdly, despite a portion of its financial statements (which Plaintiff terms a "disclosure") regarding factors "to be considered in developing [their] best estimate[s]," Plaintiff asserts that Defendants did not establish IBNR reserves that "incorporated these exact factors."  *Id.* ¶¶ 150-51.   Lastly, Plaintiff states that Defendants neglected to incorporate Cuomo's subpoena and "certain other events occurring in early 2008 that gave [them] further insight" into Form 10-K.   Plaintiff claims that this information was "require[d] consideration by management" but inappropriately disregarded by Defendants. *Id.* ¶ 152.

Plaintiff likewise alleges that the following Management, Discussion, and Analysis ("MD&A") disclosures in Defendants' financial statements were limited and materially misleading:

> Liabilities for both claims incurred but not reported and reported but not yet processed through our systems are determined in aggregate, employing actuarial methods that are commonly used by health insurance actuaries and meet Actuarial Standards of Practice.   Actuarial Standards of Practice require that the claim liabilities be adequate under moderately adverse circumstances.   We determine the amount of the liability for incurred but not paid claims by following a detailed actuarial process that entails using both historical claim payment patterns as well as emerging medical cost trends to project our best estimate of claim liabilities.
> * * *
> Circumstances to be considered in developing our best estimate of reserves include changes in utilization levels, unit costs, mix of business, benefit plan designs,

33

provider reimbursement levels, processing system conversions and changes, claim inventory levels, claim processing patterns, claim submission patterns and operational changes resulting from business combinations.

* * *

We regularly review and set assumptions regarding cost trends and utilization when initially establishing claim liabilities.

* * *

Our benefit expense includes costs of care for health services consumed by our members, such as outpatient care, inpatient hospital care, professional services (primarily physician care) and pharmacy benefit costs.

* * *

Our cost of care trends are calculated by comparing the year-over-year change in average per member per month claim costs for which we are responsible, which excludes member co-payments and deductibles.   While our cost of care trend varies by geographic location, based on medical cost trends during the twelve months ended December 31, 2007, our aggregate 2007 cost of care trend was less than 8%.

* * *

Benefit expense increased $3.8 billion . . . .

* * *

Our benefit expense ratio increased 120 basis points to 82.4% in 2007.

PSAC ¶ 155.   In Plaintiff's opinion, Defendants knew (or were reckless not to know) that their earlier projections were unsustainable because of system integration problems and WellPoint's alleged participation in the Ingenix Scheme.   She contends that Defendants violated SEC rules about MD&A disclosures by failing to supplement the above disclosures with "known adverse information"— that the Company's past and current results would not be predictive of future results.   *Id.* ¶ 156.   In support of her pronouncements, she cites SEC releases that stress the importance of disclosing, *inter alia*, "information necessary to an understanding of the registrant's financial condition," "material events and uncertainties known to management," and "matters that will have an impact on future operations and have not had an impact in the past."   *Id.* ¶¶ 159-60.

Accompanying Plaintiff's assertion that Defendants knew (or were reckless in not knowing) that the Company's Putative Class Period financial statements were "materially false and misleading" is an inventory of several "additional factors" which she believes are symptomatic of scienter.   This list, in pertinent part, sets forth the following "indicators" of Defendants' knowledge or recklessness:

- [t]he types of accounting gimmicks employed – the accounting misstatements and disclosure violations at issue were not due to simple mathematical errors or honest misapplication of [] accounting standards.   For example, the Company's involvement in a fraudulent insurance billing scheme is evidence that it was [Defendants'] intent to understate its . . . financial metrics . . . .
- [t]he duration over which the improper accounting was perpetrated . . . . WellPoint issued financial results and 2008 earnings guidance on several occasions during the Class Period before it was forced to reveal its true financial condition by drastically lowering its earnings guidance at the end of the Class Period when its accounting improprieties could no longer be concealed . . . .
- [t]he magnitude or size of the misstatements . . . . [T]he Company's understatement of . . . financial metrics was clearly material during the Class Period . . . .
- [t]he applicable accounting rules that were violated . . . . [T]he Company misapplied fundamental accounting principles . . . .
- [t]he income statement effect of the misstatements . . . . [that is,] understating expenses and inflating net income during the Class Period . . . .
- [t]he significance of the financial statement items that were misstated . . . . Notably, the Company disclosed . . . in its Class Period financial statements: . . . "We consider some of our most important accounting policies that require estimates and management judgment to be those policies with respect to liabilities for medical claims payable . . . ."

PSAC ¶ 137 (emphases omitted).   Finally, Plaintiff avers that WellPoint's Sarbanes-Oxley certifications—those depicted above in the "2007 Form 10-K" and "2007 Form 10-Q" sections—establish scienter.   "[B]ecause Braly and DeVeydt certified [that] they had personally performed the review procedures as of the dates they signed the

35

Sarbanes[-]Oxley certifications," Plaintiff reasons, "they either knew of the accounting misstatements in the Class Period financial statements or [] they knowingly failed to carry out the required review of the Company's financial statements and evaluation of the Company's disclosure controls."  *Id.* ¶ 138.   Thus, according to Plaintiff, the signatures of Braly and DeVeydt evince Defendants' knowledge or reckless disregard that these forms "were false and misleading" and should corroborate a finding of a strong inference of scienter.

In sum, it is knowledge of these alleged facts—that WellPoint was experiencing (1) system integration problems; (2) claims processing problems; (3) a growing backlog of claims; (4) lack of visibility into claims data; (5) the inability to calculate IBNR claims and establish adequate reserves; (6) problems with pricing products; (7) a rising benefit expense ratio; (8) a continuing shift in membership toward the Company's less profitable self-funded products; and (9) Braly's management meeting comment, as well as Glasscock's allegedly suspicious stock sales and the "new Ingenix Scheme allegations"—that Plaintiff argues demonstrate scienter on behalf of Defendants.   With respect to the alleged Ingenix Scheme, Plaintiff further argues that the PSAC ably sets forth the required element of loss causation.   Defendants deny all of these allegations and request that the Court deny Plaintiff leave to amend her complaint.

## <u>Legal Analysis</u>

## I.  **Standards of Review**

Count I of Plaintiff's Complaint asserts violations of § 10(b) of the Exchange Act

and SEC Rule 10b-5 promulgated thereunder.   Count II asserts a violation of § 20(a) of the Exchange Act, alleging control person liability with respect to Braly, DeVeydt, and Glasscock.   The standards of review applicable to these claims are drawn from Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4 *et seq.*

Any civil lawsuit begins from the precept that the complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2).   However, a fraud action requires "more . . . investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate," and the complaint "must provide 'the who, what, when, where, and how.'"   *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999); *United States ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 605 (7th Cir. 2005)).   Such heightened pleading standards are prescribed due to "the 'great harm to the reputation of a business . . . a fraud claim can do.'"   *Borsellino*, 477 F.3d at 507 (quoting *Payton*, 184 F.3d at 627).   Accordingly, Federal Rule of Civil Procedure 9(b) mandates that fraud complaints allege the circumstances constituting the claim "with particularity."   Fed. R. Civ. P. 9(b).

Section 10(b) of the Exchange Act renders it illegal "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may

37

prescribe."   15 U.S.C. § 78j(b).   By virtue of the authority granted to it by Congress under

the Exchange Act, the SEC promulgated Rule 10b-5, which makes it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,
> (b) [t]o make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light of
> the circumstances under which they were made, not misleading, or
> (c) [t]o engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person, in connection with the
> purchase or sale of any security.

17 C.F.R. § 240.10b-5.   According to well-settled Supreme Court precedent, this rule does

not extend beyond conduct already prohibited by § 10(b) of the Exchange Act.

*Stoneridge Inv. Partners, LLC v. Sci.-Atl.*, 552 U.S. 148, 157 (2008); *United States v.*

*O'Hagan*, 521 U.S. 642, 651 (1997); *Cent. Bank of Denver, N.A. v. First Interstate Bank of*

*Denver, N.A.*, 511 U.S. 164, 173 (1994).   The Supreme Court acknowledged in 1971 that a

private right of action is implied under § 10(b) and, by extension, under Rule 10b-5.

*Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971).

An individual bringing a typical § 10(b) action must prove (1) a material

misrepresentation or omission made by the defendant; (2) scienter; (3) a connection

between the material misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the defendant's material misrepresentation or omission by the plaintiff;

(5) economic loss; and (6) loss causation.   *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157.

Establishing scienter is often a plaintiff's greatest hurdle.   *See, e.g.*, *In re Allscripts, Inc.*

*Sec. Litig.*, No. 00-c-6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) (noting the

difficulty of creating inferences of scienter even with clear accounting errors).

38

Furthermore, the PSLRA, which amended the Exchange Act, has made the pleading standard for scienter in § 10(b) cases more onerous than the usual Rule 9(b) requirements. The PSLRA obligates claimants to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).   The state of mind contemplated by the statute is an intent to deceive, which may be deduced from knowledge of a statement's falsity or "reckless[16] disregard of a substantial risk that the statement is false."   *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

Respecting allegations of misleading statements and omissions, the PSLRA states as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>> (A) made an untrue statement of material fact; or
>> (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1); *see Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer*, 673 F. Supp. 2d 718, 732 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012).

---

[16]In the context of securities fraud cases, behavior is "reckless" if it constitutes "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."   *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs III*") (citation omitted), *enforcing* 551 U.S. 308 (2007).

39

The PSLRA also contains a safe harbor, which provides that a person may not be liable for a forward-looking statement if the statement is: (1) identified as forward-looking and coupled with meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; (2) immaterial; or (3) made without actual knowledge.   15 U.S.C. § 78u–5(c)(1); *Wade I*, 740 F. Supp. 2d at 1012.

Supreme Court precedent provides additional guidance on the foregoing pleading standards for scienter.   Notably, in 2007, the Court interpreted the PSLRA's "strong inference" language to mean "more than merely plausible or reasonable . . . [but] cogent and at least as compelling as any opposing inference of nonfraudulent intent."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).   The Court instructed that when determining whether scienter has been properly alleged, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice."   *Id.* at 322 (citing 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004 & Supp. 2007)).   The relevant inquiry, therefore, is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."   *Id.* at 322-23.   Moreover, the district court's inquiry is to be "comparative"; that is, it "must take into account plausible opposing interferences."   *Id.* at 323.

Finally, under Federal Rule of Civil Procedure 15(a), leave to amend pleadings

"shall be freely granted when justice so requires."   Fed. R. Civ. P. 15(a).   The decision to deny leave to file a second amended complaint is within the reasoned discretion of the district court.   *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 850 (7th Cir. 2002); *DeSalle v. Wright*, 969 F.2d 273, 277 (7th Cir. 1992).   Denying leave to amend where repleading would be futile is not an abuse of the court's discretion.   *DeSalle*, 969 F.2d at 278.   "A court may determine that a proposed amendment is futile if it sets forth facts or legal theories that are redundant, immaterial, or unresponsive to the allegations in the complaint."   *Campania Mgmt. Co.*, 290 F.3d at 850.

## II.   Discussion

Our order dismissing Plaintiff's FAC was grounded in two conclusions:   first, that Plaintiff had failed to plead adequate scienter allegations, and second, that Defendants' allegedly false statements were protected under the safe harbor of the PSLRA.   *See Wade I*, 740 F. Supp. 2d at 1012.   Plaintiff was afforded forty-five days within which to seek leave to amend her complaint to conform to the instructions in that ruling.   Defendants rejoin that Plaintiff's latest submission, the PSAC, neither heeds this court's previous instructions nor remedies the defects in the FAC.   In particular, Defendants advance three arguments:   (1) that the new Ingenix Scheme allegations do not cure the FAC's failure to plead scienter; (2) that the new Ingenix Scheme allegations inadequately plead loss causation; and (3) that the PSAC shows nothing suspicious or unusual about Glasscock's stock sales that could support an inference of his (or any Defendant's) scienter.   We address each of these arguments in turn.

41

### A.   Inadequate Scienter Allegations Concerning the "Ingenix Scheme"

That Plaintiff has added numerous allegations to the PSAC is, to say the least, a patent understatement.   Most of the extra assertions—which, incidentally, have transformed this pleading into a staggering ninety-eight-page document—concern Plaintiff's attempt to revive her lawsuit by establishing a strong inference of scienter.   In reviewing the PSAC, we have carefully considered whether the additional allegations reveal each Defendant's knowledge of purportedly false statements when those statements were made, *see Wade I*, 740 F. Supp. 2d at 1010, and now conclude that they do not. Defendants' suggestion that there really is nothing "new" about Plaintiff's allegations is, in our view, precisely the case.

As a preliminary matter, we address Defendants' argument that there is nothing new about Plaintiff's Ingenix Scheme allegations by virtue of Plaintiff's own admission that she was aware of the so-called ruse as early as February 2008.   We agree in the sense that Plaintiff has taken the position that "WellPoint's participation in the Ingenix [S]cheme started to come to light in February 2008."   Pl.'s Br. at 2.   Defendants correctly emphasize that this information was ostensibly available to Plaintiff one month before she filed her initial complaint with this court.   *See* Docket No. 1 (filed March 18, 2008).   It is therefore puzzling why Plaintiff omitted any facts related to the Ingenix Scheme from both the original and amended versions of her complaint.   Presumably, Plaintiff is aware of the Seventh Circuit's holding that denial of leave to amend a complaint "is particularly warranted in instances in which the plaintiff has failed to provide an explanation as to why

the amendment did not take place sooner." *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 774 (7th Cir. 1995).   Even so, the FAC—filed fourteen months after the original document—was completely silent with respect to the Ingenix Scheme.   Plaintiff's current reliance on the Ingenix Scheme assertions as "pervasive[]" evidence of fraud is misplaced as an untimely maneuver to save her faltering claims.   We are mindful of the Seventh Circuit's exhortation that "[t]here must be a point at which a plaintiff makes a commitment to the theory of [her] case." *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993).   Here, as in *Johnson*, Plaintiff endeavors to add an entirely new theory to her case more than two years after her initial filing, with no explanation in her supporting and reply briefs as to why she did not previously include these allegedly "pervasive" facts. Notwithstanding Plaintiff's dubious pleadings tactics, however, we will consider her argument that the PSAC cures the FAC's deficiencies with respect to scienter.

Again, we find curious Plaintiff's self-assured pronouncement that the new Ingenix allegations, without more, meet the requirements for pleading securities fraud.   *See* Pl.'s Reply at 5.   Plaintiff is certain that the PSAC remedies our prior finding that the FAC contained "very little discussion . . . to any disregarded risk of falsity," *Wade I*, 740 F. Supp. 2d at 1009, because the PSAC "contains well-pled facts rather than 'generalized allegations' about the details of the Ingenix [S]cheme."   Pl.'s Reply at 6.   Bearing in mind that the quality, not quantity, of a complaint's allegations is critical when pleading a claim of securities fraud, *see In re Career Educ. Corp. Sec. Litig.*, No. 03-C-8884, 2006 WL 999988, at *11 (N.D. Ill. Mar. 28, 2006), we are not similarly convinced.   Plaintiff's

43

PSAC is an unfortunate paradox:   a 98-page, 206-paragraph document that does not
provide enough information.

An investor seeking relief under § 10(b) and Rule 10b-5 must distinguish her
situation from that of many others who have been negatively impacted by business
reversals.  *Arazie v. Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993); *DiLeo v. Ernst &
Young*, 901 F.2d 624, 627 (7th Cir. 1990).   "This means the who, what, when, where, and
how:   the first paragraph of any newspaper story."   *DiLeo*, 901 F.2d at 627.   The FAC
failed in this regard, and, notwithstanding the deluge of allegations it contains, the PSAC
does as well.   Plaintiff has unquestionably propounded many "circumstances [allegedly]
constituting fraud," as Federal Rule 9(b) of Civil Procedure mandates.   The problem,
though, is that the PSAC regurgitates deficient FAC allegations along with other nebulous
assertions about a professed "scheme" to swindle investors through a database owned by
the subsidiary of another nationwide health insurer.   Nowhere is this vagueness more
evident than in Plaintiff's repeated statements addressing Defendants' "knowledge" about
the Ingenix data.   To invoke the *DiLeo* metaphor, these statements gloss over all of the
interrogative words but the "what."   This is patently insufficient evidence of scienter, and
it is certainly not "cogent or compelling," as *Tellabs* requires.

Plaintiff's Ingenix Scheme allegations continue to sidestep the "who" aspect of her
claim via group pleading.   This issue proved fatal to her previous pleading efforts, which
we noted when we dismissed the FAC.   In that order, we informed Plaintiff that the
Seventh Circuit disallows "group pleading" and requires plaintiffs to plead facts showing

44

the scienter of each individual defendant.   *Wade I*, 740 F. Supp. 2d at 1008 (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 693-94 (7th Cir. 2008)).   We also advised her, "Paragraph 78 begins, 'Defendants knew, but failed to disclose . . . the following adverse facts.'   But providing such an opening does not provide the type of particularized allegations of scienter required here."   *Id.* at 1011.   Consequently, it was disappointing to discover the same failures in the PSAC.

Like the FAC, the PSAC contains very few references to Braly, DeVeydt, and Glasscock as individuals.   Plaintiff generally groups the individual Defendants together when referring to the Ingenix Scheme; she incorporates no particularized facts about any one person's knowledge or awareness of this alleged plot.   Our meticulous review of the PSAC revealed that nowhere do the phrases "Braly knew," "Braly became aware," "Braly was aware," or "Braly was made aware" appear in the document in connection with the Ingenix Scheme—or at all.   The same is true with respect to DeVeydt and Glasscock. Rather than providing specific facts from which the Court could infer that the named Defendants knew (or were reckless in not knowing) of any improper "data scrubbing," Plaintiff persists in pleading "generalized allegations[, which] are insufficient under the PSLRA."   *Wade I*, 740 F. Supp. 2d at 1012; *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 999 (E.D. Wis. 2009).   The result is a document replete with the following wholly unpersuasive boilerplate allegations, none of which can support the required strong inference of scienter:

- "[D]efendants knew that WellPoint contracted with Ingenix to obtain access to Ingenix's databases and in turn WellPoint provided claims data for Ingenix's database," PSAC ¶ 118;
- "[D]efendants knew that WellPoint used Ingenix's faulty and defective data," *id.* ¶ 74;
- "[D]efendants knew that WellPoint's use of [the] Ingenix database was causing the Company to understate its benefit expenses," *id.* ¶ 31;
- "[D]efendants knew or were reckless in not knowing not only that its reported benefit expenses and reserves were understated as a result of the Company's involvement in the Ingenix [S]cheme and the Company's systems integration problems, . . . but also that these matters caused WellPoint's reported results to be not indicative of WellPoint's future results," *id.* ¶ 156;
- "Defendants knew or were reckless in not knowing that the eventual termination of the Ingenix [S]cheme would cause a significant increase to the . . . medical claim costs that WellPoint had recorded during the Class Period," *id.*;
- "[D]efendants knew that the New York Attorney General was investigating Ingenix," *id.* ¶ 133;
- "Defendants knew that if the Ingenix scheme came to light and the Company was forced to stop using the faulty database[,] the Company's benefit expense[] [ratio] would increase going forward," *id.* ¶ 99(k);
- "[Defendants] knew that if the Ingenix [S]cheme came to light, the cost trends would deteriorate further.  Braly acknowledged the cost trend problem internally in 3Q07 and announced a new reorganization strategy[17] to help control the increasing cost of care, effective 2008," *id.* ¶ 27;
- "[D]efendants knew they could not . . . reveal the scheme," *id.* ¶ 3;
- "[D]efendants knew but failed to disclose that WellPoint was involved in the Ingenix [S]cheme," *id.* ¶ 23;

---

[17]Plaintiff has been apprised of the Court's stance on use of mitigation evidence to establish scienter.  In *Wade I*, 740 F. Supp. 2d at 1010, we stated in the plainest of terms that Plaintiff's allegations regarding Braly's announcement were unavailing and contrary to Federal Rule of Evidence 407.  Nevertheless, because they have resurfaced in the PSAC, we state once again that these conclusory assertions do not demonstrate Defendants' intent to defraud Plaintiff. Additionally, they do not overcome the non-fraud inference that Defendants' conduct was ordinary business activity.  *See, e.g.*, *In re Brightpoint Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *13 (S.D. Ind. Mar. 29, 2001) ("[A] plaintiff cannot allege scienter based merely upon . . . factors that would be true for nearly all corporate executives.").  The same is true regarding Plaintiff's allegations concerning post-Class Period settlements between Cuomo and several insurers, including WellPoint.

- "Defendants knew that [the] Ingenix [S]cheme was coming to an end," *id.* ¶ 30;
- "After using Ingenix for several years, United Health Group and WellPoint finally publicly admitted after the Class Period that there were 'inherent conflicts of interest' in the business relationship with Ingenix and "WellPoint acknowledges the conflicts of interest in the Ingenix database," *id.* ¶¶ 10, 111; and
- "[I]n its Class Period financial statements, WellPoint admitted that specific factors associated the Company's involvement in the Ingenix [S]cheme and the Company's system integration problems were required to be considered in the calculation of its period end IBNR reserves," *id.* ¶ 150.

The last two statements on the above list pose problems not only because they reflect group pleading, but also because they clearly are not even "well-pled facts." First, Plaintiff neglects to mention when, where, or in what context United Health Group and WellPoint's allegedly public admission occurred, to say nothing of who made it. Second, after claiming that WellPoint's Class Period financial statements "admitted that specific factors associated the Company's involvement in the Ingenix [S]cheme," Plaintiff quotes a "disclosure" that states no such thing. *See* PSAC ¶ 150 (listing business factors, but omitting all mention of data manipulation or Ingenix, Inc.). In any event, neither assertion evinces that any Defendant had the requisite state of mind regarding a distinct false statement or flaw in the Ingenix database.

As is common in private securities lawsuits, some of Plaintiff's contentions depend on information provided by confidential witnesses. The nineteen CWs upon whom Plaintiff's allegations of scienter rest are all former employees of WellPoint. PSAC ¶¶ 46-65. Plaintiff has pled the titles, job duties, and dates of employment for these CWs with sufficient particularity for the Court to determine the probability that these individuals

47

would have actual knowledge of, or access to, the information underlying their statements. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (holding that, although a plaintiff need not plead the "name, rank, and serial number" for each of her confidential sources, she must describe every source with exactitude "to support the probability that a person in the position occupied by the source would possess the information alleged").   Indeed, we have already indicated our appreciation for Plaintiff's efforts to corroborate her allegations with evidence offered by the CWs.   Our ruling in *Wade I*, 740 F. Supp. 2d at 1011, commended Plaintiff's "attempt to splice generalized allegations of the alleged troubles at WellPoint" with the CWs' statements.

Nevertheless, we are also cognizant that the Seventh Circuit's approval of the use of such information to generate a strong inference of scienter, *see Tellabs III*, 513 F.3d at 712, does not absolve us of the duty to conduct our analysis with care and prudence. *Higginbotham*, 495 F.3d at 756-57, cautions that statements from CWs must be steeply discounted.   As the *Higginbotham* court reasoned, in many circumstances "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.   Perhaps these confidential sources have axes to grind . . . [or] are lying." *Id.* at 757.   We do, of course, concede that the CWs had the potential to provide useful, cogent, and compelling evidence of Defendants' respective states of mind in the instant matter.   Still, we cannot ignore the fact that the

PSAC's allegations concerning the CWs are identical to those in the FAC (except for one or two ancillary modifiers).   Having compared the documents word for word, we can confirm Defendants' statement that "[t]here are no new CWs, and no additional information is pleaded by any of them."   Defs.' Resp. at 7.   These allegations hence remain "off point" as inadequate clues of scienter.   *See Wade I*, 740 F. Supp. 2d at 1009 n.10.

It may be that Plaintiff expects the Court to afford great weight to what she deems the Company's "admission" to using a conflicted database.   This allegation, found in paragraph 111 of the PSAC, consists of Company executive Goulet's statement that "WellPoint acknowledges the conflicts of interest in the Ingenix database which the Attorney General's investigation brought to light."   PSAC ¶ 111.   Plaintiff does not ask the Court in either of her briefs to impute knowledge of any "data scrubbing" (or reckless disregard thereof) to the Company.   Nonetheless, had she done so, this argument would be fruitless.   To be sure, "[w]here a corporate agent obtains knowledge while acting in the scope of his agency, . . . the court imputes such knowledge to [the] corporation."   *United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992).   But the key to the foregoing rule is precisely what the PSAC lacks elsewhere:   evidence of the agent's knowledge.   Goulet's alleged declaration merely acknowledges a conflict, which is not in itself fraudulent.   From this assertion, we cannot infer that Goulet had any knowledge of, or recklessly disregarded, the "data scrubbing" Plaintiff claims was the cause of the alleged fraud.   Plaintiff's sparse discussion of Goulet strikes the Court as another impermissible

49

"group pleading" exercise, and because no facts have been pled suggesting his scienter, we cannot make the leap of imputing such scienter to the Company.

Yet another fact upon which Plaintiff seizes is that both Braly and DeVeydt signed required Sarbanes-Oxley certifications in Forms 10-K and 10-Q.   Pursuant to typical securities practice, their signatures verify that they reviewed the applicable financial statements and deemed them fair representations of WellPoint's financial status in all material aspects.   According to Plaintiff, such review "would clearly have alerted [D]efendants to . . . the systems integration problems and the Company's involvement in the Ingenix Scheme."   PSAC ¶ 138.   Plaintiff therefore asserts (indeed, rather summarily) that these signatures establish scienter because Defendants either knew or recklessly disregarded the "false and misleading" nature of their Sarbanes-Oxley signatures.   *Id.* ¶ 139.   We are not so easily convinced.   By Plaintiff's own admission, these individual Defendants were "new top management" during the Putative Class Period.   Bearing in mind the uphill struggle involved in any job change, we are inclined to afford these Defendants some grace.   Assuming the existence of any facts (which, again, have not been presented with sufficient particularity) suggesting that Forms 10-K and/or 10-Q inaccurately reflected WellPoint's financial health, it is our view that Defendants' state of mind when signing these forms was at most akin to negligence.[18]   A relative lack of experience does not compel a finding of knowledge or reckless disregard.   *See, e.g.*,

---

[18]Negligence, of course, is the failure to do something that a "reasonably careful" person would do under the same or similar circumstances.   *Griffin v. Foley*, 542 F.3d 209, 215 n.20 (7th Cir. 2011) (Indiana's formulation).

*Schultz v. TomoTherapy Inc.*, No. 08-cv-314-SLC, 2009 WL 2032372, at *21 (W.D. Wis. July 9, 2009).   As we have previously explained, much more information regarding Braly and DeVeydt's conduct during the Putative Class Period is required to show "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (recklessness), to say nothing of actual knowledge.   Consequently, we decline to characterize the Form 10-K and 10-Q certifications as evidence establishing a strong inference of scienter.

Ultimately, the most damning accusation Plaintiff includes in the PSAC is that WellPoint "manipulated or 'scrubbed' the data it contributed to Ingenix by throwing out outlying high costs so as to [e]nsure that the Ingenix databases reported invalid and unreasonably low charges" and that Ingenix then impermissibly "remove[d] valid high charges from [its] calculations."   PSAC ¶ 9.   Clearly, this behavior might raise red flags for a reasonable factfinder if alleged with sufficient particularity.[19]   Lamentably, paragraph 9 is as detailed as the PSAC gets with respect to the "who, what, when, where, and how" of WellPoint's alleged data manipulation.   Plaintiff later cites a Senate committee's conclusion that "*[i]nsurers* that contributed charge data to Ingenix *often* 'scrubbed' their data," *id.* ¶ 113 (emphasis added), but she does not point to any finding

_____

[19]We do, however, note with some interest the Northern District of California's comment that "[t]he securities laws do not . . . require that companies who report information from imperfect studies include exhaustive disclosures of procedures used, including alternatives that were not utilized and various opinions with respect to the effects of these choices on the interpretation of the outcome data."   *Padnes v. Scios Nova Inc.*, No. C-95-1693-MHP, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996).

that WellPoint was one such insurer or that any of the named Defendants in this lawsuit

acted in such a way.   For the sake of comparison, we note two district court cases in which

data manipulation by Ingenix *was* alleged with the requisite degree of particularity:   *In re*

*WellPoint, Inc. Out-of-Network UCR Rates Litigation*, No. MDL-09-2074-PSG (FFMx),

2011 WL 3555610, (C.D. Cal. Aug. 11, 2011), and *Franco v. Connecticut General Life*

*Insurance Co.*, 818 F. Supp. 2d 792 (D.N.J. 2011).   In the first case, the court observed of

the plaintiffs' second amended complaint that:

> More than just identifying WellPoint Defendants' and other insurers possible
> motivations to use and manipulate the Ingenix database, *Plaintiffs also provide*
> *dates, players, purposes, and effects* [in their complaint].   Plaintiffs generally
> allege a conspiracy to fix [out-of-network services] reimbursements:   "WellPoint
> reached an agreement with the Insurance Conspirators, who are direct competitors,
> including UnitedHealth via its alter ego Ingenix to determine maximum UCRs
> using primarily the Ingenix Database . . . even while knowing that use of the
> database would result in artificially low reimbursements to Subscriber and Provider
> Class members. . . . All of the [participating insurers] provide raw pricing data to
> Ingenix and receive UCR pricing data in return.   Ingenix uses the billing data
> provided by the Insurer Conspirators to create False UCR schedules, and those
> False UCR schedules are used by the Insurer Conspirators to determine how much
> to reimburse their members for [out-of-network services]."

*In re WellPoint, Inc.*, 2011 WL 3555610, at *10 (emphasis added).   In the second case, the

court determined as follows:

> Both the [amended class action complaint] and [another complaint] *go into great*
> *detail about the reasons* they allege the Ingenix database deliberately yielded
> too-low and "False UCRs." . . . The [amended class action complaint] is replete with
> allegations concerning CIGNA's *decision-making role* with regard to the use of
> Ingenix to determine [out-of-network] claims, the submission of allegedly
> insufficient and flawed data to the database, and the very defrauding of its
> subscribers by paying claims *based on an amount* it knew to be less than the
> prevailing fee.

*Franco*, 818 F. Supp. 2d at 820, 827 (emphases added).

Even though the holdings in the preceding cases are not binding upon this court, we find them useful to our resolution of the instant motion.   Plaintiff would have been well-advised to include similar factors in the PSAC—for example, dates, players, amounts, specific descriptions of decisionmaking, and detailed reasons for each assertion of data manipulation—to support her Ingenix Scheme allegations.   Because she did not plead accordingly, we are left wondering whether she intends that we infer scienter from some ill-defined incentive (*e.g.*, to make the Company appear profitable or otherwise in good health, to receive bonuses, or to remain employed at WellPoint).   Reasons of this ilk are "too generic to satisfy *Tellabs*."   *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012); *see also In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 932 (S.D. Ind. 2008); *Lewis v. Straka*, No. 05-C-1008, 2006 WL 2927658, at *6 (E.D. Wis. Oct. 12, 2006); *In re Bally Total Fitness Sec. Litig.*, No. 04-C-3530, 2006 WL 37147080, at *9 (N.D. Ill. July 12, 2006).   The Court therefore finds that Plaintiff has not pled facts sufficient to show that any individual Defendant had the requisite state of mind concerning the alleged Ingenix Scheme.   As a result, we cannot impute this state of mind to the Company as a corporation.   The "new" Ingenix Scheme allegations cannot save the PSAC because they fail to establish the strong inference of scienter mandated by *Tellabs*.   For these reasons, the Ingenix Scheme allegations are immaterial to Plaintiff's claim, and appending them to a new complaint would be futile.

### B.   Materiality and Conflicting Theories

Plaintiff's vague pronouncements regarding the CWs and alleged violations of GAAP and MD&A disclosure rules also lack the materiality required to sustain a private securities fraud claim.   In this particular context, information is material if "a substantial likelihood that a reasonable shareholder would consider it important" exists.   *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989).   The concept of materiality is fluid, but for the most part, "[r]easonable investors do not want to know everything that could go wrong," and corporations "must winnow things to produce manageable, informative filings."   *Wielgos*, 892 F.2d at 517.

In the PSAC, Plaintiff refers the Court to SEC Staff Accounting Bulletin Number 99 for guidance on the concept of materiality in securities fraud litigation.   PSAC ¶¶ 165. The SEC stated in this dispatch that a matter is "material" if it is substantially likely that a reasonable person would deem it important.   The bulletin also instructs persons assessing materiality to consider all facts in the context of surrounding circumstances, or, in the words of the Supreme Court, the "total mix" of information.   *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988).   The Supreme Court has taken great care not to set a low standard for materiality out of concern that a minimal standard might "lead management 'simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking.'"   *Id.* at 231 (quoting *TSC Indus., Inc.*, 426 U.S. at 448-49).   In *Basic*, the Supreme Court also clarified that there is no bright-line rule for

materiality in the securities milieu and "reject[ed] the proposition that information becomes material by virtue of a public statement denying it." *Basic, Inc.*, 485 U.S. at 249.

Here, Plaintiff argues that information regarding both the alleged Ingenix Scheme and the Company's failure to meet earlier expectations ought to have been included in WellPoint's financial statements or, in the alternative, corrected by the Company.   This was precisely the purpose of WellPoint's March 10, 2008 press release and the March 10 Call, during which Braly stated, "[C]learly, we missed trend. . . . [I]n December, we did make adjustments in our completion factors, [but] . . . [w]e have now seen January and February and realize our completion factors weren't adjusted enough. . . . We scheduled this call to let you[, the investors,] know what we know as we know it."   Mar. Call Tr. at 7, 13.   In Plaintiff's view, such communication was neither timely nor transparent.   Plaintiff avers that the Company engaged in material misstatements of fact, "present[ing] a misleading picture of WellPoint's business and prospects," by failing to update its financial statements to reflect:   (1) a growing backlog of claims; (2) poor visibility into claims data and actual costs; (3) imperfectly calculated IBNR reserves; and (4) the Cuomo subpoena. To paraphrase Plaintiff's argument, the Company knowingly or recklessly omitted material "known adverse information" even as it knowingly or recklessly failed to understand and assess such information.   This position is illogical, and it certainly does not lay the proper foundation for a lawsuit brought under the PSLRA.

Perhaps Plaintiff is under the impression that publicly traded corporations have an absolute duty to disclose all information bearing possible significance to stock prices as

soon as they receive such news.   If so, she is mistaken.   "We do not have a system of continuous disclosure.   Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."   *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808-09 (7th Cir. 2001) (citing *Basic, Inc.*, 485 U.S. at 239 n.17).   Certainly managers are not entitled to tell outright lies, but they may investigate "for a reasonable time, until they have a full story to reveal."   *Higginbotham*, 495 F.3d at 761.   Facing a similar situation in *Zimmer*, 673 F. Supp. 2d at 738, we ruled that it was "difficult to see how [the company's] decision to investigate quality systems problems further before fully disclosing them . . . was improper, never mind actionable."

Hearkening back to *Zimmer* seems particularly apposite because, as in that case, much about this lawsuit is "difficult to see."   One of the most bewildering characteristics of the PSAC is that its new allegations—ostensibly included to establish material misstatements of fact with the requisite scienter—actually contradict Plaintiff's other core argument.   In the FAC, Plaintiff asserted that Defendants knew of the Company's inability to calculate claims, establish reserves, and price its products.   *See Wade I*, 740 F. Supp. 2d at 1006.   At the crux of her earlier pleadings, therefore, was the Socratic paradox that Defendants "knew that they did not know" WellPoint's true medical costs.   *See* FAC ¶ 87. Plaintiff's inclusion of these allegations in the PSAC[20] is thus a confusing tactic, given the Ingenix Scheme's premise that Defendants *did* understand WellPoint's true costs and knew that this "flawed" database altered the public perception of these costs.   Juxtaposing these

---

[20]Paragraph 120 of the PSAC and Paragraph 87 of the FAC are identical.

unsupported, vague, and utterly inconsistent theories does not remedy the defects in

Plaintiff's prior pleadings.   As we have warned Plaintiff before, "without more,"[21] we

simply cannot entertain the PSAC in its present form.

Moreover, Plaintiff's list of "indicators" that Defendants surely hid material

information calls to mind *DiLeo*, 901 F.2d at 627, where the Seventh Circuit characterized

a similar securities narrative in the following manner:   "The story in this complaint is

familiar in securities litigation.   At one time the firm bathes itself in a favorable light.

Later the firm discloses that things are less rosy.   The plaintiff contends that the difference

must be attributable to fraud."   Paragraph 137 posits, *inter alia*, that "accounting

gimmicks" were behind changes to the Company's financial condition throughout the

Class Period and that "the Company's involvement in a fraudulent insurance billing

scheme is evidence that it was [D]efendant[s'] intent to understate . . . financial metrics

during the Class Period."   Pleading involvement in an allegedly fraudulent scheme as

evidence of *elements* of fraud is circular and off point.   Essentially, Plaintiff has pled

disclosures made in later financial statements, called them material, and alleged that the

Company should have made these disclosures earlier.   The barebones facts supporting this

---

[21]By "more," we mean specific facts concerning Defendants' actual data handling.   To that end, we also briefly address Plaintiff's chart in Paragraph 168, which she includes to show that "the material understatement of WellPoint's benefit expenses and other financial metrics during the Class Period are evidenced by the drop-off in WellPoint's results reported immediately after the Class Period."   PSAC ¶ 168.   These results, perhaps indicated to provide "more," are dated March 31, 2008 and June 30, 2008.   As detailed above, the Putative Class Period ended March 10, 2008, which renders irrelevant all Company events from March 11 through June 30, 2008 "post-class period events" in that they bear no relevance to Defendants' knowledge at the time of the alleged misstatements and omissions.   *See Wade I*, 740 F. Supp. 2d at 1011.

allegation make the PSAC a prime example of pleading "fraud by hindsight," *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978), which is unacceptable.   *DiLeo*, 901 F.2d at 628.

## C.  Loss Causation

Another essential element of a private securities claim is loss causation.   To satisfy this requirement, the plaintiff must establish that the defendant's conduct caused her claimed economic loss.   *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011).   Proving loss causation entails "show[ing] that a representation that affected the integrity of the market price *also* caused a subsequent economic loss."   *Id.* at 2186; *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 959 (N.D. Ill. 2011).   In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005), the Supreme Court held that a complaint missing an allegation "that [the company]'s share price fell significantly after the truth became known" had not properly pled loss causation.   The *Dura* case also illustrates the theory upon which Plaintiff relies to prove loss causation:   the "fraud-on-the-market" doctrine.   *See Dura*, 544 U.S. at 341.   Under this doctrine, a private securities plaintiff must show (1) that the defendant's alleged misrepresentations artificially inflated its stock price, and (2) that the stock's value deteriorated "once the market learned of the deception."   *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).

It is well settled that securities laws neither guarantee sound business practices nor protect investors against a capricious market.   *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473-74 (1977).   "Awards on account of business failure, even the expenses of

litigation on the subject, would discourage firms from taking risk in the first place.   This

would make investors as a whole worse off."   *DiLeo*, 901 F.2d at 627 (citing *Blue Chip*

*Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975)).   Along these lines, the Supreme

Court has noted that investors traditionally contemplate future sales when purchasing

shares of stock and that "an inflated purchase price will not itself constitute *or proximately*

*cause* the relevant economic loss."   *Dura*, 544 U.S. at 342.   The *Dura* Court instructed

that, "[g]iven the tangle of factors affecting price," the probability of intervening causes for

any one shift is substantial.   *See id.*   But the Court went even further in its explanation,

stating that:

> If [a] purchaser [of stock] sells later after the truth makes its way into the
> marketplace, an initially inflated purchase price *might* mean a later loss.   But that is
> far from inevitably so.   When the purchaser subsequently resells such shares, even
> at a lower price, that lower price may reflect, not the earlier misrepresentation, but
> changed economic circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions, or other events, which taken
> separately or together account for some or all of that lower price. . . . Other things
> being equal, the longer the time between purchase and sale, the more likely that this
> is so, *i.e.,* the more likely that other factors caused the loss.
>
> [H]igher purchase price may prove to be a necessary condition of any such loss, and
> in that sense one might say that the inflated purchase price suggests that the
> misrepresentation (using language the Ninth Circuit used) "touches upon" a later
> economic loss.   But, even if that is so, it is insufficient.   To "touch upon" a loss is
> not *cause* a loss, and it is the latter that the law requires.

*Id.* at 342-43 (citing 15 U.S.C. § 78u-4(b)(4)).   Last year, in *Erica P. John Fund, Inc.*, 131

S. Ct. at 2186, the Supreme Court recited the intervening factors discussed in *Dura* and

then elaborated, "If one of those factors were responsible for the loss or part of it, a plaintiff

would not be able to prove loss causation to that extent . . . even if the investor purchased

the stock at a distorted price, and thereby presumptively relied on the misrepresentation reflected in that price."   *Id.*

Facts alleged by Plaintiff in all versions of her complaint patently demonstrate that multiple reasons underlie her claimed loss.   Many of them were external conditions, *e.g.*, the languishing economic environment in 2007-08, changing regulatory requirements, and widespread premium reductions in California.   PSAC ¶¶ 30, 101; Mar. 10 Call Tr. at 2, 4. Even so, Plaintiff attempts to deflect her own allegations through her assertion that, in the March 10 Call, DeVeydt "admitted that '*[w]e need to fix our trend problem and price our product better*,' and that this problem was '*more of a systemic problem*' specific to WellPoint, and not 'an industry-wide trend problem.'"   PSAC ¶ 102.   This is not entirely accurate.   In fact, the March 10 Call transcript reveals that DeVeydt said, "[S]ome of this is just us missing the prediction on trend for '08 in our pricing, but there is a fair amount of this that we can fix, including that piece.   So *I don't want this to be viewed as* an industry-wide trend problem."   Mar. Call Tr. at 6 (emphasis added).   DeVeydt's desires regarding perception of the Company's problems are easily distinguishable from the Company's actual problems.   Regardless, even if these trends were firm-specific, *Dura* contemplates their role in causing economic loss.   Thus, having discussed a litany of Company woes (system integration problems, changing cost trends, and clients' unexpected move to self-funded products, *inter alia*), Plaintiff cannot establish loss causation to the extent necessary to prove that these factors affected her loss.

As in tort law, a securities fraud plaintiff must show that, "but for the circumstances that the fraud concealed, the investment . . . would not have lost its value." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990).   Plaintiff's Ingenix Scheme allegations, which she appears to regard as conclusive evidence of all elements of fraud, do not suffice in making such a showing.   None of the March 2008 guidance issued by WellPoint mentioned Ingenix in any sense.   Further, although Plaintiff believes Cuomo's Ingenix investigation demonstrated fraudulent activity, she does not directly link his February 13, 2008 public announcement thereof to any meaningful dip in stock price.   *See, e.g.*, *In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010) (rejecting a report that "[did] not indicate a statistically significant price change on those dates, as one would expect," in loss causation argument).   That the price of WellPoint shares declined from $75.88 to $74.42 per share between February 12 and February 13, 2008 (and ended up at $70.08 at the end of February, *see* PSAC ¶ 95) does not automatically plead loss causation. If it was Plaintiff's intent to demonstrate loss causation through the Company's financial history, her assertions are undercut by Defendants' rejoinder that the stock price "rebounded to $75.07 on February 15."   Defs.' Resp. at 10.   All told, the PSAC does not provide the compulsory causal link between Plaintiff's Ingenix Scheme allegations and her ultimate economic loss.   To find otherwise would contradict sage Seventh Circuit precedent from *Bastian*, 892 F.2d at 685, to wit:   "No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change

61

in market conditions to pick through offering memoranda in the hope of uncovering a misrepresentation."

### D.   Stock Sales

Finally, Plaintiff has again included allegations regarding Glasscock's propitious stock sales—which she deems "insider sales during the Class Period"—as support of scienter.   Notably, she contends that Glasscock's sale of 6.59% of his stock (including options) during the Putative Class Period was suspicious in timing and amount.   We addressed this argument in our order dismissing the FAC and noted that Plaintiff "[had] allege[d] only that the timing of those sales was suspicious because they occurred after the mid-February managers['] meeting where Braly made a reference to 'rumors' about issues that were going to be announced publicly."   *Wade I*, 740 F. Supp. at 1011.   Finding no allegations about Glasscock's trading history beyond the existence of his Rule 10b5-1 trading plan and the chart in paragraph 98 of the FAC, we determined that his stock sales were neither suspicious nor unusual enough to support a strong inference of scienter.   *Id.*

Although insider trading is permissible circumstantial evidence of scienter, the stock sales at issue "must generally be unusual or suspicious" because "executives sell stock all the time."   *Pugh*, 521 F.3d at 695; *In re Harley-Davidson*, 660 F. Supp. 2d at 1000.   To qualify as "unusual" or "suspicious," the alleged insider trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."   *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003) (citation omitted).   Factors that may assist the district

court in making this determination include "the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history."  *Id.*; *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 659 (8th Cir. 2001) (instructing that "insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved").

Very little differentiates the PSAC from the FAC in terms of allegations about Glasscock's stock sales.  Plaintiff's new allegations focus on Defendants' alleged knowledge after February 13, 2008, to wit:  "[B]y February 13, 2008, [D]efendants knew that the New York Attorney General was investigating Ingenix and a subpoena was issued to a subsidiary of WellPoint."  PSAC ¶ 133.  Plaintiff describes the timing of Glasscock's sales as "suspicious" because he sold 56,000 of his shares "shortly *after* the [February 13, 2008] announcement . . . and [D]efendants' internal disclosure at a [managers'] meeting in mid-February that the Company was having problems . . . but *before making these announcements to the public*."  *Id.*  Defendants rejoin that this hardly constitutes evidence of scienter, and we agree.

In making this determination, we have remained mindful of guiding Seventh Circuit precedent, which counsels in favor of examining patterns and trends.  *Freeman v. Decio*, 584 F.2d 186, 197 (7th Cir. 1978),[22] which is especially germane to the instant allegations

---

[22]Admittedly, *Freeman* is not particularly recent, but we note that its holding is still valid Seventh Circuit case law.

in that respect, instructs that:

> When it is shown that an insider made a sudden sale of a significant portion of his holdings of his corporation's stock and that subsequently, material adverse information became public concerning the corporation which led to a significant drop in the price of the stock, an inference arises that the insider was "bailing out" on the basis of material inside information.   However, this inference can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence.

*Id.*   The analysis in *Elliott v. Commodity Futures Trading Commission*, 202 F.3d 926, 932 (7th Cir. 2000), is also helpful because of its signal that "a pattern marked by characteristics unlikely to occur in an open and competitive market" may indicate impermissible stock trading.   To that end, we note that each stock sale Glasscock made during the Putative Class Period was executed pursuant to a Rule 10b-5 trading plan.   This negates an inference of scienter; "automatic, nondiscretionary sales made pursuant to 10b5-1 plans . . . do not give rise to a strong inference of scienter."   *In re Guidant Corp.*, 536 F. Supp. 2d at 931; *see also Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-cv-5641, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012).   That Glasscock instituted a new Rule 10b-5 trading plan in February 2008 does not, without more, raise a red flag.

Under *Tellabs*, we must consider all potential inferences related to the disputed stock sales before concluding that they establish a strong inference of scienter.   When a plaintiff fails to allege facts that would allow a complete assessment of whether trading during a certain time period was unusual or suspicious, this task becomes difficult.   *See*

*Pugh*, 521 F.3d at 695.   A plaintiff's failure to supply adequate context obviously hampers a court's ability to infer that the applicable time period was somehow unusual.   *See Higginbotham*, 495 F.3d at 759.   By contrast, the holding in *Higginbotham* suggests another inference based on Plaintiff's meager information regarding sales made by Sheila Burke and Kenneth Goulet:   that the relative "absence of sales by other managers who would have been in the know (had news of the [alleged] fraud reached HQ) implies that nothing was thought to be out of the ordinary [during the relevant time period]."   *Id.*   The Seventh Circuit has also made it obvious that "the fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud."   *Zimmer*, 679 F.3d at 956.   With the foregoing in mind, the allegations in the PSAC do not support an inference that Glasscock's sales were so dramatically unusual as to indicate fraudulent intent.   Plaintiff's conclusory allegations do not satisfy her burden to demonstrate such context, *see In re Guidant Corp.*, 536 F. Supp. 2d at 932, and they do not overcome the non-fraud inference that Defendants' conduct was ordinary business activity.   *See, e.g.*, *In re Brightpoint*, 2001 WL 395752, at *13 ("[A] plaintiff cannot allege scienter based merely upon . . . factors that would be true for nearly all corporate executives.").   Thus, as before, her allegations regarding the timing and amount of Glasscock's stock sales cannot save the PSAC, rendering leave to amend useless.

## <u>Conclusion</u>

For all of the reasons discussed in this entry, we conclude that the allegations in Plaintiff's Proposed Second Amended Complaint are redundant, immaterial, and

unresponsive to the instructions issued in our September 2010 order dismissing Plaintiff's First Amended Complaint.   Granting Plaintiff leave to amend as outlined in the current proposed version of the Complaint would therefore be futile.   However much Plaintiff may believe she deserves a third bite of the proverbial apple, she has not satisfied the pleading standards imposed by the federal securities laws and the Federal Rules of Civil Procedure.   Consequently, Plaintiff's Motion for Leave to File a Second Amended Complaint is DENIED.

IT IS SO ORDERED.

Date: _____08/31/2012_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

66

Copies to:

Anne L. Box
ROBBINS GELLER RUDMAN & DOWD LLP
anneb@rgrdlaw.com

David A. Rosenfeld
ROBBINS GELLER RUDMAN & DOWD LLP
drosenfeld@csgrr.com

Deborah Ruth Gross
LAW OFFICE OF BERNARD M. GROSS PC
debbie@bernardmgross.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Mario Alba, Jr.
ROBBINS GELLER RUDMAN & DOWD LLP
malba@rgrdlaw.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Robert Paul Frutkin
LAW OFFICES OF BERNARD M. GROSS
rpf@bernardmgross.com

Sarah Renee Holloway
ROBBINS GELLER RUDMAN & DOWD LLP
sholloway@rgrdlaw.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

X. Jay Alvarez
ROBBINS GELLER RUDMAN & DOWD LLP
jaya@rgrdlaw.com

Christopher G. Scanlon
FAEGRE BAKER DANIELS LLP – Indianapolis
chris.scanlon@faegrebd.com

J. Jorge DeNeve
O'MELVENY & MYERS LLP
jdeneve@omm.com

Lindsay L. Geida
O'MELVENY & MYERS LLP
lgeida@omm.com

Matthew Thomas Albaugh
FAEGRE BAKER DANIELS LLP – Indianapolis
matthew.albaugh@faegrebd.com

Michael M. Maddigan
O'MELVENY & MYERS LLP
mmaddigan@omm.com

Seth Aronson
O'MELVENY & MYERS LLP
saronson@omm.com